# COMMONWEALTH OF VIRGINIA



ARLINGTON CIRCUIT COURT
Civil Division
1425 NORTH COURTHOUSE RD
ARLINGTON  VA
(703) 228-7010

Summons

To: JUSTIN POTTER WILSON JR          Case No. 013CL25001935-00
289 BERWICK DRIVE
HILTON HEAD SC 29926

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Tuesday, May 06, 2025

Clerk of Court: PAUL F. FERGUSON

by _____
(CLERK/DEPUTY CLERK)

Instructions:


Hearing Official:



Attorney's name:

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. __CL25-1935__
(CLERK'S OFFICE USE ONLY)

__ARLINGTON__ ............................. Circuit Court

__ANDREI J KUBLAN, ESQUIRE__    v./In re:    __JUSTIN POTTER WILSON, JR__
PLAINTIFF(S)                                DEFENDANT(S)

I, the undersigned [X] plaintiff [ ] defendant [ ] attorney for [ ] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [X] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

## ADMINISTRATIVE LAW

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS

- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS

- [ ] Amend Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[X] Damages in the amount of $ __1,000,000.00__ are claimed.

__05/01/2025__
DATE

[s] _____ [s] PLAINTIFF    [ ] DEFENDANT    [ ] ATTORNEY FOR    [ ] PLAINTIFF [ ] DEFENDANT

Andrei J. Kublan
PRINT NAME

6521 Arlington Blvd., Suite 201
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Falls Church, VA 22042

andrei@kublankhan.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE 07/16

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE ARLINGTON COUNTY

| | |
|---|---|
| ANDREI J. KUBLAN, ESQ. | * |
| Plaintiff, | * |
| | * |
| v. | * Civil Action No. |
| | * CL25-1935 |
| JUSTIN POTTER WILSON, JR. | * |
| | * |
| Defendant. | * |
| | * |



**SERVE:** **JUSTIN POTTER WILSON, JR.**
**289 Berwick Drive**
**Hilton Head, SC 29926**

## COMPLAINT

COMES NOW, *pro se* Plaintiff, Andrei J. Kublan, Esquire (hereinafter "Plaintiff" or "Mr. Kublan"), and moves for judgment against Defendant JUSTIN POTTER WILSON, JR. (hereinafter "Wilson") on grounds and in the amount set forth below:

1.    Mr. Kublan is an upstanding and honest citizen of the Commonwealth of Virginia and a competent and ethical attorney at law admitted to practice in the Commonwealth of Virginia, who has for many years, as part of his law firm Kublan Khan PLC, practiced his profession in the Courts of the Northern Virginia and has come to enjoy an excellent professional reputation among the members of the Virginia State Bar as well as among members of the community.

2.    Wilson is an individual who until recently resided in the Commonwealth of Virginia, but who currently resides in South Carolina at 289 Berwick Drive, Hilton Head, SC 29926.

3.      The Court has personal jurisdiction over Wilson pursuant to Virginia Code Section 8.01-328.1.

4.      Neither Mr. Kublan nor his law firm of Kublan Khan PLC has ever represented Wilson as a client.

5.      Mr. Kublan had previously represented Wilson's former spouse (hereinafter "Mr. Kublan's client") against Wilson during two child custody modification actions in the Arlington County Circuit Court in connection with the parties' minor child.

6.      Wilson and Mr. Kublan's client were divorced on September 30, 2016 in Virginia where both parties resided at that time. *See* Final Order of Divorce attached hereto as **Exhibit A**.

7.      As a result of the first child custody modification action, on September 9, 2019, the Arlington County Circuit Court significantly curtailed Wilson's prior shared child custody schedule by reducing it to every other weekend visitation and ordering Wilson to pay Mr. Kublan's client $53,413.27 as a reimbursement for Mr. Kublan's attorney's fees. *See* Custody Order attached hereto as **Exhibit B**.

8.      As a result of the second child custody modification action, on March 4, 2022, the Arlington County Circuit Court granted Mr. Kublan's client sole legal and physical custody of the parties' minor child and ordered Wilson to pay Mr. Kublan's client $50,000.00 as a reimbursement for Mr. Kublan's attorney's fees. *See* Child Custody and Visitation Order attached hereto as **Exhibit C**.

10.     On December 11, 2021, during the pendency of the second child custody modification action, Wilson posted a one-star review on Kublan Khan PLC's Google.com page and an identical review on Kublan Khan PLC's Yelp.com page. *See* Yelp.com and Google.com reviews attached hereto as **Exhibit D**.

11.     In particular, on or about December 11, 2021, Wilson, with knowledge of Mr. Kublan's fine reputation as an upstanding member of the community and an ethical and competent attorney at law, did, with actual malice, compose, publish and circulate as "John P." on Kublan Khan PLC's Yahoo.com and Google.com pages, which are generally available to and visible to any members of the Virginia State Bar and the community, a "review" misleadingly titled "Ibrayeva v. Kublan", which directed audience to search for via Google and read the Virginia Court of Appeals published opinion in connection with Mr. Kublan's personal divorce case and contained certain false, scandalous, and defamatory statements concerning Plaintiff and his professional fitness, as follows:

a.      "Kublan has adopted the approach and argumentation reflected in his own divorce proceeding in subsequent client representations."

b.      "Potential clients risk suboptimal outcomes as his approach may result in a negative reputation and/or poor credibility among some judges in Virginia."

*See* **Exhibit D**.

8.      The clear implication of the above-quoted statements in Paragraph 7 is that Mr. Kublan is completely unfit to practice law, lacks necessary integrity in the discharge of his job, and has negative reputation and poor credibility among judges which could negatively affect his clients' cases.

9.      On December 13, 2021, Wilson added an additional comment to his earlier "reviews" titled "UPDATE 12/13/21" where he refers to Mr. Kublan's communication with Wilson's then lawyer John L. Bauserman, Esquire. *See* **Exhibit D**.

10.     Although Wilson subsequently removed his Google.com "review," he kept his Yelp.com "review" posted.

11.    On or about February 27, 2025, after his unsuccessful appeal of the March 4,

2022 custody order, Wilson posted another one-start "review" on Kublan Khan PLC's

Google.com page, which, although similar to his prior "review," now contained some additional

defamatory statements and a section titled as "UPDATE" misleading readers to believe that a

certain action occurred after Wilson posted his "review" on February 27, 2025 necessitating an

update. *See* Google.com review attached hereto as **Exhibit E.**

12.    In particular, on or about February 27, 2025, Wilson, with knowledge of Mr.

Kublan's fine reputation as an upstanding member of the community and an ethical and

competent attorney at law, did, with actual malice, compose, publish and circulate as "Justin

Wilson" on Kublan Khan PLC's Google.com page, which is generally available to and visible to

any members of the Virginia State Bar and the community, a "review" misleadingly titled

"Ibrayeva v. Kublan", which directed audience to search for via Google and read the Virginia

Court of Appeals published opinion in connection with Mr. Kublan's personal divorce case and

contained certain false, scandalous, and defamatory statements concerning Plaintiff and his

professional fitness, as follows:

a.    "Kublan has adopted the approach and argumentation reflected in his own divorce

proceeding in subsequent client representations."

b.    "Potential clients risk suboptimal outcomes as his approach may result in a

negative reputation and/or poor credibility among some judges in Virginia."

c.    "The act Kublan threatens, in my view, represents egregiously poor legal ethics

and a willingness to abuse the court system."

d.    "An electronic search of Fairfax circuit court records indicate Kublan has initiated

unsuccessful defamation suits."

e.   "This practice in my view lends further credibility an assertion echoed among others on this page that Kublan's threats have coerced the removal of negative reviews."

*See* **Exhibit E.**

13.   The clear implication of the above-quoted statements in Paragraph 12 is that Mr. Kublan is completely unfit to practice law, lacks necessary integrity in the discharge of his job, has negative reputation and poor credibility among judges which could negatively affect his clients' cases, and only has positive reviews about him due to his coercive and bullying tactics against his clients forcing them to remove negative reviews.

14.   At the time said statements were published, no action, disciplinary or otherwise, had been taken against Mr. Kublan by the district committee of the Virginia State Bar or any other body, nor had any recommendations been made that such action should be considered. There was no judicial or quasi-judicial record upon which the above-quoted statements could be based.

15.   At the time said statements were published, Mr. Kublan has not initiated any unsuccessful defamation suits anywhere, including in the Fairfax County Circuit Court.

16.   The above-quoted statements were published by Wilson with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. It was willfully designed by Wilson to discredit Mr. Kublan in his profession, and as such was malicious and per se slanderous and libelous. Statements such as those contained in the above-quoted material are, from their usual construction and common usage, construed as insults.

17.   As a proximate result of the aforementioned false, malicious, defamatory, slanderous, libelous and insulting statements, published with actual malice by Wilson, Mr. Kublan has been caused to suffer great mortification, humiliation, shame, vilification, exposure

to public infamy, scandal and disgrace, injury to his good reputation, harm in the conduct of his business affairs, and financial loss, and has been and will forever be hampered in the practice of his profession, all in that Mr. Kublan has been falsely imputed to have conducted himself in an unethical and unprofessional manner. Much of this injury will endure permanently.

### JURY DEMANDED

18.    A trial by jury is demanded.

WHEREFORE, Plaintiff, Andrei J. Kublan, Esquire, demands judgment against Defendant, Justin Potter Wilson, Jr., awarding Plaintiff his compensatory damages in an amount of One Million Dollars ($1,000,000.00), plus interest; punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00); preliminary and permanent injunction ordering Defendant to remove Defendant's defamatory statements and prohibiting Defendant from publishing any additional statements; Plaintiff's costs expended in this action; and such other relief as the Court deems appropriate.

Respectfully submitted,

Andrei J. Kublan (VSB No. 73120)
6521 Arlington Blvd, Suite 201
Falls Church, VA 22042
Tel: 703-854-1081
Fax: 703-854-1083
Email: andrei@kublankhan.com
*Pro Se Plaintiff*

*Complaint*
*Andrei J. Kublan, Esq. v. Justin Potter Wilson, Jr.*
*Page 6 of 6*



CL16001673-00
DIV
fd

**VIRGINIA:**

## IN THE CIRCUIT COURT OF ARLINGTON COUNTY

JUSTIN POTTER WILSON, JR.,          :

      Plaintiff,          :

                          :

v,          :          CIVIL NO.  16-1673

ANNA NIKOLAEVA WILSON,          :

      Defendant.          :

### FINAL ORDER OF DIVORCE

THIS CAUSE came on to be heard upon the Complaint for Divorce filed by Plaintiff,

JUSTIN POTTER WILSON, JR. ("Husband"), against Defendant, ANNA NIKOLAEVA

WILSON ("Wife"); and the Answer to Complaint for Divorce filed by Wife;

IT APPEARING TO THE COURT that the parties agree to the terms of this Order, as

evidenced by the signatures below and that the terms of this Order resolve all issues arising

out of their marriage.

IT FURTHER APPEARING TO THE COURT, from the evidence duly taken, and

independent of the pleadings or the admissions of either party, that:

1.     The parties hereto were lawfully married to each other on September 30, 2005,

in Arlington, Virginia.

2.     One child was born of this marriage, namely Justin Potter Wilson, III, born

September 1, 2008.  No children were adopted of this marriage, and none are expected.

3.     Husband is and has been an actual bona fide resident and domiciliary of the

Commonwealth of Virginia for at least six months immediately before commencing this case.

4.     Both parties are over the age of 18 years and neither is or has been an active

duty member of the military service of the United States since commencement of this case.

**EXHIBIT A**

5.    Wife's social security number is (See Private Addendum), and Husband's social security number is (See Private Addendum).

6.    Prior to the marriage, the parties entered into a Premarital Agreement dated September 30, 2005. The parties have also entered into a Marital Settlement Agreement, which was signed by Wife and by Husband on May 19, 2016. A copy of the parties' Premarital Agreement is attached hereto as <u>Exhibit 1</u>. The parties' May 19, 2016, Marital Settlement Agreement is attached hereto as <u>Exhibit 2</u>.

7.    The Premarital Agreement and the Marital Settlement Agreement together resolve all issues arising out of their marriage, including the matters of custody, visitation, support, and property division.

8.    The parties have lived separate and apart without any cohabitation and without interruption for one year; to-wit: since at least January 1, 2015.

9.    On or before January 1, 2015, it was Husband's intention that the parties' separation would be a permanent separation, and his intention has continued through the present day.

10.    There is no hope or possibility of reconciliation between the parties.

**IT IS HEREBY**

**ORDERED** and **ADJUDGED** that Plaintiff is granted a divorce, *a vinculo matrimonii* from Defendant on the grounds that the parties have lived separate and apart without any cohabitation and without interruption for twelve months, to wit: since at least January 1, 2015, and have entered into a Marital Settlement Agreement; and it is further

**ORDERED** and **ADJUDGED** that the parties' Premarital Agreement and Marital Settlement Agreement Marital Settlement Agreement are hereby affirmed, ratified and

2

incorporated into this Final Order of Divorce, but not merged, in accordance with the provisions of Virginia Code §20-109.1, and the parties are hereby ordered to comply with all of its terms and conditions. This Order shall not be deemed a modification of the terms of the September 30, 2005, Premarital Agreement or the May 19, 2016, Marital Settlement Agreement; and, it is further

ORDERED and ADJUDGED that the Plaintiff and Defendant shall share joint legal custody of their minor child, Justin, as set forth in Paragraph 19(A) of their May 19, 2016, Marital Settlement Agreement. Plaintiff and Defendant shall share physical custody of Justin as set forth in Paragraph 19(B) of their May 19, 2016, Marital Settlement Agreement; it is further

ORDERED and ADJUDGED that in accordance with the provisions of §§ 20-60.3 and 20-107.1(H) of the 1950 Code of Virginia, as amended, the following information is provided:

### NOTICES and INFORMATION:

1.    Notice is hereby given that support payments may be withheld as they become due pursuant to §20-79.1 or §20-79.2, from income as defined in §63.2-1900, without further amendments of this order or having to file an application for services with the Department of Social Services.

2.    Notice is hereby given that support payments may be withheld pursuant to Chapter 19 (§63.2-1900 *et seq*) of Title 63.2 without further amendments to the order upon application for services with the Department of Social Services.

3.    The name, date of birth and the last four digits of the social security number of the child to whom a duty of support is then owed by the parent as follows:

3

| Name | Date of Birth | Resides With | SSN Last 4 |
|---|---|---|---|
| Justin P. Wilson, III | 9/1/2008 | Mother/Father | 0633 |

4.     The name, date of birth, the social security number of each parent of the child and, unless otherwise ordered, each parent's residential, and if different, mailing address, residential and employer telephone number, driver's license number, and the name and address of his or her employer as follows:

Person responsible for paying child support is Defendant/Husband.

|  | **PLAINTIFF** | **DEFENDANT** |
|---|---|---|
| Name: | Justin Potter Wilson, Jr. | Anna N. Wilson |
| Date of Birth: | 9/20/1976 | 06/09/1976 |
| Social Security No.: | See Private Addendum Last Four Digits 2150 | See Private Addendum Last Four Digits 7883 |
| Driver's License No. and State: | C69603833, Virginia | B66007224, Virginia |
| Residence Address: | 319 North Oxford Street Arlington, Virginia | 888 N. Quincy Street, Unit 810 Arlington, Virginia |
| Residence Phone Number: | 202-492-0433 | 703-992-5626 |
| Mailing Address if different from residence: | Same as above. | Same as above. |
| Employer's Name and Address: | TennisServ. 626 Grant Street, Herndon, Virginia 20170 | Yorktown Systems Group, Inc. FSI/SLS/SPP – Russian Section 1200 Wilson Blvd., Room 736 Arlington, VA 22209 |
| Employer Phone Number: | 703-657-0566 | 703-746-2645 |

If any of above information is not provided because of an exception pursuant to §20-60.3.4, state the exception:  None exist.

4

5.      Notice is hereby given that, pursuant to §20-124.2, support will continue to be paid for any child over the age of 18 who is (i) a full-time high school student, (ii) not self-supporting, and (iii) living in the home of the party seeking or receiving child support until such child reaches the age of 19 or graduates from high school, whichever occurs first, and that the court may also order that support be paid or continue to be paid for any child over the age of 18 who is (a) severely and permanently mentally or physically disabled, and such disability existed prior to the child reaching the age of 18 or the age of 19 if the child met the requirements of clauses (i), (ii), and (iii); (b) unable to live independently and support himself; and (c) residing in the home of the parent seeking or receiving child support.

6.      Notice is hereby given that a petition may be filed for suspension of any license, certificate, registration or other authorization to engage in a profession, trade, business, occupation or recreational activity issued to the obligor by the Commonwealth of Virginia to a parent as provided in §63.2-1937 upon the occurrence of a delinquency for a period of ninety (90) days or more or in an amount of $5,000.00 or more.  Neither party holds such a license.

7.      **SUPPORT**:

A.      SPOUSAL SUPPORT:  As more fully set forth in Paragraph 18 of the parties' May 19, 2016, Marital Settlement Agreement, each party waives spousal support and maintenance from the other, now and in the future.

B.      CHILD SUPPORT:  Commencing July 1, 2016, and on the first day of each month thereafter until further Order of this Court, Husband shall pay to Wife as child support the monthly sum of Two Thousand Dollars ($2,000.00).  The parties' agreement as to support

and expenses for the child is set forth in Paragraphs 20, 21 and 22 of their May 19, 2016,

Marital Settlement Agreement, as follows:

### 20. CHILD SUPPORT.

A. The Parents acknowledge their mutual duty to provide for the support and maintenance of the child. The Parents agree that Father shall pay child support to Mother as follows:

Commencing July 1, 2016, and continuing on the first day of each month thereafter, without demand or deduction, Father shall pay to Mother as child support the sum of TWO THOUSAND DOLLARS ($2,000.00), which sum has been agreed to by the Parties. The Parties have reached this agreement in consultation of the Virginia Child Support Guidelines, but without specific findings as to their respective incomes, and without prejudice at any future determination. The Parties have agreed, as further set forth above, that they shall each be responsible for the costs of the work related child care for Justin for the period that they have custody of Justin in the summer (Father, first half; Mother, second half).

Support shall continue to be made at the rate set forth herein until modified by mutual written agreement of the Parties incorporated into a court order, or as further determined by a court of competent jurisdiction in accordance with then-existing Virginia law. The Parties acknowledge that either party may request a modification to the child support payable between the parties upon a material change of circumstances.

B. The Parties acknowledge that pursuant to the Virginia Code, child support is payable for a child until that child reaches the age of eighteen, dies, marries, or is otherwise emancipated, whichever event first occurs. However, support shall continue past age eighteen if the minor child is (i) a full-time high school student, (ii) not self-supporting, and (iii) living in the home of a parent receiving support, until the child reaches age nineteen or graduates high school, which ever first occurs.

C. For good cause shown, Father shall pay his child support obligation by direct deposit to Mother to such account as she designates.

### 21. PRIVATE SCHOOL EXPENSES.

A. The Parties acknowledge that their son, Justin, is enrolled in and attending Congressional School Schools of Virginia (hereinafter, "Congressional"). The Parties agree that the child will continue to attend Congressional through the Eighth grade, unless they otherwise mutually agree, in writing. Husband agrees to be solely liable for and pay tuition, fees and costs for Justin's attendance at Congressional. Husband's agreement to pay for Congressional shall be without prejudice; nothing in this provision shall serve to require Husband to pay for any other private school, or any private school tuition after the Eighth grade.

### 22. COLLEGE EXPENSES.

A. Husband shall be responsible for the college costs for Justin, as set forth herein. For purposes of this Agreement, the term "college costs" includes, but is not limited to, tuition and other required enrollment or matriculation fees and charges; all

necessary attendant fees and expenses, whether charges for attendance in general or by virtue of enrollment in a special course or program; and room and board on campus. However, the Parties agree that Husband's liability for college costs shall be capped at then-current in-state levels for tuition, fees, room and board at the University of Virginia. Husband's responsibility for the costs and expenses set forth above shall be reduced/adjusted to take into account any gifts or payments by Husband's family or any trusts or investments established by Husband and/or his family, scholarships, grants, loans or work study payments received by or on behalf of Justin.

B. College costs shall be paid directly to any college, university, or appropriate third-party associated with the incurred cost as and when such costs are due. However, it is expressly agreed that in the event a child lives with a parent during all or any part of a college academic period in which the child is taking classes, there shall be no reimbursement to that parent for the child's room and board at their residence, unless the Parties otherwise agree.

C. Husband's obligation for payment of Justin's college costs shall terminate upon Justin attaining the age of 22.

D. For purposes of enforcement of this Agreement, Justin shall not be considered a third party beneficiary.

## 8.    HEALTH CARE COVERAGE & UNREIMBURSED MEDICAL EXPENSES:

A. NOTICE INFORMATION: This Order contains a provision for health care coverage, including the health insurance policy information, for dependent children pursuant to §§20-108.1 and 108.2, if available at reasonable cost. And this Order contains a statement as to whether health care coverage is provided for a spouse or former spouse. The health insurance carrier providing coverage applicable to this Order is: Blue Choice HAS Bronze, Group ID 99#1. The coverage is provided as a benefit of Plaintiff/Husband's employment. This Order further contains a statement whether any unreimbursed medical expenses are to be paid by or reimbursed to a party pursuant to Subsections D and G of §20-108.2, and if such expenses are ordered, then the provisions governing how such payment is to be made.

B. FOR CHILD: As more fully set forth in Paragraph 23A of the parties' May 19, 2016, Marital Settlement Agreement, medical coverage for Justin shall be provided by Plaintiff/Husband as a benefit of his employment. Unreimbursed medical expenses incurred

7

by a party are to be reimbursed to that party within 30 days of receipt of documentation by the other party that such expenses have been incurred and paid, as more fully set forth below. The parties' Agreement with respect to health care coverage and unreimbursed expenses is set forth at Paragraph 23(A), (B), (C), (D), (E), and (F) of their Marital Settlement Agreement as follows:

A. Husband shall continue to maintain medical insurance for Wife until such time as a Final Order of Divorce is entered between them.

B. Husband shall continue to maintain medical insurance for the child for so long as he is eligible to be covered.

C. Commencing June 1, 2017, the Parties shall divide equally (50/50) any unreimbursed medical expenses for the child. Medical expenses shall include, but not be limited to, prescription medication, doctor-recommended vitamins and supplements, prosthetics, orthodontics, and mental health or developmental disabilities services including without limitation services provided by a social worker, psychologist, psychiatrist, counselor, or therapist. Husband shall be solely (100%) responsible for any unreimbursed medical expenses for the child prior to June 1, 2017.

D. Commencing June 1, 2016, Husband shall be solely (100%) responsible for any reasonable and necessary unreimbursed dental or vision expense for the child.

E. In the event that Wife pays for such an unreimbursed medical, dental or vision expense, she shall provide Husband with documentation evidencing that such expense was incurred, and Husband shall then provide within Thirty (30) days of receipt of that documentation, his reimbursement of such expense to Wife.

F. The Parties' obligation under Paragraph 23C, 23D and 23E shall continue for the child for so long as there is an obligation of child support.

C. FOR SPOUSE OR FORMER SPOUSE: There is no obligation to provide health coverage for a spouse or former spouse upon entry of this Final Order of Divorce.

9.      **ARREARAGES:** There are no support arrearages as of July 1, 2016; and it is further

**ORDERED and ADJUDGED** as follows:

10.      If at any time child support payments are ordered to be paid through the Department of Social Services or directly to a party, and unless the Court for good cause shown orders otherwise, the parties shall give each other and the Court, and, when payments

8

are to be made through the Department, the Department of Social Services at least thirty (30) days' written notice, in advance, of any change of address and any change of telephone number within thirty (30) days after the change. Further, because support payments are to be paid directly to Wife, the parties shall give each other and this Court, at least 30 days advance written notice of any change in address and any change in telephone number within 30 days after the change.

11.    If at any time child support payments are ordered to be paid through the Department of Social Services, the party with the support obligation shall keep the Department of Social Services informed of the name, address and telephone number of his current employer, or if at any time payments are ordered to be paid directly to the party receiving support, the payor party shall keep the Court informed of the name, address and telephone number of his current employer;

12.    If child support payments are ordered to be paid through the Department of Social Services or directly to the obligee, and unless the court for good cause shown orders otherwise, the parties shall give each other and the court and, when payments are to be made through the Department, the Department of Social Services at least 30 days' written notice, in advance, of any change of address and any change of telephone number within 30 days after the change.

13.    The separate amounts due to each person under this Order for child and/or spousal support, are set forth in this Order;

14.    Notice is hereby given that in determination of a support obligation, the support obligation as it becomes due and unpaid creates a judgment by operation of law. Pursuant to Virginia Code Section 20-78.2, interest shall accrue on the arrearage at the

9

judgment rate as established by Virginia Code Section 6.2-302 unless the obligee, in a writing submitted to the court, waives the collection of interest.

15.    Notice is hereby given that on and after July 1, 1994, the Department of Social Services may, pursuant to Chapter 19 of Title 63.2 of the 1950 Code of Virginia, as amended, and in accordance with Section 20-108.2 and Section 63.2-1921 of the 1950 Code of Virginia, as amended, initiate a review of the amount of support ordered by any Court.

16.    If any arrearages for child support, including interest or fees, exist at the time the youngest child included in the order emancipates, payments shall continue in the total amount due (current support plus amount applied toward arrearages) at the time of emancipation until all arrearages are paid.

17.    Notice is hereby given that, in cases enforced by the Department of Social Services, the Department of Motor Vehicles may suspend or refuse to renew the driver's license of any person upon receipt of notice from the Department of Social Services that the person (i) is delinquent in the payment of child support by 90 days or in an amount of $5,000 or more or (ii) has failed to comply with a subpoena, summons, or warrant relating to paternity or child support proceedings; and, it is further

ORDERED and ADJUDGED that this Court shall retain jurisdiction to enter any orders necessary to enforce, modify, or carry out any orders of this Court pursuant to §20-107.3K, 1950 Code of Virginia, as amended, to ensure that the provisions of the parties' Agreement, are carried out; and, it is further

ORDERED and ADJUDGED that pursuant to § 20-124.5, Code of Virginia, as amended, the parties shall provide each other and the Court with thirty (30) days advance written notice of their intent to relocate and their intended change of address; and, it is further

10

ORDERED and ADJUDGED that in accordance with the provisions of §20-111.1 of the 1950 Code of Virginia, as amended, the following information is provided:

Beneficiary designations for any death benefit, as defined in subsection B of § 20-111.1 of the Code of Virginia, made payable to a former spouse may not be revoked by operation of law upon the entry of a final decree of annulment or divorce. If a party intends to revoke any beneficiary designation made payable to a former spouse following the annulment or divorce, the party is responsible for following any and all instructions to change such beneficiary designation given by the provider of the death benefit. Otherwise, existing beneficiary designations may remain in full force and effect after the entry of a final decree of annulment or divorce.

ENTERED this 20th day of September, 2016.

_____
JUDGE

SEEN & AGREED:

POWELL PIPER RADOMKSY, PLLC

By: _____
SARAH ANN PIPER (VSB No. 47290
Counsel for Plaintiff/Husband
11350 Random Hills Road, Suite 420
Fairfax, Virginia 22030
Telephone: (703) 665-3688
Facsimile: (703) 865-6188
spiper@pprfamilylaw.com

By: _____
VERONIKA METONIDZE (VSB No. 74146)
Counsel for Defendant/Wife
6807 Woodland Drive
Falls Church, Virginia 22046
Telephone: (571) 241-5987
Facsimile: (703) 997-0863
veronika.met@gmail.com

12

CL 16001673-01

FILED by Arlington County Circuit Court
09/09/2019



VIRGINIA:

IN THE CIRCUIT COURT OF ARLINGTON COUNTY

JUSTIN POTTER WILSON, JR.,

    Plaintiff,

v.

ANNA VLADIMIROVNA WILSON,
(f/k/a Anna Nikolaeva Wilson)

    Defendant.

Case No. CL 16-1673-01

## CUSTODY ORDER

THIS CAUSE CAME before the Court on August 19-21, 2019 for a full evidentiary hearing upon Defendant's Verified Emergency Motion to Modify Child Custody and Visitation and Plaintiff's Motion to Modify Custody & Visitation of the minor child, Justin Potter Wilson III (hereinafter the "Child"), age 10, born September 1, 2008; and

IT APPEARING TO THE COURT that after carefully considering each of the factors in Virginia Code Section 20-124.3, affording each the appropriate weight, given the record in this case, the testimony presented, including the demeanor and credibility of the respective witnesses which the Court heard and observed over a period of three (3) days of testimony, and the exhibits introduced into evidence; that, for the reasons set forth in the Court's ruling on August 23, 2019, a copy of which is attached hereto and made a part of this Custody Order below,

IN CONSIDERATION WHEREOF, it is hereby ORDERED AND ADJUDGED:

(1)    <u>Transcript</u>.  The transcript of this court's ruling of August 23, 2019 is attached hereto and incorporated by reference into this order.

*Custody Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 1 of 6*

EXHIBIT B

(2)    Defendant's ("Mother's") Verified Emergency Motion to Modify Child Custody and Visitation is granted. Plaintiff's ("Father's") Motion to Modify Custody & Visitation is denied. The Court find that it is Father's conduct, not Mother's conduct, that brings this matter before the Court. The Court further finds that the custody and visitation schedule set forth in the parties' May 19, ~~2019~~ 2016 Marital Settlement Agreement shall be modified as follows.

(3)    <u>Legal Custody</u>. Defendant ("Mother") and Plaintiff ("Father") shall continue to share joint legal custody of the Child. In the event that the parties cannot reach agreement, then Mother shall have final authority to make decisions on behalf of the Child.

(4)    <u>Physical Custody</u>.    Commencing August 26, 2019, Mother shall have primary physical custody of the Child.

(5)    <u>Visitation</u>.    Commencing August 26, 2019, Father shall have visitation with the Child every other weekend beginning after school on Friday (or 4:00 p.m. if there is no school) until Monday night at 7:00 p.m. Father's alternating weekends shall begin on Friday, September 6, 2019.

(6)    <u>Summer Visitation</u>. The parties shall have additional custodial time with Justin during his summer vacation from school as follows:

A.    Father shall have two (2) uninterrupted weeks with the Child during the month of June. That fourteen (14) day period shall commence on a Sunday at 10:00 a.m. and end on a Sunday at 7:00 p.m. Father shall also have one uninterrupted week in each of the months of July and August from 10:00 a.m. Sunday until 7:00 p.m. the following Sunday. Mother shall not contact the Child during this time or schedule any activities for him.

B.    Mother shall have two (2) uninterrupted weeks with the Child during the Child's summer vacation from school, which can be either in July or August. That fourteen (14) day period shall commence on a Sunday at 10:00 a.m. and end on a Sunday at 7:00 p.m. Father shall not contact the Child during this time or schedule any activities for him.

*Custody Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 2 of 6*

C.    The parties shall provide a written notice to each other, electronic mail being

sufficient, of the dates of their respective weeks with the Child on or before ~~April 15~~ May 1 each year.

To the ~~extend~~ extent these dates conflict with each other, Mother's dates shall have priority in 2020 and

all even-numbered years thereafter and Father's dates shall have priority in 2021 and all odd-

numbered years thereafter. Neither party shall schedule his/her summer custodial time during the other parents holiday/birthday.

(7)    Parents' Birthdays. The Child shall spend parents' birthdays with the respective

parent. The parent celebrating the birthday can pick the Child up the night before at 7:00 p.m. and

return the child to school the morning after the birthday. If the morning after the birthday falls on

a weekend, the Child shall be returned no later than 10:00 a.m., unless it is that parent's custodial

weekend.    Neither parent shall call the Child while the Child celebrating the other parent's

birthday.

(8)    Child's Birthday. Commencing 2019 and every odd-year thereafter, the Child shall

spend his birthday with Father. Commencing 2020 and every even-year thereafter, the Child shall

spend his birthday with Mother. The parent celebrating the Child's birthday can pick the Child up

the night before at 7:00 p.m. and return the child to school the morning after the Child's birthday.

If the morning after the Child's birthday falls on a weekend, the Child shall be returned no later

than 10:00 a.m., unless it is that parent's custodial weekend. The parent who is not with the Child

on his birthday may call the Child at a time to be agreed upon by the parties.

(9)    Holidays, Spring Break, and Winter Break. Except as modified herein, the parties

shall continue to share custody of the Child on holidays, spring break and winter break as set forth

in their May 19, ~~2019~~ 2016 Marital Settlement Agreement.

(10)    Telephone Calls.

A.    Father shall not call the Child during Mother's custodial time except Father may

call the Child between the hours of 8:00 p.m. and 8:30 p.m. every Tuesday, Wednesday, and

Thursday evening when the child is in Mother's custody. Father's calls to the Child shall be limited

to half an hour. Mother will ensure that the Child is available to speak with Father during this

time. Mother shall not call the child during Father's regular weekend custodial time except as provided in this Order.

Custody Order
Wilson v. Wilson
Case No. 16-1673-01
Page 3 of 6

Neither parent shall hang up on the non-custodial parent during that parents call with the Child, unless profanity is used in the call with the child.

B.      Each parent will be permitted one half-hour call with the Child on the following holidays: New Year's Day, Thanksgiving, and Christmas Day.

C.      The parents shall not call the Child on any other holiday when the Child is with the custodial parent and will be permitted one (1) call with the Child during spring and one (1) call with the Child during winter break during the other parent's custodial time.

D.      All telephone calls with the Child may be recorded at the option of the custodial parent without warning, and such recording will be deemed consensual on the part of the recorded party.

(11)    Camps and Extracurricular Activities.  Neither parent shall schedule any camps or other activities for the Child during other parent's custodial time.  Mother will advise Adam J. Sowa, Ph.D. or any other licensed therapist treating the Child at that time regarding any camp Mother intends to register the Child in during the summer prior to registration and that therapist will advise Mother if the Child expresses any concerns with any camps proposed.  Mother will forward via electronic mail to Father invitations to birthday parties or other events that occur during Father's custodial time and Father shall have sole authority to decide whether the Child will attend.

(12)    Tennis Lessons.  The Child may attend one (1) tennis lesson with Michael Retta ("Mr. Retta") each week during Mother's custodial time.  Said lesson shall be scheduled directly between Mother and Mr. Retta.  Mother will bring the Child to and from the lesson.  Father shall arrange for payment to Mr. Retta in accordance with any financial Father and Mr. Retta reach.

(13)    Travel.  Each parent will give the other parent 24-hour notice, electronic mail being sufficient, of his/her intention to take the Child on a trip outside of the D.C. Metropolitan area, providing the time and dates of travel, destinations and persons traveling with the parent and the Child.  Unless the travel dates include New Year's Day, Thanksgiving, or Christmas Day, the non-custodial parent shall not call the Child during the travel dates. *with a therapist of his choice*

(14)    Therapy.  Father shall continue his current therapy *√*and shall also complete anger management therapy within six (6) months of the date of this Order.  Father shall also engage in *Sm (JM* family counseling with the Child and coordinate the counseling with Adam J. Sowa, Ph.D. or any

*Custody Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 4 of 6*

other licensed therapist treating the Child at that time. Mother shall engage in family counseling with the Child and coordinate the counseling with Adam J. Sowa, Ph.D. or any other licensed therapist treating the Child at that time.

(15)   Neither parent shall make derogatory or disparaging comments about the other parent or the activities that parent has arranged for the Child. Neither parent shall use profanity in conversations with the Child or with the other parent.

(16)   Attorney's Fees. The Court finds that the award of attorney's fees to Mother is supported by the record. Father shall pay the sum of ~~Sixty-Four~~ *Fifty Three* Thousand Four Hundred ~~Eleven~~ *thirteen* and ~~52~~/100 Dollars (~~$64,411.52~~) *$53,413.27* to Mother as and for reimbursement of her attorney's fees ~~within thirty (30) days of the date of this Order.~~ This amount shall be paid based on the following schedule: a) #17,804.42 is due and payable on or before *November 6, 2019;*

(17)   30 Day Notice. Pursuant to Section 20-124.5 of the Code of Virginia, 1950, as amended, thirty (30) days advance written notice must be given to the Court and the other party by any party intending to relocate and of any intended change of address. Such notice shall provide the Court and the other party of the intended date of change of address, the specific street, route address, city or county, state and zip code of the intended new address. Such written notice shall be mailed to the Court at the following address: Clerk of the Court, Circuit Court of Arlington County, 1425 N. Courthouse Road, Arlington, Virginia 22201, and shall certify the date that such information was mailed or otherwise delivered to the other party.

IT IS FURTHER ORDERED that the Clerk of the Court may forthwith issue certified copies of this Order to Counsel of Record.

ENTERED this *4th* day of September, 2019.

_____
Circuit Court Judge

*Custody Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 5 of 6*

b) #17,804.42 is due and payable on or before January 6, 2020; and (c) #17,804.42 is due and payable on or before March 6, 2020.

SEEN: AND OBJECTED TO the Court's finding that the current holiday schedule as set forth in May 19, 2016 Marital Settlement Agreement is appropriate, considering the court's ruling granting primary physical custody to Mother w/ every other weekend to Father.

KUBLAN KHAN PLC

By: _____
ANDREI J. KUBLAN (VSB No. 73120)
Counsel for Defendant/Mother
6521 Arlington Blvd., Suite 201
Falls Church, Virginia 22042
Telephone: (703) 854-1081
Facsimile: (703) 854-1083
Email: andrei@kublankhan.com
*Counsel for Defendant (Mother)*

SEEN: AND OBJECTED TO FOR THE FOLLOWING REASONS: *

HICKS CRANDALL JUHL, PC

By: _____
SARAH ANN PIPER (VSB 47290)
Counsel for Plaintiff/Father
Three Flint Hill
3201 Jermantown Road, Suite 200
Fairfax, Virginia 22030
Telephone: (703) 691-4848
Facsimile: (703) 359-0197
sarah@hcj-law.com
*Counsel for Plaintiff (Father)*

*(1) The Court's finding that Defendant and her witnesses were credible was an abuse of discretion.

(2) The court failed to take into account Plaintiff's efforts and active and involved role in effectuating ADHD behavioral modifications for the child, which evidence was provided by plaintiff, expert Sowa, witness Sova and witness Retta. This was an abuse of discretion, as the court did not properly consider this evidence in respect to 20-124.3(1), 20-124.3(3) and 20-124.3(4).

(3) The court's findings in respect to Defendant's psychological evaluation and the weight given thereto was error and an abuse of discretion in considering 20-124.3(1).

(4) The court's failure to consider Defendant's interference in Plaintiff's calls with the child was an abuse of discretion / failure to consider 20-124.3(6)

*Custody Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 6 of 6*

V I R G I N I A:

      IN THE CIRCUIT COURT OF ARLINGTON COUNTY

JUSTIN POTTER WILSON, JR.,  )

      Plaintiff,      )

v.              )  CASE NO. 16-1673-01

ANNA VLADIMIROVNA WILSON,  )

      Defendant.      )

                      Circuit Courtroom 10C
                      Arlington County Courthouse
                      Arlington, Virginia

                      Friday, August 23, 2019

      The above-entitled matter came on to be heard
before the HONORABLE JUDITH L. WHEAT, Judge, in and for
the Circuit Court of Arlington County, in the Courthouse,
1425 North Courthouse Road, 10th Floor, Arlington,
Virginia, beginning at 4:15 o'clock p.m.

      APPEARANCES:

               On Behalf of the Plaintiff:

                      Sarah A. Piper, Esquire
                      HICKS CRANDALL JUHL, P.C.
                      3201 Jermantown Road
                      Suite 200
                      Fairfax, Virginia  22030

               On Behalf of the Defendant:

                      Andrei J. Kublan, Esquire
                      KUBLAN KHAN, PLC
                      6521 Arlington Boulevard
                      Suite 201
                      Falls Church, Virginia  22042

2

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Good afternoon.

 3            THE COURT REPORTER:  Good afternoon.

 4            THE COURT:  Do I need to swear you again?  Ms.

 5    Court Reporter, should I swear you again?

 6            THE COURT REPORTER:  Oh, yes.

 7            (Whereupon, the court reporter was duly sworn by

 8    the Court.)

 9            THE COURT:  Good afternoon, Counsel, Mr. and

10    Mrs. Wilson.

11            This case comes before the Court on the

12    Defendant's emergency motion to modify custody and the

13    Plaintiff's cross motion to modify custody.

14            Upon consideration of the record in this case,

15    the testimony presented, including the demeanor and

16    credibility of the respective witnesses, review of the

17    exhibits introduced into evidence, and having afforded the

18    weight the Court deems appropriate to each, the Court

19    finds that there is sufficient evidence that there is a

20    material change in circumstances regarding the custody of

21    the parties' minor child, Justin Wilson.

22            Specifically, the Court finds that the father,
```

3

1    Justin Potter Wilson, Jr., has engaged in behavior over a

2    period of months in which he has disparaged the mother,

3    Anna Wilson, in front of Justin, who is 10 years old, used

4    profane and wholly inappropriate language in talking with

5    the child about his mother on numerous occasions, and

6    engaged in an ongoing and continuous course of conduct

7    designed to turn the child against his mother and

8    interfere with Ms. Wilson's custody and visitation rights

9    which the parties mutually agreed would govern the

10   relationship at the time of their divorce.

11         This conduct violates the Marital Separation

12   Agreement between the parties and has caused severe stress

13   and anxiety to the minor child, as attested by the child's

14   therapist, Dr. Sowa.

15         In determining custody and or visitation for a

16   minor child, Virginia Code 20-124.3 requires the Court to

17   consider the following factors.

18         1.   The age and physical and mental condition of

19   the child, giving due consideration to the child's

20   changing developmental needs.

21         Justin is 10 years old.  He will turn 11 next

22   month and entering the fifth grade.  He has been diagnosed

4

1    with attention deficit hyperactivity disorder -- ADHD --

2    and has documented difficulty with impulsive behavior,

3    executive functioning and decision making, including

4    processing information, following instructions, and

5    understanding the consequences of his words, actions and

6    choices.

7              Evidence regarding Justin's diagnosis and

8    functioning was provided by Dr. Sowa, a clinical

9    psychologist and Justin's treating therapist, and Mr.

10   Sere, Director of Lower Education at Commonwealth Academy,

11   Justin's elementary school.

12             It is undisputed that at various times over the

13   past twelve months Justin has presented as depressed,

14   anxious and or stressed, specifically, one, when

15   transitioning between his parents' custodial time; two,

16   prior to and during phone conversations with Mr. Wilson

17   during mother's custodial time; and, three, in the

18   presence of Mother, after returning from Father's

19   custodial time, as evidenced by the testimony of

20   Defendant's witnesses Galina Spivak, Olga Bogatova and

21   Maxim Usubyan, and Plaintiff's witnesses, Michael Retta

22   and Dr. Sowa.

5

1         Justin has been described as otherwise healthy,

2    although small for his age.  He enjoys playing tennis and

3    other sports, is an avid reader, and reads and speaks in

4    both Russian and English.

5         When in the company of one parent or the other,

6    he presents as happy, warm and loving toward that parent.

7    He has been described by numerous witnesses as sociable

8    and having a varied group of friends, including both

9    childhood friends and classmates.

10        Dr. Sowa testified that Justin is making

11   progress in therapy addressing his ADHD.  And Mr. Sere

12   testified that his grades at Commonwealth Academy have

13   been good.

14        The second factor.  The age and physical and

15   mental condition of each parent.

16        Addressing first Ms. Wilson, Ms. Wilson is a 46-

17   year-old female who has been diagnosed with insomnia.  A

18   considerable amount of testimony was presented to the

19   Court regarding Ms. Wilson's prescribed use of Xanax for

20   insomnia during the period 2015 to the present, and its

21   effect on her ability to be an appropriate custodian for

22   Justin.

1          Ms. Wilson's primary physician, Dr. Maria

2    Natividad, who was accepted by the Court as an expert in

3    internal medicine, testified that she has been Ms.

4    Wilson's doctor since June, 2009, and has been treating

5    Ms. Wilson for stress related insomnia since approximately

6    2015 when Ms. Wilson and Mr. Wilson separated.

7          Dr. Natividad originally prescribed .5

8    milligrams of alprazolam, otherwise known as Xanax, for

9    Ms. Wilson which she described as the lowest dose.  Since

10   that time Dr. Natividad has increased Ms. Wilson's

11   prescription to one and a half to two milligrams daily to

12   be taken before bed.

13          Dr. Natividad explained that it is normal over

14   the course of time to increase the dosage of Xanax when

15   used for insomnia, as the patient becomes more accustomed

16   to the drug.  She testified that Ms. Wilson is still on a

17   low dosage of Xanax, given the number of years she has

18   been on the medication.

19          Recognizing the potential for alprazolam to be

20   abused, Dr. Natividad testified that she meets with Ms.

21   Wilson every 3 to 6 months and reviews her use of

22   alprazolam to ensure it is still medically appropriate.

1           She also reviewed Ms. Wilson's prescription

2    report and confirmed that Ms. Wilson's usage was

3    consistent with the medication that had been prescribed.

4           Because of the amount of time that Ms. Wilson

5    has taken the drug, she has twice tried to change Ms.

6    Wilson to a different medication, but neither was found to

7    be effective in addressing Ms. Wilson's medical condition.

8           Dr. Natividad opined to a reasonable degree of

9    medical certainty that Ms. Wilson is not addicted to

10   alprazolam and that her usage of the drug is medically

11   appropriate.

12          Dr. Natividad's testimony was largely

13   corroborated by the testimony of Plaintiff's witness,

14   George Young, a clinical social worker who was accepted by

15   the Court as an expert in the field of substance abuse

16   counseling and testing.

17          Mr. Young is not a medical doctor and has never

18   prescribed alprazolam for any medical condition. He has

19   never met with Ms. Wilson or conducted any substance abuse

20   evaluation of her.

21          He has reviewed the medical records admitted

22   into evidence and Ms. Wilson's deposition testimony, and

1    agreed that Ms. Wilson's use of Xanax appeared consistent

2    with what had been prescribed by Dr. Natividad.  He also

3    agreed that use of one and a half to two miligrams of

4    alprazolam per day would not in itself indicate a

5    dependency on the drug.

6              He opined that as a substance abuse

7    professional, not a medical professional, he had a concern

8    about whether Ms. Wilson had a dependency on the

9    medication, given the length of time Ms. Wilson had used

10   the medication and the amount prescribed, but again

11   acknowledged he had not conducted a personal evaluation of

12   Ms. Wilson and had no medical training -- no formal

13   medical training.

14             He also opined that, given these factors, any

15   decision for her to stop using alprazolam needed to be

16   done gently to avoid potential medical complications.

17   Since he had not personally evaluated Ms. Wilson, he could

18   not render any further opinions regarding the

19   appropriateness of Ms. Wilson's alprazolam use.

20             Mr. Young described a number of possible side

21   effects of alprazolam that he has observed in his clinical

22   practice on the part of individuals who have developed a

9

1    chemical dependency to the drug, including irritability,

2    mood swings and difficulty operating motor vehicles.  He

3    could not opine whether Ms. Wilson experienced any of

4    these side effects from her alprazolam use.

5        Mr. Young also agreed that these side effects

6    would be less of an issue for a person taking the

7    medication before going to sleep, as does Ms. Wilson,

8    since the drug would likely have flushed out of a person's

9    system by morning.

10        Dr. Natividad testified that she had not

11    observed any adverse indications from Ms. Wilson's use of

12    the drug.  And Ms. Wilson's fact witnesses confirmed that

13    they had never observed any behavior suggesting she was

14    abusing drugs or alcohol.

15        I found the testimony of Ms. Wilson's fact

16    witnesses to be credible.

17        Dr. Samenow, the independant mental health

18    expert appointed by the Court, testified that he was aware

19    that Ms. Wilson had an issue with sleeping and had been

20    prescribed Xanax.  He testified that he was not a medical

21    doctor and, therefore, was not qualified to comment on

22    whether the Xanax dosage medically prescribed for Ms.

1    Wilson was appropriate.

2              He agreed that the use of Xanax, even pursuant

3    to a doctor's prescription, could be a cause of concern if

4    there was evidence that Ms. Wilson was taking the drug in

5    an amount that exceeded what had been prescribed on an

6    ongoing basis.  No such evidence has been tendered to the

7    Court.

8              The Plaintiff introduced photographs from

9    Defendant's Facebook page showing her drinking a glass of

10   wine on her birthday and at a friend's birthday

11   celebration, which was consistent with Ms. Wilson's

12   testimony that she occasionally drinks one or two glasses

13   of wine on social occasions.

14              Dr. Natividad testified that if Ms. Wilson had a

15   glass of wine and took a Xanax at the same time, she would

16   feel extremely drowsy.  There was no evidence presented

17   that Ms. Wilson ever did this.

18              The Court had ample opportunity to observe Dr.

19   Natividad's demeanor while on the witness stand and

20   reviewed a copy of her curriculum vitae, which was entered

21   into evidence.  The Court finds Dr. Natividad's testimony

22   to be credible.

11

1    The Court further finds, based on the totality

2    of the evidence, there is no evidence that Ms. Wilson has

3    a substance abuse problem or that her use of Xanax

4    interferes with any of her ongoing daily activities.

5    Dr. Samenow conducted psychological testing

6    which also contained no indication of any psychopathology

7    on the part of Ms. Wilson.  Dr. Samenow interviewed Ms.

8    Wilson and a number of Ms. Wilson's colleagues, including

9    Galina Spivak and Frederico Delasobera, who both testified

10   at trial and were subject to cross examination by counsel

11   for Mr. Wilson.

12   Dr. Samenow found that Ms. Wilson is reflective

13   and appeared willing to identify and discuss shortcomings.

14   She is generally a cheerful person but not ambitious or

15   competitive.

16   She self-reported difficulty making decisions

17   because she is "full of doubts".  Based on his evaluation,

18   Dr. Samenow found that Ms. Wilson had some general anxiety

19   as well as difficulty sleeping, both situational and

20   stemming from the divorce.

21   His professional opinion, therefore, is that Ms.

22   Wilson has no diagnosable mental disorder.

1           Ms. Wilson appears otherwise healthy and engages

2    in a variety of activities, including hiking, camping,

3    travel, cooking and reading.

4           Mr. Wilson.  Mr. Wilson is a 46-year-old male

5    who self-reports that he has undiagnosed ADHD.  Dr.

6    William Zuckerman, the independent mental health expert

7    appointed by the Court, found the following with respect

8    to Mr. Wilson.

9           "He can be assertive" -- and this is a quote --

10    "He can be assertive, even aggressive at times, not

11    necessarily physical, in his interpersonal relationships,

12    but his social skills are good.  He is able to work

13    collaboratively with others and he is likely in most

14    situations to act in a conventional way.

15           "He can be oppositional at times but he is also

16    likely to be quite perseverant in pursuit of his goals

17    with that pursuit having yielded positive results in the

18    past.

19           "Mr. Wilson is stressed by the current

20    circumstances so that he is likely to be experiencing

21    tension and some helplessness along with a temporary

22    increase in irritability.  However, his coping skills, in

13

1  general, are within the normal range.  He may have some

2  deficits in understanding others, but they are balanced by

3  a level of interest in others and an ability to develop

4  warm and intimate relationships.  Moreover, his thinking

5  is likely to be logical and coherent and his day to day

6  judgments are likely to be within the normal range.

7        "Family issues can create some stress for Mr.

8  Wilson, perhaps due to current and past events, but he is

9  quite child focused with a strong and positive view toward

10  his son and a normal positive embrace of the parental

11  position.

12        "Despite the current stress, there are no long-

13  term predictions of difficulty with anxiety or depression.

14  Diagnostically he would fit the category of having a

15  situational adjustment disorder with anxiety.

16        "He has, according to testing, some compulsive

17  personality features, but he has no diagnosable axis two

18  disorders and no other axis one disorder.  There are no

19  findings that would preclude him from being able to parent

20  effectively," unquote.

21        Dr. Zuckerman's report further notes that when

22  Justin was about -- Justin, the child -- was about 3 or 4,

14

1   Mr. Wilson described that his drinking had become "a

2   problem" and that he was having as many as 5 beers a night

3   for a period of about 4 years.

4          During that time he "remembers having driven a

5   car in situations -- sometimes taking Zhenya" -- another

6   name for Justin -- "to activities wherein he might have

7   been legally considered inebriated. He feels he was

8   somewhat less available to Zhenya during this time."

9          Mr. Wilson testified that he has not had a drop

10  of alcohol in over a thousand days. Mr. Wilson appears to

11  be in good physical health. He is a vegetarian and works

12  out daily.

13          3.   The relationship existing between each

14  parent and Justin, including positive involvement and

15  ability to accurately assess and meet the emotional,

16  intellectual and physical needs of the child.

17          Ms. Wilson.  The weight of the credible evidence

18  shows that Ms. Wilson's relationship with Justin when he

19  is in her presence without interference from Mr. Wilson is

20  warm, loving and caring.

21          Ms. Wilson engages Justin in numerous age

22  appropriate activies, including soccer, swimming, music

1    lessons, reading in both Russian and English, cooking,

2    amusements, cultural activities, outings with friends,

3    hiking, camping, birthday parties, and travel.

4           Family friends who have known Ms. Wilson and

5    Justin since before the divorce testified as to the

6    positive nature of their relationship and the types of

7    activities that they do together.  Justin spends time in

8    the company of his mother and his childhood friends when

9    he is with his mother, as well as at a wide variety of

10   activities.

11          He also plays tennis with one of his coaches,

12   Fred Delasobera, on Sunday mornings, who testified that

13   Justin's relationship with his mother was normal.  Mr.

14   Delasorbera was Justin's primary tennis coach until

15   December 2018, when Mr. Wilson hired a different coach,

16   Michael Retta, for Justin.  Mr. Retta only coaches Justin

17   when he is with his father.

18          Ms. Wilson's mother, Olga Bogatova, spends

19   summers in the United States and provided testimony

20   regarding the nature of Ms. Wilson's relationship with

21   Justin.  She observed that Justin appeared happy when he

22   was in his mother's house, except when he expected his

1    father to call.  She testified that sometimes during these

2    calls, Justin suddenly starts screaming at Ms. Bogatova

3    and Ms. Wilson, saying derogatory things to them.

4            The Court finds significant the fact that after

5    these calls finish Justin apologizes to his mother and

6    grandmother for his behavior, recognizing that the

7    behavior is not appropriate.

8            The credible evidence shows that in the last

9    several years, transitions between Mother and Father's

10   custodial time have been very difficult for Justin.

11           Mr. Retta, Justin's tennis coach, who plays

12   tennis with Justin immediately upon his return to Mr.

13   Wilson on Sunday evenings, and several of Ms. Wilson's

14   friends who routinely spend time with the family on Sunday

15   afternoons, testified that Justin is noticeably anxious in

16   the time before the transition between the two households

17   or lethargic and sad afterwards.

18           Ms. Wilson testified that she generally needs to

19   end activities about an hour before Justin is returned to

20   his father on Sunday.  And she spends this time alone with

21   him sitting with him, talking with him, and hugging him as

22   he prepares to go to his father's home.

17

1             Likewise, Justin has, on at least three

2      occasions before returning to his mother's home,

3      physically resisted leaving his father's company until his

4      father was no longer present.

5             At some point between the summer of 2017 and

6      2018, Justin's attitude towards his mother changed.

7             In an email exchange between Ms. Wilson and Mr.

8      Wilson, which was admitted as Plaintiff's Exhibit 12, Ms.

9      Wilson noted that "Zhenya seems more resentful of me and

10     blames me for everything whenever he gets upset.  It is

11     especially noticeable when he first comes to be with me."

12            In that same email Ms. Wilson stated that she

13     was concerned about Justin's well-being, stating, "He

14     needs reassurance from you" -- Mr. Wilson -- "that it's

15     okay to feel good with both parents.  Since you have a

16     great deal of influence on him and he takes your opinions

17     very personally, he would clearly benefit from you cutting

18     back on criticizing him and his activities with me.  We

19     need to prepare him and ourselves for his pre-teen and

20     teen years and need to help him work on the coping

21     mechanisms and build his confidence."

22            Mr. Wilson acknowledged that he likely did not

1    respond to Ms. Wilson's email.

2          On numerous occasions in the fall and winter of

3    2018 and 2019, Ms. Wilson overheard Mr. Wilson using

4    profane and derogatory language when discussing her in

5    front of Justin.

6          She also heard him belittling the child's

7    activities with her, including swimming, guitar lessons

8    and going to the trampoline park, and telling the child to

9    disobey his mother.

10         During the mother's custodial time in winter

11   2018, she overheard Mr. Wilson instructing Justin to

12   refuse to go on a trip to Disney World with her and

13   instead to leave the house and go to his father's home.

14         Mr. Wilson admitted to Dr. Zuckerman that there

15   were times when "he has expressed his dissatisfaction

16   about Ms. Wilson to Justin," including that she does not,

17   "support his strong interest in tennis."

18         He also told Dr. Zuckerman that Justin knows

19   "that his father disapproves of his mother's behavior and

20   demonstrates dissatisfaction with Ms. Wilson at

21   transition."

22         Mr. Wilson stated unequivocally on direct

1   examination that he has said "reprehensible things about

2   the mother in front of the child."

3           Although he was noticeably less candid on

4   cross-examination, he did not deny the statements

5   attributed to him by Ms. Wilson that he used profanity

6   when describing her to the child, that he told the child

7   to disobey the mother, and that he disparaged the child's

8   activities with the mother, including going to the

9   trampoline park and to Disney World.

10          As to the content of these conversations, after

11  hearing the testimony of both Ms. Wilson and Mr. Wilson,

12  and watching the demeanor of the two in the courtroom, the

13  Court finds Ms. Wilson's testimony to be credible and Mr.

14  Wilson's testimony on cross-examination not credible.

15          The weight of the evidence establishes that

16  since the time of separation, Ms. Wilson has been aware of

17  Justin's need to maintain a relationship with his father

18  and has tried to navigate a coparenting relationship with

19  Mr. Wilson without success.

20          Ms. Wilson is responsive and appropriate in

21  matters involving Justin's school, takes him to medical

22  appointments and counseling, encourages him to play

1   · tennis, even during her custodial·time, and does not

2   interfere with Mr. Wilson's custodial time, going so far·

3   as to find ways for Justin to talk with his father even

4   when the family is on a camping trip, on vacation, at the

5   park and on travel.

6         .Plaintiff presented evidence of two occasions

7   when there did appear to have been a misunderstanding  .

8   regarding transfer dates and times on the part of Ms.

9   Wilson.

10         The Court finds that while Justin is with Ms.

11  Wilson, she provides both structured and unstructured time

12  as well as ongoing and varied physical activity.  She also

13  engages Justin in social and creative activities and

14  intellectual pursuits, including birthday parties, trips

15  to the library, math, chess, reading in Russian and

16  English, cooking, music and theater arts.·

17         Ms. Wilson and her mother both testified that

18  there is a clear routine followed in the home when Justin

19  is present.  While the routine is different than what Mr.

20  Wilson follows, Dr. Sowa testified that Justin can adapt

21  to different routines in different households as long as

22  .the routines within each household are consistently

·21·

1   followed in that household.

2          The Court found this testimony to be credible.

3          Mr. Wilson.  The evidence also shows that when

4   Justin is with Mr. Wilson they appear to have a positive,

5   loving relationship.

6          This evidence was presented by Dr. Sowa, who has

7   seen Mr. Wilson interact with Justin, and Michael Retta,

8   the tennis coach who has spent approximately 8 to 10 hours

9   per week with Justin and Mr. Wilson since December of

10   2018.  Mr. Sere also testified that Mr. Wilson's

11   interactions with Justin at school were all appropriate.

12          Mr. Wilson's interactions with Justin appear to

13   center around tennis and basketball.  Justin plays every

14   day for two to two and a half hours during Mr. Wilson's

15   custodial time.  Mr. Retta testified that he is paid

16   $2,500 per week by Mr. Wilson to provide tennis lessons to

17   Justin and Mr. Wilson who is his largest single client.

18          Justin also plays basketball at the rec center

19   while Mr. Wilson works out nearby.

20          Mr. Wilson admitted that for one season he

21   allowed Justin to watch a Netflix series about a serial

22   killer.

22

1           Mr. Wilson testified that when school is not in

2    session, he and Justin also read and spend free time

3    together doing various activities.

4           Although Mr. Wilson emphasized that he had a

5    strict routine that he followed with Justin, Mr. Retta and

6    Mr. Wilson provided somewhat conflicting testimony

7    regarding that schedule.

8           While it appears that Mr. Wilson does love his

9    son, he admitted that he loathes Ms. Wilson.

10          The Court finds that the weight of the credible

11   evidence established that since at least the summer of

12   2018, Mr. Wilson has engaged in a course of behavior that

13   is negatively interfering with Ms. Wilson's relationship

14   with Justin.

15          The Court finds that this behavior is not

16   consistent with Justin's emotional needs, but instead

17   creates substantial stress for the child by forcing the

18   child to choose between his parents.

19          Mr. Wilson testified that he calls Justin every

20   day and talks for upward of a half an hour during Ms.

21   Wilson's custodial time.

22          During the school year Ms. Wilson has custodial

Verbatim Reporting, LLC
14723 Braddock Road
Centreville, Va 20120
703 932 0654

1    time only three nights per week.   Ms. Wilson's testimony

2    is that the calls at times last an hour or longer and

3    often upset the child so much that he has a hard time

4    falling asleep.

5         Mr. Wilson expects to talk with Justin,

6    regardless of what he is doing.  By his own admission he

7    becomes frustrated and upset if his call is not returned

8    almost immediately after it is made.

9         Various witnesses testified that Ms. Wilson

10   often has to go to great lengths to ensure that Justin is

11   able to communicate with Mr. Wilson when he calls and that

12   the calls are not only stress inducing for Justin, but

13   generate conflict between Justin and Ms. Wilson.  As a

14   result of one such call while Justin was in Florida with

15   his mother, Justin jumped out of a car onto the side of a

16   busy road at night in the dark and ran from his mother,

17   putting himself and others in the car in real danger.

18   Justin can be heard on the video telling his father he has

19   to call him back and subsequently yelling at his mother

20   that she and the others in the car have to wait so he can

21   talk with his father.

22         During the 4-day trip to Florida, Mr. Wilson

24

1    constantly and repeatedly called and emailed Ms. Wilson

2    about talking with Justin, even though there was no

3    obvious need for Mr. Wilson to talk with the child while

4    he was on vacation in Florida.

5           Email communications introduced by Plaintiff's

6    Counsel, as well as testimony by Ms. Wilson, indicate that

7    Mr. Wilson has repeatedly threatened to stop providing

8    things to Justin that are important to him, such as tennis

9    lessons, in order to induce the child to do what Mr.

10   Wilson wants, including refusing to go on planned outings

11   and vacations with Ms. Wilson.

12          On the night prior to the Disney World trip, Mr.

13   Wilson not only attempted to convince the child to refuse

14   to go on the trip, but then physically drove over to the

15   mother's apartment and asked the concierge to go to the

16   apartment to perform a welfare check on the child in what

17   can only be viewed as an attempt to manufacture some

18   reason to keep the child from going on the trip.

19          After observing Mr. Wilson's demeanor on the

20   witness stand for almost 5 hours, the Court finds Mr.

21   Wilson's testimony to be, for the most part, not credible,

22   particularly regarding the events of December 29 through

1    January 2nd.

2         The Court finds that Mr. Wilson is willing to

3    support only those activities that he deems appropriate

4    for Justin -- primarily sporting activities and one on one

5    time with Mr. Wilson -- and actively attempts to undermine

6    those activities that Ms. Wilson deems important.  He also

7    consistently seeks to impose his will on Justin, even when

8    he is with Ms. Wilson, and to create conflict with Ms.

9    Wilson when Mr. Wilson cannot get what he wants.

10         The Court finds these facts significant in

11    determining the best interest of the child.

12         4.  The needs of the child, giving due

13    consideration to other important relationships of the

14    child, including, but not limited to siblings, peers and

15    extended family members.

16         Justin needs and wants the love and affection of

17    both parents, and as a general matter seems content when

18    dealing with either parent without the interference of the

19    other.

20         Justin is a high needs child.  And routine and

21    structure are important to him.  The credible evidence

22    supports that both parents provide structure in their

1  household.   The structure is simply different in the two

2  households.  However, as Dr. Sowa explained, Justin need

3  not have the same routine and structure with both parents.

4  He needs clear rules and routines for each individual

5  household which are consistently applied within that

6  household.

7          Justin appears to have a close relationship with

8  his maternal grandmother who he sees for several months

9  every year, friends he knows through his mother, friends

10  from school, and his tennis coach, Mr. Retta.

11          He apparently also has some friends he plays

12  basketball with at the community center, but there was no

13  evidence that Justin socializes with them outside of that

14  environment.

15          5.   The role each parent has played and will

16  play in the future in the upbringing of the child.

17          Ms. Wilson testified that she has been Justin's

18  primary caretaker his entire life up to this point.   Mr.

19  Wilson testified that he became Justin's primary caretaker

20  when Justin was 4 or 5 when Ms. Wilson returned to work.

21          While it is probable that Mr. Wilson took on

22  additional responsibilities for Justin's care when Ms.

1    Wilson returned to work, by Mr. Wilson's own admission, he

2    was drinking heavily during this time and likely not very

3    available to Justin.

4          Given the toxic relationship between the

5    parents, this Court cannot envision how both parents can

6    continue to play an equal ongoing supportive role in

7    Justin's life in the future.

8          6.   The propensity of each parent to actively

9    support the child's contact and relationship with the

10   other parent, including whether a parent has unreasonably

11   denied the other parent access to or visitation with the

12   child.

13         The Court adopts the facts previously

14   articulated in evaluating this factor.

15         The Court finds that Ms. Wilson has demonstrated

16   an ongoing willingness to support Justin's contact and

17   relationship with his father and has not unreasonably

18   denied Mr. Wilson access or visitation with Justin.

19         The Court finds that Mr. Wilson has actively and

20   somewhat successfully undermined Ms. Wilson's relationship

21   with Justin and has actively interfered with Ms. Wilson's

22   access to and visitation with the child.

1        In addition to the testimony regarding Mr.

2    Wilson actively denigrating the mother's choices for the

3    child, as well as trying to impose Mr. Wilson's needs and

4    wants on Ms. Wilson's custodial time with the child, the

5    Court finds significant Mr. Wilson's statement to Dr.

6    Zuckerman that when Justin complains about issues with his

7    mother, Mr. Wilson agrees with the child, rather than

8    supporting Ms. Wilson.

9        The Court does not find evidence to support Mr.

10   Wilson's contention that Ms. Wilson has repeatedly

11   interfered with his ability to have reasonable contact

12   with his child.

13        . 7.   The relative willingness and demonstrated

14   ability of each parent to maintain a close and continuing

15   relationship with the child and the ability of each parent

16   to cooperate and resolve disputes regarding the matters

17   affecting the child.

18        The Court adopts the facts previously

19   articulated in evaluating this factor.  As already

20   described in substantial detail, the Court finds that Mr.

21   Wilson is neither capable nor willing to cooperate with

22   Ms. Wilson to resolve issues regarding the child.

29

1    The Court notes that although Dr. Sowa has

2    suggested on at least two occasions that the parents

3    consider medication for Justin for his ADHD, and Ms.

4    Wilson has indicated a willingness to discuss this

5    possibility, Mr. Wilson has consistently refused to

6    discuss with Ms. Wilson the possibility of medication for

7    Justin.

8    The Court also notes that when deciding which

9    school to transfer Justin to after the decision was made

10   to remove him from Congressional, although Ms. Wilson was

11   leaning towards a different school, Mr. Wilson

12   unilaterally made the decision to place Justin at

13   Commonwealth Academy then criticized Ms. Wilson for

14   waiting until the final day to sign the paperwork.

15   Finally, the evidence supports a finding that

16   had this Court not entered an order in March 2019 allowing

17   either party to record telephone calls with the child, Mr.

18   Wilson would have continued his abusive and derogatory

19   comments towards the mother in his phone calls with the

20   child.

21   The reasonable preference of the child if the

22   Court deems the child to be of reasonable intelligence,

30

1    understanding, age, and experience to express such a

2    preference.

3         The Court finds that Justin does not possess the

4    requisite age, understanding or experience to express a

5    preference.  Justin is 10 years old, about to turn 11, and

6    will be entering the fifth grade.  As such, he has not yet

7    completed elementary school.

8         He has ADHD and struggles with impulse control

9    which appears to be triggered to extreme degrees after

10   spending time with or during phone conversations with his

11   father.

12        He has difficulty with executive decision

13   making, particularly understanding the consequences of his

14   words, actions and choices.

15        He exhibits continued and ongoing stress when

16   faced with conflict between his parents, and acts out

17   aggressively, particularly towards his mother, when faced

18   with making any choice that is contrary to the expressed

19   wishes of his father.

20        The Court has carefully considered each of the

21   above factors and all of the -- I do not believe there's

22   -- I think the final factor is evidence of prior abuse.

31

1    And I do not find that any evidence was presented of prior

2    abuse, so the Court has also considered that factor.

3            The Court has carefully considered each of the

4    factors in Code Section 20-124.3 affording each the

5    appropriate weight, given the record in this case, the

6    testimony presented, including the demeanor and

7    credibility of the respective witnesses which the Court

8    heard and observed over a period of 3 days of testimony,

9    and has reviewed the exhibits introduced into evidence.

10           The Court finds that the best interests of the

11   child require that the custody and visitation schedule set

12   forth in the Marital Settlement Agreement be modified as

13   follows.

14           One.  The parties will continue to share joint

15   legal custody.  However, in the event the parties cannot

16   reach agreement, Ms. Wilson will have final authority to

17   make decisions on behalf of the child.

18           Two.  Ms. Wilson is granted primary physical

19   custody of Justin.

20           Three.  Mr. Wilson will have visitation with

21   Justin every other weekend beginning after school on

22   Friday until Monday night at 7:00 p.m.

1          Four.  Justin may attend one tennis lesson with

2     Mr. Retta each week during mother's custodial time.  Said

3     lesson will be scheduled directly between Ms. Wilson and

4     Mr. Retta.  And Ms. Wilson will bring the child to and

5     from the lesson.

6          Mr. Wilson will arrange for payment to Mr. Retta

7     in accordance with any financial arrangement they reach.

8          Five.  Neither parent shall make derogatory or

9     disparaging comments about the other parent or the

10    activities that parent has arranged for the child.

11         And neither parent shall use profanity in

12    conversations with the child or with the other parent.

13         Six.  Ms. Wilson will not call or schedule any

14    events for Justin during Father's custodial time.

15         Ms. Wilson will forward via email to Mr. Wilson

16    invitations to birthday parties or other events that occur

17    during Mr. Wilson's custodial time.  And Mr. Wilson will

18    have sole authority to decide whether Justin attends.

19         Seven.  Mr. Wilson will not call Justin during

20    Mother's custodial time except Mr. Wilson may call Justin

21    between 8:00 and 8:30 p.m. every Tuesday, Wednesday and

22    Thursday evening.  And the calls will be limited to half

1   an hour.

2         Ms. Wilson will ensure that Justin is available

3   to speak with his father during this time.  All telephone

.4   calls may be recorded at the option of the custodial

5   parent without warning, and such recording will be deemed

6   consensual on the part of the recorded party.

7         Eight.  Justin will spend parents' birthdays

8   with the respective parent.  The parent celebrating the

9   birthday can pick Justin up the night before at 7:00 p.m.

10   and return the child to school the morning after the

11   birthday.

12         If the morning after falls on a weekend, the

13   child shall be returned no later than 10:00 a.m., unless

14   it is that parent's custodial weekend.

15         Neither parent shall call the child while he is

16   celebrating the other parent's birthday.

17         Justin will spend every other one of his

18   birthdays with his father beginning in 2019.  The

19   visitation schedule will be the same as for either

20   parent's birthday.

21         The parent who is not with Justin on his

22   birthday may call him at a time to be agreed upon by the

1    parties.

2           Holidays, spring break and winter break will

3    remain as set forth in the parties' Marital Separation

4    Agreement.

5           Each parent will be permitted one half-hour call

6    with the child on the following holidays: New Year's Day,

7    Thanksgiving, and Christmas.

8           The parents will not call the child on any other

9    holiday when the child is with the non-custodial parent

10   and will be permitted one call with the child during

11   spring and winter break during the other parent's

12   custodial time.

13          During the summer Mr. Wilson will have two

14   uninterrupted weeks with Justin during the month of June

15   which will begin at 10:00 a.m. Sunday and last until 7:00

16   p.m. the following Sunday.  So two successive Sundays

17   because it's two uninterrupted weeks.

18          Mr. Wilson will have one uninterrupted week in

19   each of the months of July and August which will last from

20   10:00 a.m. Sunday until 7:00 p.m. the following Sunday.

21          Ms. Wilson will not contact Justin during this

22   time or schedule any activities for him.

1          Mr. Wilson will not schedule any camps or other

2   activities for Justin except during his custodial time.

3          Eleven.  Ms. Wilson will advise Dr. Sowa or

4   whoever Justin's current therapist is regarding any camp

5   she intends to register Justin in during the summer prior

6   to registration.  And that therapist will advise her if

7   Justin expresses any concerns with any camp proposed.

8          Twelve.  Each parent will give the other parent

9   24 hours notice of their intention to take the child on a

10  trip outside of the D.C. Metropolitan area, providing the

11  times and dates of travel, destination and persons

12  traveling with parent and child.

13          Unless the travel dates include New Year's Day,

14  Thanksgiving or Christmas, the non-custodial parent will

15  not call the child during the travel dates except on the

16  specified holiday.

17          Thirteen.  Mr. Wilson will continue his current

18  therapy and will also complete anger management therapy.

19  Mr. Wilson will also engage in family counseling with

20  Justin and coordinate the counseling with Dr. Sowa.

21          Fourteen.  Ms. Wilson will engage in family

22  counseling with Justin and will coordinate the counseling

1   with Dr. Sowa.

2        Defendant's emergency motion to modify custody

3   is granted.  Father's motion to modify custody is denied.

4   The Court finds it it Mr. Wilson's conduct, not Ms.

5   Wilson's conduct, that brings this matter before the

6   Court.

7        The Court further finds that the award of

8   attorney's fees to Ms. Wilson is supported by the record.

9        Do the parties have any questions?

10       MR. KUBLAN:  Your Honor, just one clarification

11  about summertime?  I think the Court said two weeks in

12  June, one week in July and one week in August for the

13  father.

14       What about Ms. Wilson --

15       THE COURT:  The rest of the time is Ms.

16  Wilson's.

17       MR. KUBLAN:  But -- you know, but if she wants

18  to take him, let's say two weeks uninterrupted and, you

19  know, we have --

20       THE COURT:  She should be able to do that

21  because he has every other weekend.

22       MR. KUBLAN:  I guess so, yes.  Never mind.

1          THE COURT: I don't think that should be a

2    problem, but if it is, I do intend for her also to be able

3    to have a period of two uninterrupted weeks.  That can be

4    in July or August.

5          MR. KUBLAN:  Can Your Honor put that in the

6    order then?

7          THE COURT:  Certainly.

8          MR. KUBLAN:  Okay.

9          THE COURT:  Any additional questions?

10         MS. PIPER:  As to Mr. Wilson's therapist -- may

11   he choose a therapist?

12         THE COURT:  Certainly.

13         MS. PIPER:  I have questions as to times but I

14   can get that from the court reporter.

15         THE COURT:  Okay.  What I would suggest is if

16   the parties would prepare an order.  And that way you can

17   kind of confer and you can look at the transcript and make

18   sure it's -- it's consistent.

19         We can schedule a date in a couple of weeks to

20   enter the order.  And if there are any questions at that

21   point the Court will take them up.

22         Mr. Wilson, I will simply tell you I don't

1    really think you appreciated how generous Ms. Wilson was

2    in the marital separation and custody and visitation

3    arrangement that she agreed with you at the time of the

4    divorce.

5            And I genuinely believe that we would not be

6    here today but for the conduct that you have engaged in.

7    And I hope that you will use this as an opportunity to

8    reflect on that and modify that conduct because I do

9    believe it is very important for you -- and that you

10   consider it very important -- to have an ongoing

11   relationship with your son.

12           And I'd like to see that happen.  But it can not

13   -- things can not continue in the way they have been over

14   the last 18 months.

15           If there are no further questions, thank you,

16   Counsel for your time.  Have a nice weekend.

17           MR. KUBLAN:  Your Honor, should we select a date

18   to --

19           THE COURT:  Oh, yes.  Why don't we do that?

20           MS. PIPER:  Actually, Your Honor, I -- I do have

21   a question.  When is the custodial schedule to begin?

22           MR. KUBLAN:  Can it be (indiscernible)?

1              THE COURT:  Where is -- where is Justin this --

2     where was he supposed to be this weekend?

3              MS. PIPER:  Justin is supposed to be with Mr.

4     Wilson this weekend.

5              THE COURT:  Okay.  So I would like to keep that.

6     I don't at five o'clock on Friday want to suddenly pull

7     the rug out from under him.  So I would like to keep that

8     and have that custody continue until 7:00 p.m. on Monday.

9              And then we'll pick up with the custodial

10    schedule beginning 7:00 p.m. on Monday.

11             MS. PIPER:  And I -- and I didn't raise this

12    before, but, Your Honor, I believe it would be best for

13    Justin to have Dr. Sowa talk to him about the custodial

14    change or be available.

15             Can we have a ruling or can the parties agree

16    that they are not going to discuss the changes with Justin

17    until his therapy appointment which is Thursday?

18             MR. KUBLAN:  I don't understand why there needs

19    to be even a discussion, Your Honor.  The child is ten

20    years.  I mean, it just -- it's -- I -- I just think, you

21    know, they are just going to continue with the new

22    schedule.

40

 1            And if the child has any questions, you know,

 2      then I think they just say to the child that this is what

 3      they decided.

 4            MS. PIPER:   I mean, I think that he would

 5      benefit from having Dr. Sowa available to talk to him.

 6            THE COURT:   I don't have any problem with having

 7      Dr. Sowa available.   I -- I do think at this point that it

 8      makes the most sense to just explain to him that this is

 9      what the -- the arrangement is going to be going forward.

10            And then Dr. Sowa can certainly be available to

11      him whenever Justin would like to talk with him about it.

12      I'm sure there will be a number of issues that he'll like

13      to talk about.

14            MR. KUBLAN:   So just to be clear, Your Honor,

15      starting this Monday at 7:00 o'clock that's when the new

16      schedule is going to begin?

17            THE COURT:   Correct.

18            MR. KUBLAN:   Okay.   And what's the Court's

19      availability for the --

20            THE COURT:   Any day but the 13th of September --

21      any Friday but the 13th of September.

22            MS. PIPER:   I'm available on the 30th and the

41

1    6th.

2                MR. KUBLAN:  I'm available on the 6th, Your

3    Honor, too.

4                THE COURT:  We will set this down for 10:00 a.m.

5    on the 6th of September.

6                THE CLERK:  (Inaudible.)

7                THE COURT:  Yes.  Thank you, Counsel, Mr.

8    Wilson, Mrs. Wilson.

9                           * * * * *

10                (Whereupon, at approximately 5:00 o'clock p.m.,

11    the hearing in the above-entitled matter concluded.)

12

13

14

15

16

17

18

19

20

21

22

42

CERTIFICATE OF REPORTER

I, COURTNEY A. SEBASTIAN, a Certified Court Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

*Courtney Sebastian*
COURTNEY A. SEBASTIAN, CCR

Verbatim Reporting, LLC
14723 Braddock Road
Centreville, Va 20120
703 932 0654

**EXHIBIT C**

RECEIVED by Arlington County Circuit Court
03/02/2022 03:48:37 PM

VIRGINIA:

## IN THE CIRCUIT COURT OF ARLINGTON COUNTY

|  |  |
|---|---|
| JUSTIN POTTER WILSON, JR., | * |
| | * |
| Plaintiff, | * |
| v. | *     Case No. CL 16-1673-01 |
| | * |
| ANNA VLADIMIROVNA WILSON, | * |
| (f/k/a Anna Nikolaeva Wilson) | * |
| | * |
| Defendant. | * |
| | * |

### CHILD CUSTODY AND VISITATION ORDER

THIS CAUSE CAME before the Court on June 15-16, 2020, June 21-23, 2021,

September 1-2, 2021, and September 15, 2021 for a full evidentiary hearing upon "Defendant's

Verified Emergency Motion to Suspend Visitation and Modify Child Custody and Visitation"

and "Plaintiff's Counter Motion Against Defendant for Emergency and Permanent Custody,

Injunctive Relief and Sanctions" regarding the parties' minor child, Justin Potter Wilson III

(hereinafter the "Child"), age 13, born September 1, 2008; and

IT APPEARING TO THE COURT that after carefully considering each of the factors in

Virginia Code Section 20-124.3, affording each the appropriate weight, given the record in this

case, the testimony presented, including the demeanor and credibility of the respective witnesses

which the Court heard and observed over a period of eight (8) days of testimony, and the exhibits

introduced into evidence; that, for the reasons set forth in the Court's ruling on September 29,

2021, a copy of which is attached hereto and made a part of this Child Custody and Visitation

Order below,

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 1 of 5*

IN CONSIDERATION WHEREOF, it is hereby ORDERED AND ADJUDGED:

(1)     Transcript. The transcript of this Court's ruling of September 29, 2021 is attached hereto and incorporated by reference into this order.

(2)     Material Change. Based on the reasons stated in the Court's ruling, the Court finds that there has been a material change in circumstances since entry of the Custody Order on September 9, 2019 and that this material change justifies a modification of said Order based upon the best interests of the Child as follows. The Court further finds that the custody and visitation schedule set forth in the September 9, 2019 Custody Order shall be modified as follows.

(3)     Legal Custody. Defendant ("Mother") shall have sole legal custody of the Child. Mother shall provide Plaintiff ("Father") with information regarding any medical treatment received by the Child, as well as any school reports from any school the Child is attending. Mother may, but is not required to, consult with Father regarding the Child's activities, school performances, and any behavioral or emotional issues involving the Child.

(4)     Physical Custody. Mother shall have sole physical custody of the Child until further order of the Court.

(5)     Visitation. Father shall have the following visitation with the Child:

(a)     Supervised visitations shall initially be with the reunification therapist, Michele Cole, Ph.D. ("Dr. Cole"), who is the therapist selected by the guardian *ad litem*. Dr. Cole will work with Father and the Child in order to begin the reunification process. The number and timing of sessions shall be decided by Dr. Cole. When approved by Dr. Cole, Father will also be allowed supervised visitation with the Child one (1) Saturday a month for a period not to exceed four (4) hours, with supervision through either Safe Heavens or a certified visitation professional approved by the guardian *ad litem*. Father shall pay for both the reunification therapy services and his supervised visitation.

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 2 of 5*

(b)    Mother shall not call or schedule any event for the Child during any of Father's supervised visitation times. Father shall provide Mother with a visitation schedule approved by Dr. Cole at least two (2) weeks in advance, and Mother can reach out to Dr. Cole to adjust the schedule if an unavoidable conflict exists.

(c)    Telephone Calls. Father shall not call the Child during Mother's custodial time, except Father may call the Child between 8:00 p.m. and 8:30 p.m. every Tuesday, Wednesday, and Thursday evening, and the calls shall be limited to a half hour. Mother shall ensure that the Child is available to speak with Father during this time. All Father's telephone calls with the Child may be recorded by Mother without warning, pursuant to this Order. Notwithstanding the forgoing, Father shall be permitted to call the Child for up to one (1) hour during the following holidays: New Year's Day, Thanksgiving, and Christmas.

(6)    Disparaging Comments. Neither parent shall make derogatory or disparaging comments about the other parent or the activities that parent has arranged for the Child, and neither parent shall use profanity in conversations with the Child or with the other parent.

(7)    Corporal Punishment. Neither parent shall use corporal punishment as a means of disciplining the Child or engage in any physical abuse of the Child. This is to include intentionally hitting any part of the Child's body to get his attention, remonstrate him for inappropriate or thoughtless conduct, or for any other reason, except if the Child's safety or health is in danger and such action is necessary to protect the Child's immediate well-being.

(8)    Therapy. Father shall continue his current therapy and shall also complete a specific anger management program to be approved by the guardian *ad litem*, and that can be done by William B. Zuckerman, Ph.D., as long as there is a clear focus on anger management as it applies to the relationship with Mother and the Child. Mother shall engage in family counseling with Elizabeth Bennett, Ph.D. ("Dr. Bennett") and the Child at least every two (2) weeks until further order of the Court.

(9)    Mother shall make every effort to ensure that the Child is attending school in a consistent and timely manner, and shall work with the guardian *ad litem* if absences or tardies continue to be an ongoing issue while school is back in-person.

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 3 of 5*

(10)    The Court will set this matter for review, at which time the reunification therapist, guardian *ad litem*, and Dr. Bennett shall report to the Court as to whether increased visitation and unsupervised visitation with Father, including overnights, weekends, and holidays, are appropriate.

(11)    Father shall provide Mother with the Child's U.S. Passport, currently in his position, within ten (10) days from the entry of this Order.

(12)    <u>Attorney's Fees</u>. The Court finds that the award of attorney's fees to Mother is supported by the record. Father shall pay the sum of Fifty Thousand and no/100 Dollars ($50,000.00) to Mother as and for reimbursement of Mother's attorney's fees within thirty (30) days of the entry of this Order.

(13)    <u>30 Day Notice</u>. Pursuant to Section 20-124.5 of the Code of Virginia, 1950, as amended, thirty (30) days advance written notice must be given to the Court and the other party by any party intending to relocate and of any intended change of address. Such notice shall provide the Court and the other party of the intended date of change of address, the specific street, route address, city or county, state and zip code of the intended new address. Such written notice shall be mailed to the Court at the following address: Clerk of the Court, Circuit Court of Arlington County, 1425 N. Courthouse Road, Arlington, Virginia 22201, and shall certify the date that such information was mailed or otherwise delivered to the other party.

IT IS FURTHER ORDERED that the Clerk of the Court may forthwith issue certified copies of this Order to Counsel of Record.

ENTERED this ___ day of _____

03/04/2022

JUDITH L. WHEAT
JUDGE

Circuit Court Judge

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 4 of 5*

SEEN AND AGREED:

ANDREI J. KUBLAN (VSB No. 73120)
KUBLAN KHAN PLC
6521 Arlington Blvd., Suite 201
Falls Church, Virginia 22042
Telephone: (703) 854-1081
Facsimile: (703) 854-1083
Email: andrei@kublankhan.com
*Counsel for Defendant (Mother)*

SEEN AND OBJECTED TO*:

John L. Bauserman, Jr., VSB #33816
P.O. Box 1403
Fairfax, Virginia 22038
Telephone: (703) 939-4990
Facsimile: (703) 547-0257
Email: jblaw22@gmail.com
*Counsel for Plaintiff/Father*

*Objected for reasons stated in argument and on the record and for such other and further
reasons as may be submitted to the Court in the form of objections or motion for
reconsideration within twenty-one days from the date of entry of this Order.

SEEN AND AGREED:

Aaron S. Book, Esq.
300 N. Washington St.
Suite 404
Alexandria, VA 22314
888-987-9991 Phone & Fax
202-281-4890 Cell
abook@websterbook.com
*Guardian ad Litem*

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 5 of 5*

SEEN AND AGREED:

_____
ANDREI J. KUBLAN (VSB No. 73120)
KUBLAN KHAN PLC
6521 Arlington Blvd., Suite 201
Falls Church, Virginia 22042
Telephone: (703) 854-1081
Facsimile: (703) 854-1083
Email: andrei@kublankhan.com
*Counsel for Defendant (Mother)*


SEEN AND OBJECTED TO*:

_____
John L. Bauserman, Jr., VSB #33816
P.O. Box 1403
Fairfax, Virginia 22038
Telephone: (703) 939-4990
Facsimile: (703) 547-0257
Email:  jblaw22@gmail.com
*Counsel for Plaintiff/Father*


*Objected for reasons stated in argument and on the record and for such other and further reasons as may be submitted to the Court in the form of objections or motion for reconsideration within twenty-one days from the date of entry of this Order.


SEEN AND AGREED:

_____
Aaron S. Book, Esq.
300 N. Washington St.
Suite 404
Alexandria, VA 22314
888-987-9991 Phone & Fax
202-281-4890 Cell
abook@websterbook.com
*Guardian ad Litem*


*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 5 of 5*

1

V I R G I N I A

IN THE CIRCUIT COURT OF ARLINGTON COUNTY

- - - - - - - - - - x
                    :
JUSTIN POTTER WILSON, JR.,        :
                    :
          Plaintiff,        :
                    :
     -vs-                :  CASE NO.: CL16001673-00
                    :
ANNA VLADIMIROVNA WILSON,         :
                    :
          Defendant.        :
                    :
- - - - - - - - - - x

                    Circuit Courtroom 10C
                    Arlington County Courthouse
                    Arlington, Virginia

                    Wednesday, September 29, 2021

          The above-entitled matter came on to be heard

*Via Microsoft Teams module* before the HONORABLE JUDITH L.

WHEAT, Judge, in and for the Circuit Court of Arlington

County, beginning at 2:46 o'clock p.m.

          APPEARANCES:

               On Behalf of the Plaintiff:

                    JOHN L. BAUSERMAN, JR., ESQUIRE

               On Behalf of the Defendant:

                    ANDREI J. KUBLAN, ESQUIRE

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

2

Also Present:

AARON S. BOOK, ESQUIRE

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

3

1                P R O C E E D I N G S

2              THE BAILIFF:  All rise.  This Circuit Case is

3    now in session. The Honorable Judith Kelly Wheat is now

4    presiding.

5              THE CLERK:  This is CL16001673-03, Wilson

6    versus Wilson.

7              (Whereupon, the Court Reporter was sworn by

8    the Clerk of the Court.)

9              THE COURT:  Good afternoon, everyone.  Mr.

10   Book, do you have any objection if I take my mask off?

11              MR. BOOK:  No objection.

12              THE COURT:  All right.  As I indicated to all

13   of you, I would render my decision today.  I have spent a

14   considerable amount of time working on it, and I will go

15   through the facts that I have considered and the

16   conclusions that I have drawn after multiple days of

17   testimony in this case.

18              This matter came before the Court on the

19   motion of Anna Wilson to modify custody based on

20   allegations of physical abuse of a child by Justin Wilson.

21   Justin Wilson filed a cross-motion to modify custody,

22   alleging that Mrs. Wilson committed fraud on the Court in

23   filing her petition and in her testimony in June 2020

4

1    during the emergency custody proceeding.

2            The first issue before the Court is whether

3    there has been a material change in circumstances such

4    that modification of the custody is properly before the

5    Court.  In deciding this issue, the Court makes the

6    following preliminary observations.

7            The Court heard several days of testimony on

8    August 20, 2019, on the party's cross motions to modify

9    custody.  At the conclusion of that hearing, the Court

10   maintained joint legal custody on the part of Mr. and Mrs.

11   Wilson, with Mrs. Wilson having final decision-making

12   authority.  I awarded primary physical custody to Mrs.

13   Wilson, with extended weekend and holiday visitation to

14   Mr. Wilson.

15           This decision was intended to achieve certain

16   objectives which the Court deemed to be in the best

17   interest of the parties' minor child, Justin, who at that

18   time was turning 11 years old.

19           The Court's objectives include, first,

20   providing each parent the opportunity to engage fully in

21   the child's educational, emotional, and physical

22   development, while also providing a final decision-maker,

23   given the high level of conflict between the father and

5

1  mother.

2          Second, allowing the child to maintain

3  relationships with other important individuals in his

4  life, including Mr. Wilson's family, Mrs. Wilson's and the

5  minor child's childhood friends, Mr. Rhett (ph.), a hired

6  tennis coach who appeared to be a positive adult influence

7  in the child's life; and Dr. Sowa, a clinical psychologist

8  and therapist who had been working with the child for over

9  a year prior to the hearing and appeared to have a good

10  relationship with the child.

11          Third, creating clear lines of separation

12  between the child's time with each parent, with the goal

13  of minimizing intrusion or interference by the other

14  parent during their non-custodial time.  And, four,

15  diffusing the parties' efforts to embroil the child in

16  their high-conflict relationship.

17          The Court was also concerned, given the

18  testimony presented during the 2019 hearing, about Mr.

19  Wilson's ability to control his emotions and his anger

20  towards Mrs. Wilson, when he believed Mrs. Wilson and the

21  child were engaging in activities that Mr. Wilson did not

22  agree were a priority for the child, such as taking a

23  four-day trip to Disney World with Mrs. Wilson and family

6

1   friends rather than staying in Arlington with Mr. Wilson

2   practicing tennis, which was the subject of extended

3   testimony in the 2019 hearing.

4          In addition, the Court was concerned, based on

5   the testimony provided, that Mr. Wilson would be upset

6   with the Court's decision to modify custody.

7          For these reasons, the Court made anger-

8   management counseling and continued therapy a condition of

9   the September 2019 custody order for Mr. Wilson to

10  minimize the possibility of intended or unintended

11  emotional and physical harm to the minor child when

12  conflicts arose between the parents or between the parents

13  and the child.

14         Based on the evidence presented in eight days

15  of hearing the instant cross petitions to modify custody,

16  it appears that none of these objectives were met in the

17  ten months between the 2019 custody trial and the 2020

18  emergency cessation of Mr. Wilson's visitation in this

19  case.

20         Before the Court signed the final order in

21  September 2019, Mr. Rhett was no longer providing tennis

22  lessons to Justin and had otherwise discontinued his

23  relationship with him.

7

1          In December 2019, Dr. Sowa advised that he was

2     unable to continue to assist the family and recommended a

3     new therapeutic model involving two therapists working

4     separately with Justin and an individual parent, which

5     ultimately was the genesis of the emergency petition filed

6     in May 2020.

7          Throughout the period January 20 through April

8     20, 2020, the parents disagreed over how best to implement

9     the two therapists mom recommended by Dr. Sowa to the

10    family.

11         Consequently, instead of counseling providing

12    both continuity and a safe space for the child to engage

13    with adults, who could help him navigate the high level of

14    ongoing conflict between his parents and its effect on

15    him, it became the catalyst for the events now before the

16    Court.

17         In April of 2020, Mr. Wilson verbally

18    assaulted family friends of the minor child in front of

19    the minor child when he happened upon them while out

20    jogging, calling them terrible, horrible, ugly people,

21    because of the testimony they provided in the 2019 custody

22    trial.

23         Mr. Wilson urged the child to tell the family

8

1    that he wanted to live with his father, not his mother,

2    notwithstanding the Court's order the previous fall.  Mr.

3    Wilson also admitted in June 2020 that he was angry about

4    the outcome of the 2019 custody trial.

5             Significantly, and in keeping with the Court's

6    2019 concerns, Mr. Wilson admitted during an emergency

7    custody hearing in June of 2020 that in May of 2020, after

8    being advised by the child's therapist that the child was

9    provided conflicting information to both therapists

10   regarding his relationship with each parent, Mr. Wilson,

11   in a rage he described as 9.5 out of 10, physically

12   grabbed the child by the shoulders and vigorously shook

13   him about six times and smacked him on the bottom.

14            He admitted to telling the child that he was

15   so angry he would not look at him, that he feels like he

16   could break the child's nose, and that the child needed to

17   stay in his room.

18            In the week after this incident, the child

19   made clear to his therapist and Court-appointed GAL that

20   he did not want to have contact with his father.

21            The Court finds this combination of factors

22   sufficient to create a material change in circumstances.

23            Mrs. Wilson's emergency petition to modify

9

1    custody alleges the child reported that on May 18th, 2020,

2    Mr. Wilson hit the child in the face, head and arms.   The

3    petition also alleges the child reported that on prior

4    visits with Mr. Wilson he repeatedly hit the child in the

5    head, causing pain which lasted up to 20 minutes.

6            Mr. Wilson's cross petition to modify custody

7    alleges that Mrs. Wilson committed fraud on the Court, and

8    that the pictures submitted to support the emergency

9    petition were fabricated and Mrs. Wilson provided false or

10   misleading testimony to the Juvenile Court and this Court,

11   respectively, in the June 2nd protective order hearing and

12   the June 15th emergency motion to modify custody in this

13   court.

14           After 15 months of extended discovery in the

15   case, the Court heard three days of testimony in June 2021

16   and two additional days of testimony and one-half day of

17   argument in September 2021.

18           Having considered the credibility of the

19   evidence and the witnesses presented by both parties and

20   according the weight the Court deems appropriate to each,

21   the Court makes the following findings with respect to the

22   factors set forth in Virginia Code 20-124.3.

23           On the age and physical and mental condition

10

1   of the child, given due consideration to the child's

2   changing developmental needs, Justin is now 13 years old

3   and entering the 7th grade. For the 2019-2020 and 2020-

4   2021 school years he was enrolled in Commonwealth Academy

5   in Alexandria, Virginia, however he was not invited back

6   for the 2021 and 2022 school year. The guardian ad litem

7   reports this was due to litigation in this case.

8          Mr. Wilson acknowledged that in or around

9   December of 2020 he received an e-mail from the school

10  asking the parents not to embroil the school in the

11  litigation. He also acknowledged that one of the factors

12  cited by the school for Justin not being allowed to return

13  was the subpoenas issued by Mr. Wilson's attorney in this

14  case. Justin, the son, currently attends Swanson Middle

15  School in Arlington, Virginia.

16          He has been diagnosed in the past with

17  attention-deficit hyperactivity disorder, but the Court

18  has not been made aware that he is taking any medication

19  for ADHD.

20          Mr. Wilson testified that Justin's grades at

21  Commonwealth Academy were Bs and B-minuses and that his

22  grades had been slightly lower this past year, but neither

23  party introduced Justin's academic records or report

11

1  cards.

2         Jacqueline Riley, Justin's 5th-grade math

3  teacher, testified that he attended class regularly

4  throughout 2019-2020.  Mr. Wilson introduced attendance

5  records which show that during the 2020-2021 school year

6  Justin was marked absent or tardy from various classes in

7  excess of 100 times.

8         Mrs. Wilson testified that Commonwealth

9  Academy's policy was to mark a student tardy or absent

10  even if they were a few minutes late.

11         Dr. Bennett testified that sometime in March

12  of 2021 she recalled that Justin was sent home from school

13  for refusing to wear a mask.

14         Justin has been described by both parents and

15  the guardian ad litem as active, athletic, and in good

16  physical health.  He has been involved in football,

17  tennis, skateboarding, hiking, chess and guitar.

18         Marianna Lanzo and Iryna Balusheuskaya, who

19  see Justin frequently and saw him in June of 2021 prior to

20  the trial, described him as very happy, inquisitive,

21  talkative, and open to trying new things.

22         Regarding Justin's mental and emotional state,

23  the Court heard testimony from Dr. Elizabeth Bennett, Dr.

12

1    Guy Van Sickle, and Dr. Adam Soa in June 2020, and

2    additional testimony from Dr. Bennett in June 2021.  Dr.

3    Bennett, accepted by the Court as an expert in clinical

4    psychology, began seeing Justin every other week,

5    beginning in March of 2020, upon a referral from Dr. Sowa.

6    She had met with Justin approximately nine times and Mrs.

7    Wilson twice as of June 2020.

8                She described Justin initially as somewhat

9    aloof, oppositional, disruptive, and mildly hostile to

10   Mrs. Wilson during their initial sessions.

11               Dr. Van Sickle, accepted by the Court as an

12   expert in clinical psychology, first began seeing Justin

13   in April 2020, also at the suggestion of Dr. Sowa, and saw

14   him every other week through May 15th, 2020.  He observed

15   that Justin seemed fond of his father and appeared calm

16   and happy when he spoke about his father.  He testified

17   that Justin was extremely unhappy when discussing his

18   mother, claiming he never did anything when he was with

19   her, and generally having nothing positive to say.

20               Dr. Bennett and Dr. Van Sickle first conferred

21   in May 2020 regarding Justin.  Based on their

22   conversations and observations of Justin, it was obvious

23   that Justin was in conflict and was telling very

13

1    different, polarized stories to both parents.

2           Dr. Bennett described Justin as a child who

3    felt trapped by a loyalty conflict between his parents and

4    was struggling to figure out how to untangle himself from

5    it.

6           Both therapists were concerned about Justin's

7    psychological well-being, and their goal for therapy in

8    early May 2020 was to ensure that Justin was safe and to

9    bring his emotions more to center, help him develop a

10   positive relationship with both parents, and lessen the

11   loyalty conflict.

12          Dr. Bennett testified that after the May 2020

13   incident, Justin seemed relieved that there was going to

14   be a break in contact with his father and more open to

15   discussing the pressure he had been under and his worries

16   about being hit by his father.

17          Dr. Bennett found the child's demeanor and

18   specific emotional response during their conversations

19   consistent with the comments he was making.  She observed

20   that his overall demeanor changed significantly after June

21   2020, and he was more age-appropriate and spontaneous in

22   therapy than he had been before.

23          Although Justin remained fearful of his father

14

1    even into June 2021, he was much warmer towards his mother

2    and exhibited fewer power struggles with her during this

3    time.

4         Over the course of 2020, he did exhibit

5    perspective about his father's feelings, concerned that he

6    may be sad, and appeared to be softening a bit in his

7    unwillingness to have contact with his father.

8         Dr. Bennett acknowledged that although Mrs.

9    Wilson articulated significant worry in early May about

10   physical abuse by Mr. Wilson, Dr. Bennett did not recall

11   having any information consistent with physical abuse by

12   Mr. Wilson prior to the May 2020 CPS report.

13        In subsequent sessions with Justin, Justin

14   talked about being hit by Mr. Wilson on other occasions,

15   but his reports were inconsistent from session to session,

16   and Dr. Bennett had no specific information about the

17   nature of the contact or the frequency.

18        Dr. Van Sickle testified that during his

19   sessions with Justin, he never manifested discomfort with

20   his father or disclosed that Mr. Wilson had treated him

21   poorly.

22        Factor two, the age and physical and mental

23   condition of each parent.

15

1        Prior to the 2019 custody trial, the Court

2   ordered both Mr. and Mrs. Wilson to undergo independent

3   medical examinations, which were performed by Dr.

4   Zuckerman and Dr. Saminow, respectively.  The Court did

5   not require new evaluations prior to the 2021 hearing, and

6   neither parent was deemed to have any mental or emotional

7   disorder.  Mr. Wilson self-reported that he believes he

8   has ADHD, but it has never been diagnosed.

9        Both parents are in their late 40s, and both

10  appear to be in good physical health.  Mr. Wilson

11  described his level of fitness as above average.  Prior to

12  June 2020, both parents engaged in various physical

13  activities with the child, including hiking, jogging,

14  pick-up basketball, and skating.

15       Number three, the relationship existing

16  between each parent and Justin, including cognitive

17  involvement and ability to accurately assess and meet the

18  emotional, intellectual, and physical needs of the child.

19       Mrs. Wilson.  Mrs. Wilson testified that

20  during the period of September of 2019 through June 2021,

21  she would take Justin to the skate park, hiking, to

22  swimming lessons, guitar lessons, basketball, and to play

23  chess.

16

1    He was enrolled in skateboard lessons and

2    winter soccer in 2019, guitar lessons, swimming lessons,

3    flag football, football camp and nature camp in 2020,

4    tennis in 2020 and 2021, and Carnegie, an online

5    scholastic math game in 2019 and 2020.

6    Mrs. Wilson and Justin also like to read and

7    cook together and spend time with family friends.

8    During the time period in issue, they went on

9    two winter ski vacations to Canaan Valley, West Virginia,

10   two beach vacations in Marco Island, Florida, played laser

11   tag, went rock-climbing, attending skating groups,

12   birthday parties, and movie nights.

13   Defendant's Exhibit 7 contains numerous photos

14   of Justin engaging in many of these activities with Mrs.

15   Wilson and others.

16   Mother's witnesses, Marianna Lanzo, Iryna

17   Balusheuskaya, and Galina Spivak, who see Justin with his

18   mother frequently, described him in June 2021 as very

19   happy, inquisitive, talkative, and open to trying new

20   things.

21   During the period of 2019 through May 2020,

22   they also described Justin as more relaxed, open, and less

23   stressed after prolonged stays with his mother. They were

17

1    aware of his involvement in football, tennis, chess,

2    skateboarding and guitar.

3            In apparent conflict with this evidence, Dr.

4    Sowa testified that through December 2019 Justin described

5    having a very negative relationship with his mother,

6    claiming that they never did anything together and that he

7    would just sit in his room and play videogames when he was

8    with her.  Dr. Sowa never discussed this with Mrs. Wilson,

9    even though Mrs. Wilson brought Justin to most of their

10   sessions in 2019.

11           Dr. Van Sickle provided similar testimony in

12   June 2020, but admitted he never observed any interactions

13   between Justin and his mother, and that Mrs. Wilson was

14   very agreeable with the idea of him working with Justin.

15           Neither therapist was able to offer an opinion

16   as to whether Justin's statements regarding time spent

17   with his mother was coached, but Justin's descriptions are

18   wholly inconsistent with the overwhelming, credible

19   evidence presented to the Court in 2019 and again in 2021.

20           Dr. Bennett, too, described Justin initially

21   as defiant and oppositional towards his mother in the

22   spring of 2020, but noticed a marked positive difference

23   in his attitude immediately after the events of May 2020.

18

1   By 2021, she described the child's relationship with his

2   mother as generally stable and his therapy as being on a

3   maintenance level.

4          The Court finds all of this evidence

5   consistent with the therapists' opinions that, due to the

6   conflict between the parents, Justin did not feel it was

7   permissible to admit having a positive relationship with

8   his mother.

9          Mr. Wilson.  The only friends of Mr. Wilson,

10  Solomon Wanamu (ph.) and Rajish Lashish (ph.) testified

11  that they had engaged in numerous activities with Mr.

12  Wilson and Justin, mostly revolving around tennis and

13  other sports, prior to the change in custody in 2019.

14         They did not interact with Mr. Wilson or

15  Justin frequently after that.  They described Mr. Wilson's

16  relationship with Justin as a good father who tended to

17  his needs.  They had seen Mr. Wilson pat Justin on the

18  back or the butt, but never saw him physically abuse

19  Justin.

20         The Court notes that although tennis was a

21  predominant part of Mr. Wilson's and Justin's routine

22  prior to the custody hearing in 2019, and Mr. Wilson

23  testified in this hearing how important he believes tennis

19

1   is for Justin's ADHD, Mr. Wilson discontinued tennis

2   lessons with Mr. Rhett immediately after the 2019 hearing

3   and stopped playing tennis with Justin during his

4   custodial time.

5          The Court notes that this was done even

6   though, due to the holiday schedule incorporated into the

7   Court's 2019 order, Mr. Wilson had custody of Justin close

8   to 50 percent of the time in the fall and the winter of

9   2019 and 2020.

10          Mr. Wilson did testify that during this time,

11   he planned fun weekend outings with Justin, including

12   traveling to New York and the Dominican Republic, and

13   trips to a football game in Florida, and to visit family

14   in Nashville.

15          Mr. Wilson worked in an exercise component

16   during his visitation time with Justin.  And when he and

17   Justin stayed in the D.C. area, they would go to the

18   movies, play paintball, go to the park, jog, play at the

19   rec center, or engage in other physical type activities.

20          Because his visitation with Justin was

21   primarily on weekends, Mr. Wilson did not engage in much

22   school work with Justin.  However, he testified that

23   Justin usually had less than 15 minutes of homework while

20

1    he was enrolled in Commonwealth Academy.

2           He testified that throughout the period 2019

3    through 2021, he checked in with the school approximately

4    once per week regarding Justin's progress and assisted him

5    with one large project in the fall of 2019.

6           Mr. Wilson was aware that Justin was taking

7    skateboarding lessons in October of 2019 and attended some

8    swimming lessons in the fall of 2020 and drove him to flag

9    football in early 2020.

10          While Mr. Wilson appears to have come to some

11   realization, with the help of Dr. Zuckerman, of the impact

12   that continuous custody disputes had had on Justin, Mr.

13   Wilson appears unable or unwilling to see that it is his

14   actions which have played the most significant role in the

15   outcome of these proceedings, and instead continues to

16   blame Mrs. Wilson for the rupture in the father/child

17   relationship.

18          Mr. Wilson also does not seem to understand

19   why his 11-year-old son might understand a statement made

20   in raging amber that he could break his nose as a threat

21   of physical harm rather than a rhetorical statement, as

22   Mr. Wilson continues to describe it.

23          In addition, Mr. Wilson has embarked on a

21

1    scorcher of litigation strategies to discredit Mrs. Wilson

2    and indirectly Justin, notwithstanding his own admissions

3    at the very first emergency hearing in June 2020 that he

4    precipitated an inappropriate and physical abusive

5    encounter with his son on May 18, 2020, that Mrs. Wilson

6    played no role in whatsoever.

7              This conduct occurred just nine months after

8    the Court found that Mr. Wilson engaged in a pattern of

9    emotional abuse towards both Mrs. Wilson and Justin that

10   necessitated a change in custody and anger-management

11   counseling.

12             Moreover, while the Court has attempted

13   repeatedly over the past 18 months to focus this case back

14   on Justin, Mr. Wilson has done the opposite.  To this day,

15   he has expressed no concern about the decision by

16   Commonwealth Academy to disenroll Justin for the 2021-22

17   school year, nor has he taken any responsibility for the

18   impact his litigation tactics has had on his son's ability

19   to return to the specialty school he has attended for the

20   past several years.

21             Finally, while Mr. Wilson appears genuinely

22   upset about not having had contact with Justin for the

23   past 18 months, he has been unwilling to participate in

22

1    the program of supervised visitation as recommended by the

2    guardian ad litem in order to begin the reconciliation

3    process with Justin.

4                    As a result, Justin, too, has lost 18 months

5    of interaction with his father, during COVID, one of the

6    most challenging and isolating times he has likely faced

7    in 13 years of life.

8                    The Court finds these facts significant in

9    weighing what is in the best interest of the child in this

10   case.

11                   Factor four, the needs of the child, given due

12   consideration to other important relationships of the

13   child, including, but not limited to siblings, peers, and

14   extended family members.

15                   The evidence is undisputed that after the

16   incident on May 18th, 2020, Justin wanted no contact with

17   Mr. Wilson and has had no contact with Mr. Wilson or his

18   family, all of whom have strong relationships with Justin.

19                   The evidence also establishes that Justin's

20   hardline position appears to be softening as the months

21   have gone by, and Justin seems more willing to re-engage

22   with his father, although he is still fearful of what that

23   process might look like.

23

1            Prior to May 2020, witnesses called by both

2    Mr. and Mrs. Wilson testified that Justin appeared content

3    when dealing with either parent without the interference

4    of the other, although transitions were difficult,

5    particularly given the custody tug-of-war Justin's

6    therapist described him as being in.

7            Justin has been described as a polite,

8    articulate, athletic, bright, high-needs child, and

9    routine and structure as well as physical activity are

10   important to him.

11           Although the Court attempted to create a

12   framework in its 2019 order that would allow the parties

13   to institute both routine and structure, the ongoing

14   conflict between the parties and Mr. Wilson's volatile

15   responses to that conflict have completely undermined any

16   routine or structure the Court's 2019 order was designed

17   to provide.

18           Five, the role each parent has played and will

19   play in the future in the upbringing of the child.  Mrs.

20   Wilson was awarded primary physical custody in 2019.

21   Although it was noted previously, given the holiday

22   schedule incorporated into that order, Mr. Wilson's

23   custody in the fall of 2019 continued to be closer to

24

1    50/50.  Since May 21, 2020, Mr. Wilson has had no contact

2    at all with Justin.

3              Although the Court maintained joint legal

4    custody in its 2019 order, in the hope that Mr. and Mrs.

5    Wilson would work with one another to achieve Justin's

6    best interest, given the toxic relationship between the

7    parents, this Court cannot envision how both parents can

8    continue to play an equal, ongoing, and supportive role in

9    Justin's life in the future.

10              Six, the propensity of each parent to actively

11    support the child's contact and relationship with the

12    other parent, including whether the parent has

13    unreasonably denied the other parent access to or

14    visitation with the child.

15              The Court adopts the facts previously

16    articulated in that in evaluating this factor, and finds

17    the ongoing high level of conflict between the parties,

18    and their continued willingness to embroil the child in

19    that conflict, and the propensity of each as evidenced by

20    the testimony to think the worst of the other, is a

21    significant factor in the Court's consideration.

22              The relative willingness and demonstrated

23    ability of each parent to maintain the close and

25

1    continuing relationship with the child and the ability of

2    each parent to cooperate and resolve differences regarding

3    the matters affecting the child.  The Court adopts the

4    facts previously articulated in evaluating this factor.

5            Eight, the reasonable preference of the child.

6    The Court deems the child to be of reasonable

7    intelligence, understanding, age, and experience to

8    express such a preference.  At 13, the Court finds that

9    Justin possesses the requisite age, understanding, and

10    experience to express a preference, taking into

11    consideration that he struggles with impulse control and

12    has expressed fear about reinitiating contact with his

13    father, given the facts and circumstances currently before

14    the Court.

15            The Court previously found that Justin has

16    difficulty with executive decision-making, particularly

17    understanding the consequences of his words, actions and

18    choices.  He continues to exhibit ongoing stress when

19    faced with conflict between his parents.

20            Justin has expressed and acted upon his desire

21    not to have contact with his father.  However, this

22    position has softened, and presented with a safe scenario

23    to begin reunification, he may be amenable to that

26

1   process.

2          In addition, Justin appears to have developed

3   an open relationship with his guardian ad litem, who can

4   assist Justin with decision-making and any reunification

5   process.

6          Nine, prior history of the family abuse.   The

7   parties presented evidence of an incident in 2017, when

8   Mr. Wilson struck Justin with a belt and a report was made

9   to CPS.   The facts regarding this incident are now fully a

10  part of the record in this case.

11         The incident was addressed by CPS, but the

12  only assessment that appears from the deposition from the

13  testimony of Mr. Rails (ph.), is that Mr. Wilson was

14  advised to refrain from further corporal punishment of the

15  child.

16         The Court finds the incident relevant as an

17  additional example of a stern physical interaction between

18  Justin and Mr. Wilson that may play into his fear of

19  physical violence on the part of his father and weighs it

20  accordingly.

21         The Court does not find it particularly

22  informative on the issue of whether Mrs. Wilson's

23  testimony that she did not know what to do the week of May

27

1   18, when she learned that Justin was hit by his father was

2   credible.

3                  There is no evidence that Mrs. Wilson made the

4   CPS report regarding the 2017 incident, moreover knowing

5   what to do and knowing whether to do it are two completely

6   different issues.

7                  Ten, other factors the Court deems

8   significant.  The Court does find that during the week of

9   May 18, 2020, Mrs. Wilson embroiled Justin in the instant

10  dispute by having the child make multiple tape recordings

11  regarding the events of May 18, which she was slow to

12  produce in discovery, and taking various pictures of the

13  child's face, which were relied upon by Mr. Wilson for his

14  fraud on the Court allegations.

15                 In addition, Mrs. Wilson provided conflicting

16  explanations regarding the events of May 18 to 22 and

17  admitted that she provided false information to the

18  police, Dr. Bennett, and Child Protective Services

19  regarding the date she learned the cause of the bruise on

20  the child's face.

21                 She explained that she did not tell the

22  authorities she had learned about the source of the bruise

23  several days earlier because she was afraid she would get

28

1    in trouble for not reporting the injury at that time.

2              The Court believes that Mrs. Wilson was not

3    sure what she should do in May 2020 after learning about

4    the abuse, given the way this litigation has proceeded so

5    close in timing to the 2019 proceedings and its effect on

6    Justin.

7              However, her decision to alter the narrative

8    to make herself look better provided Mr. Wilson the

9    factual basis to allege fraud, and Mrs. Wilson to some

10   extent brought that on herself.  That said, the Court does

11   not find either clear and convincing or a preponderance of

12   evidence that Mrs. Wilson committed a fraud on the Court.

13             Notwithstanding Mr. Wilson's arguments to the

14   contrary, Mrs. Wilson did not make up an allegation of

15   physical abuse by Mr. Wilson on May 18th, 2020.  Mrs.

16   Wilson stated in her emergency motion to modify custody

17   and in her motion for protective order that Justin told

18   her that Mr. Wilson struck him in the face, the arms, and

19   the head on May 18th.

20             Mr. Wilson admitted that a physical

21   altercation occurred between Justin and him on May 18th.

22   No one else was present.  Mr. Wilson did not tell Mrs.

23   Wilson about the altercation.  Thus, the only way Mrs.

29

1    Wilson could have learned about the altercation was from

2    Justin.

3            Mr. Wilson testified in June 2020 that around

4    4:30 p.m. on the afternoon of May 18 he had a telephone

5    conversation with Dr. Van Sickle about the conflicting

6    information Justin was providing the two therapists.

7    Justin had denied this to Dr. Van Sickle in a session the

8    previous Friday, May 15th.

9            Mr. Wilson had confronted Justin about what he

10   had been saying to Dr. Van Sickle and Dr. Bennett.  Mr.

11   Wilson admitted that he was angry, disappointed, and

12   stunned.  In what Mr. Wilson characterized as a rage of

13   9.5 out of 10, he smacked the child on the bottom with an

14   open hand to get his attention and usher him into his

15   room.

16           He testified that he also took Justin by both

17   arms, placed his hands on his shoulder, and shook him

18   fairly vigorously about six times.  He admitted telling

19   the child that he was so angry he couldn't look at him and

20   felt like he could break his nose, the same statement that

21   Mrs. Wilson included in her motion for a preliminary

22   protective order filed prior to Mr. Wilson's June 2020

23   testimony.

30

1          Afterwards, the child stayed in his room while

2   Mr. Wilson calmed down by running for a lengthy time on

3   the treadmill. Mrs. Wilson picked the child up around

4   7:00 p.m.

5          Even accepting Mr. Wilson's version of events

6   as true, given these facts, it's certainly reasonable that

7   a ten-year-old who was being securely held by his arms and

8   shoulders and shaken vigorously by a much stronger,

9   larger, outraged parent, would describe the physical

10  sensation he was feeling as being hit in the arms, head

11  and face, particularly if he had his eyes closed or if his

12  face or head came into contact with Mr. Wilson's hand

13  while they were clamped onto his shoulders.

14         No one but Mr. Wilson and Justin know exactly

15  what happened that day. But given Mr. Wilson's

16  contemporaneous admissions in June of 2020, Mr. Wilson's

17  own evidence is not inconsistent with the child's report

18  that the father struck him on the head, face and arms on

19  May 18th, 2020.

20         When Mrs. Wilson picked the child up around

21  7:00, she noticed that he was quiet and had a bruise on

22  his cheek that was blue in color. Justin did not tell her

23  about the source of the bruise on Monday, and she did not

31

1    take a photograph of it.

2            Dr. Warburton, who the Court accepted as an

3    expert in pediatric medicine, testified that a bruise is

4    normally red in color for the first one to two hours,

5    after which it is predominantly blue.

6            Mrs. Wilson's description of the bruise on

7    Justin's cheek is wholly consistent with both Dr.

8    Warburton's and Mr. Wilson's testimony, as he stated the

9    incident occurred sometime after 5:00, but sufficiently

10   before 7:00, to allow Mr. Wilson to perform a lengthy

11   workout on the treadmill and then sit with Justin for an

12   additional period of time before Mrs. Wilson arrived.

13           Dr. Warburton testified that between 24 and 72

14   hours after an injury is inflicted, a bruise will begin to

15   turn yellow and green with blue hues, and most bruises

16   will be completely resolved within a week.

17           Three witnesses testified that they observed a

18   bruise on Justin's cheek the way of May 18th.  Ms.

19   Balusheuskaya, who saw the bruise Friday evening,

20   testified that it was yellowish-blue in color.  She

21   testified that she gently touched the bruise and it did

22   not feel swollen.  No makeup came off on her hand when she

23   touched the bruise.

32

1          The DCPS worker, Jackie Martinez, saw the

2     bruise on Saturday afternoon and described the bruise as

3     purple-blue.  Ms. Martinez testified that she had not

4     notified Mrs. Wilson that she was coming to the house on

5     Saturday, and that Mrs. Wilson was out of her sight less

6     than a minute before taking Ms. Martinez to meet with

7     Justin.

8          She took photos of Justin's face from about

9     two feet away within the first ten minutes of the visit,

10    which she forwarded to the hotline staff and then deleted

11    from her phone.

12         She also spoke with Justin about what

13    happened.  She did not testify that Justin seemed to be

14    fabricating or dissembling how he got the bruise and

15    offered no testimony that the bruise appeared to have been

16    applied or was fake.  She recalled the coloring of the

17    bruise being more intense than what she saw depicted in

18    the photo.

19         Ms. Lanza saw Justin on Sunday and noticed a

20    discoloration on his cheek, which was yellowish and

21    fading.

22         Dr. Warburton opined that the purple-blue

23    coloration described by Ms. Martinez on Saturday was not

33

1    consistent with the color progression of a healing bruise.

2    Dr. Warburton also testified that when someone is slapped

3    or punched, it is more likely than not one will see hand

4    or finger marks, which he did not see any sign of in the

5    digital images.

6          However, he did not quantify how long these

7    would be visible.  Dr. Warburton admitted that most of his

8    medical experience dealing with bruises was not in his

9    medical practice, as he was rarely called upon in the

10   office to treat a bruise, and he has not conducted any

11   medical research regarding bruises or aging of bruises.

12         Prior to this case, he has never been asked to

13   opine whether a photograph depicts a real or fake bruise.

14   Nevertheless, he opined the bruise in the May 2020 photos

15   was either fake or occurred sometime after May 18.

16         None of Justin's teachers reported noticing a

17   bruise on his face in any of the remote learning sessions

18   the week of May 18th.  The teachers had somewhere between

19   5 and 16 students on their screens during each class.

20         While the Court finds Dr. Warburton's

21   testimony regarding the general aging and coloration

22   progression of bruises to be largely credible, the Court

23   finds that his opinion is otherwise contrary to the

34

1   credible evidence in the case, including the testimony of

2   the three witnesses who actually saw the bruise, none of

3   whom testified it appeared to be fake or applied.

4           Moreover, there is no evidence that Dr.

5   Warburton was apprised of these facts or that he was aware

6   that Mr. Wilson admitted vigorously shaking the child

7   while his hands were clutching the child's shoulders close

8   to his face.

9           Moreover, other than being told the child was

10  generally in good health, there is no evidence that Dr.

11  Warburton was provided any information regarding the

12  child's medical condition, including that he suffers from

13  eczema, a skin condition.

14          Rather, Dr. Warburton appears to have relied

15  on the narrowly-tailored set of factors provided by Mr.

16  Wilson's counsel to render an opinion on whether the

17  bruise depicted in the mother's photos was real, an

18  opinion he acknowledged he has not previously been called

19  upon to render in more than 40 years of practicing and

20  teaching medicine.

21          With respect to the computer forensic experts,

22  Mr. Latham and Mr. Caruso, the Court finds Mr. Caruso's

23  testimony more persuasive.

35

1            First, Mr. Latham received the images he

2     analyzed from another expert who performed an unknown

3     authentication analysis on the images.  The Court was

4     provided no information as to whether that analysis

5     changed the images in any way.

6            Second, Mr. Latham, testified that he applied

7     different filters to the different images to attain the

8     desired results, leaving the Court to essentially compare

9     apples to oranges.  Mr. Latham testified that some

10    unspecified mathematical algorithms were applied to

11    determine which filters to use.  But Mr. Caruso testified

12    that it was impossible to determine or recreate the

13    methodology used by Mr. Latham or to determine its

14    accuracy.

15           While Mr. Caruso admitted that the filtering

16    process can be very valuable, there is sufficient

17    reference points for comparison.  Without things such as

18    the child's actual skin tone or no lighting set up, he

19    opined there were not sufficient reference points for the

20    filters to be useful.

21           In addition, Mr. Caruso noted that the images

22    were taken with different cameras with different pixel

23    capacities and different normalization features.  In

36

1    addition, the lighting conditions, shadows, distance, and

2    facial orientation were different in each picture.   To

3    equalize the size of the images, Mr. Latham zoomed in on

4    one of the pictures, which stretched the image.

5            According to Mr. Caruso, all of these factors

6    undercut the reliability of Mr. Latham's opinion.

7            Finally, Mr. Latham testified that there

8    appeared to be an area of dark contrast on both sides of

9    the child's face, including the side that all witnesses

10   testified had no evidence of bruising.

11           Based on this evidence, the Court found it

12   impossible to determine what coloration on the child's

13   face Mr. Latham's filtering process actually highlighted

14   for analysis.

15           For these reasons, the Court gave greater

16   weight to Mr. Caruso's opinion that there was simply not

17   enough information available from the photos of the

18   child's face to draw any conclusion regarding the relative

19   placement of the bruise.

20           The second allegation in Mrs. Wilson's

21   emergency motion is that Mr. Wilson repeatedly struck

22   Justin in the face and head when the child was visiting.

23   Again, Mr.  Wilson admitted in June 2020 that prior to the

37

1    2019 custody hearing it was possible that he struck Justin

2    on the head approximately two times per visit.

3            He explained that he did not do this to hurt

4    the child, but to make him think or remember to do

5    something.  He meant it to be a strong reminder for the

6    child so that he would comply with an instruction.

7            Subsequently, in 2021, Mr. Wilson testified

8    that he would hit the child in the head with an open hand

9    only one or two times in a several week period.  Either

10   way, Mr. Wilson admitted engaging in the conduct alleged

11   in Mrs. Wilson's complaints.

12           The Court has carefully considered all the

13   evidence presented in this case regarding each of the

14   above factors, and not just the facts relied upon and set

15   forth this afternoon to explain the Court's decision.

16           The Court has carefully assessed the demeanor

17   and credibility of the respective witnesses as they

18   appeared over five days of the in-person and remote

19   testimony, five days in 2021 and three days in 2020, and

20   has reviewed the exhibits introduced into evidence and

21   accorded each the weight the Court deems appropriate.

22           The Court finds that the best interest of the

23   child require that the custody and visitation schedule set

38

1   forth in the September 2019 modification of custody order

2   requires further modification.

3            The Court awards sole legal custody of the

4   minor child to Mrs. Wilson.  Mrs. Wilson will provide Mr.

5   Wilson with information regarding any medical treatment

6   received by the child, as well as any school reports from

7   any school Justin is attending.

8            Mrs. Wilson may, but is not required to,

9   consult with Mr. Wilson regarding the child's activities,

10  school performance, and any behavior or emotional issues

11  involving the child.

12           Mrs. Wilson is granted sole physical custody

13  of Justin until further order of the Court.

14           The guardian ad litem shall identify a

15  reunification therapist no later than October 31st, 2021,

16  who will work with the father and child to begin the

17  reunification process.

18           Supervised visitation will initially be with

19  the reunification therapist, and the number and timing of

20  sessions will be decided by the therapist.  When approved

21  by the reunification therapist, Mr. Wilson will also be

22  allowed supervised visitation with the child one Saturday

23  a month for a period not to exceed four hours, with

39

1  supervision through either Safe Havens or a certified

2  visitation professional approved by the guardian ad litem.

3  Mr. Wilson will pay for both the reunification therapy

4  services and his supervised visitation.

5          If the reunification therapist deems it

6  appropriate, Justin may also have two full days of

7  supervised visitation with his paternal grandfather and

8  uncles in Arlington prior to the end of the year, and Mr.

9  Wilson can participate in that visitation.

10          Neither parent is to make derogatory or

11  disparaging comments about the other parent or the

12  activities that parent has arranged for the child, and

13  neither parent shall use profanity in conversations with

14  the child or with the other parent.

15          Neither parent will use corporal punishment as

16  a means of disciplining the child or engage in any

17  physical abuse of the child.  This is to include

18  intentionally hitting any part of the child's body to get

19  his attention, remonstrate him for inappropriate or

20  thoughtless conduct, or for any other reason, except if

21  the child's safety or health is in danger and such action

22  is necessary to protect his immediate well-being.

23          Mrs. Wilson will not call or schedule any

40

1    events for Justin during any of Mr. Wilson's supervised

2    visitation times.  Mr. Wilson will provide Mrs. Wilson

3    with a visitation schedule approved by the reunification

4    counselor at least two weeks in advance, and Mrs. Wilson

5    can reach out to the counselor to adjust the schedule if

6    an unavoidable conflict exists.

7            Mr. Wilson will not call Justin during

8    mother's custodial time, except Mr. Wilson may call Justin

9    between 8:00 and 8:30 p.m. every Tuesday, Wednesday and

10   Thursday evening, and the calls will be limited to a half

11   hour.

12           Mrs. Wilson will ensure that Justin is

13   available to speak with his father during this time.  All

14   telephone calls may be recorded without warning, pursuant

15   to this order.  Mr. Wilson will be permitted to call up to

16   one hour with the child on the following holidays in 2020

17   (sic):  New Year's Day, Thanksgiving, and Christmas.

18           Mr. Wilson will continue his current therapy

19   and will complete a specific anger-management program to

20   be approved by the guardian ad litem, and that can be done

21   with Dr. Zuckerman, Mr. Book, as long as there is a clear

22   focus on anger management as it applies to the

23   relationship with Mrs. Wilson and the child.

41

1        Mrs. Wilson is to engage in family counseling

2   with Dr. Bennett and the child at least every two weeks

3   until further order of the Court.  Mrs. Wilson will make

4   every effort to ensure that Justin is attending school in

5   a consistent and timely manner, and she will work with the

6   guardian ad litem if absences or tardies continue to be an

7   ongoing issue now that school is back in-person.

8        The Court will set this matter for review in

9   January 2020 (sic), at which time the reunification

10  therapist, guardian ad litem, and Dr. Bennett shall report

11  to the Court as to whether increased visitation and

12  unsupervised visitation with Mr. Wilson, including

13  overnights, weekends, and holidays, are appropriate.

14        MR. KUBLAN:  Your Honor, what was the deadline

15  for the report?  I seem to have missed it.

16        THE COURT:  I'm sorry?

17        MR. KUBLAN:  You said there was a reporting

18  deadline for them to report to the --

19        THE COURT:  I'll set a review date in January

20  of 2020 (sic), and that will be the date for everyone to

21  provide information to the Court, with the goal that Mr.

22  Wilson obviously would get increased and unsupervised

23  visitation.  That is the Court's hope.

42

1          MR. KUBLAN:  You mean January of 2022, right?

2          THE COURT:  January of 2022, yes.

3          MR. BOOK:  Judge, could I ask a question?  I

4    was typing quickly, but is your ruling going to be

5    produced in an order, or shall we order a transcript?  I

6    just want to make sure I got down all the conditions.

7          THE COURT:  I think probably for everyone's

8    purposes, it makes sense to get a transcript and attach

9    that to the order, and that can be so that it is all

10   clearly set forth.  I think the order can just reference

11   the enclosed transcript.

12          It's unfortunate that it's come to this point,

13   and I really hope, for Justin's sake, that he can start

14   having a normal relationship with both his parents.

15          Is there anything else that we need to do

16   today?

17          MR. KUBLAN:  Yes, Your Honor, there are

18   several issues.  One of the issues, as I mentioned before,

19   is the request for attorney's fees.  And you said you want

20   us to schedule a different hearing for that.  I do

21   believe, you know, the bulk of these attorney's fees could

22   have been avoided if the father did not raise, you know,

23   the issue of fraud and a fake bruise and all that other

43

1    stuff, all the conspiracy theories that we had to deal

2    with for, like, seven days of trial.

3            And I wouldn't be surprised, Your Honor,

4    considering that Mr. Bauserman kept mentioning, you know,

5    that he's creating a record, that, you know, the father

6    will be appealing this decision.

7            THE COURT:  They have a right to do that.

8            MR. KUBLAN:  Absolutely, Your Honor.

9            THE COURT:  They have the right to do that.

10            MR. KUBLAN:  Absolutely, I mean, he has the

11    right to do that, but the issue is that my client is

12    completely out of money at this point.  So, I mean, she's

13    spent a significant amount of money to defend herself, and

14    not just from the legal piece.

15            I'm talking about the expertise and many other

16    things, you know, they had to go into this litigation to

17    basically to prove her innocence and to stand up for the

18    child.

19            So I don't know if Your Honor wants to have a

20    separate hearing on that, or if we can just submit some

21    kind of brief or something.  I mean, I'd obviously be

22    amenable to that.

23            THE COURT:  Mr. Bauserman, your position?

44

1              MR. BAUSERMAN:  So, Your Honor, Mr. Wilson's

2    position on that is that I would like to see Mr. Kublan's

3    attorney's fees affidavit and review it ahead of time and

4    to see if I have any argument on it.

5              So I think we probably do need to reconvene

6    and, you know, reserve at least half an hour, depending

7    on, you know, to an hour to review that.  I mean, I'm not

8    going to try to guess what his attorney's fees might be.

9              THE COURT:  Well, I think, given the

10   complexity of all of the issues here, that having an

11   opportunity to review it ahead of time is eminently fair,

12   and so I have no problem.

13             Mr. Kublan, when do you believe you can get

14   Mr. Bauserman your attorney's fees affidavit?

15             MR. KUBLAN:  Either today or tomorrow, Your

16   Honor.

17             THE COURT:  I'm sorry?

18             MR. KUBLAN:  Either today or tomorrow.  I

19   actually have the affidavit right here with me, you know,

20   here in the (unintelligible).

21             THE COURT:  All right.  So he gets it to you -

22   - assuming it's the end of the day today, Mr. Bauserman,

23   so it's really tomorrow -- what kind of time would you

45

1    like, and would you just prefer to do a hearing, or would

2    you prefer to submit something in writing?  I'm happy to

3    handle it either way.

4                MR. BAUSERMAN:  I think I'd prefer to have --

5    appear in person, Your Honor, and respond.

6                THE COURT:  Okay.  Two weeks, is that enough

7    time, three weeks?  When would you like to try to do it?

8    I'm available -- well, I'm not terribly available, but we

9    can find an afternoon time other than the last week in

10   October.  I know I cannot do the 4th, the 5th, and I

11   cannot do the week of the 18th.

12               But I can do possibly the 6th, possibly --

13   well, the 6th is just next week.  Possibly the 13th,

14   possibly the end of the week of the 18th.

15               MR. BAUSERMAN:  So I have a full three days of

16   trial the week of the 18th, Monday, Tuesday and Wednesday.

17               THE COURT:  Okay.  Do you want to do it in

18   November?

19               MR. KUBLAN:  I mean, obviously, our

20   preference, Your Honor, is to do it as soon as possible,

21   because --

22               THE COURT:  I know, Mr. Kublan, but I'm out

23   the entire last week in October.  It sounds like Mr.

46

1    Bauserman is out a bunch the third week in October.  So, I

2    mean, we can try to find a date sometime, the 13th, 14th,

3    15th of October, that week of the 11th, but otherwise I

4    think we're into November.

5                MR. KUBLAN:  I have, Your Honor, availability

6    on the 14th, Your Honor.  I also can do the 15th.  So, I

7    mean, are any of those dates available for Mr. Bauserman?

8                MR. BAUSERMAN:  The afternoon of the 14th is

9    not available to me, but the morning is, and the afternoon

10   of the 15th is available.

11               MR. KUBLAN:  It's available for me, too, Your

12   Honor, if you have availability on the Court's schedule.

13               MR. BOOK:  Your Honor --

14               THE COURT:  This doesn't really affect you;

15   right?

16               MR. BOOK:  I was going to suggest that if I do

17   not need to participate, I don't want to hold up anybody's

18   schedule.

19               THE COURT:  Okay.  Do you think an hour is

20   enough time?

21               MR. BAUSERMAN:  Yes.

22               MR. KUBLAN:  I would think so, Your Honor,

23   yes.

47

1          THE COURT:  All right.  How about if we set it

2     on the afternoon of the 15th at, say, 2:00?

3          MR. KUBLAN:  And that's October 15th, Your

4     Honor, right?

5          THE COURT:  Yes, October the 15th.

6          MR. KUBLAN:  Yes.

7          MR. BAUSERMAN:  So that would be --

8          THE COURT:  You have a trial starting on

9     Monday, or would that really create an issue for you?

10          MR. BAUSERMAN:  It's not ideal, but --

11          THE COURT:  Yeah, I don't think it's ideal

12     either.  Would you prefer the morning of the 14th?

13          MR. BAUSERMAN:  I would.

14          THE COURT:  Does that work for you, Mr.

15     Kublan?

16          MR. KUBLAN:  Yes, Your Honor, certainly.

17          THE COURT:  Do I have a trial set that day?  I

18     know I had something on the 14th.  It's a carry-over,

19     yeah, it's a carry-over of a case.

20          But could we do this at 9:00 via Teams?  Would

21     that work for all of you, and then we could be done by

22     10:00?

23          MR. KUBLAN:  Yes, Your Honor, absolutely.

48

1            MR. BAUSERMAN:  Yes, Your Honor.

2            THE COURT:  All right.  So we'll go ahead and

3    set it at 9:00 a.m. on October the 14th.

4            MR. KUBLAN:  And, Your Honor, before you

5    leave, we do have one small issue here.  The father still

6    continues to hold the passport, the child's passport.

7            Can we ask him to surrender it to the mother

8    at this point?

9            THE COURT:  Is there any idea that she's going

10   to be traveling internationally with him right now?  I

11   just don't want to inject another issue into the case that

12   doesn't need to be in there.

13           MR. KUBLAN:  Well, she doesn't have any plans

14   to travel anywhere, but I believe, in light of the Court's

15   decision that my client has sole legal custody, I think

16   it's appropriate for her to keep that passport at this

17   point.

18           THE COURT:  Mr. Bauserman, why don't we just

19   address that on the 14th as well, so that you have an

20   opportunity to talk with your client.  I think she should

21   be entitled to it, but why don't we just take that up on

22   the morning of the 14th as well.

23           MR. BAUSERMAN:  All right.

49

1          THE COURT:  All right, thank you all.

2          MR. KUBLAN:  Thank you, Your Honor.

3          (Whereupon, at approximately 3:39 o'clock

4     p.m., the proceedings in the above-entitled matter were

5     concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136

50

\* \* \* \* \*

CERTIFICATE OF REPORTER

I, MICHELLE L. DONATH, a Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_____
MICHELLE L. DONATH
Verbatim Reporter

2:37 ✈ 🛜 🔋 **EXHIBIT D**

←  🔍 ☰

 **John P.**
🖼 1  ⭐ 11  🖼 1

3 years ago

"Ibrayeva v Kublan"

I would encourage anyone considering retainment of Kublan to first search via Google "Ibrayeva v Kublan" and read the resulting document carefully and in full. It is the case summary of an appeal to a ruling for divorce filed by Kublan's former wife (and mother of their children). The document states Kublan represented himself in the matter.

Kublan has adopted the approach and argumentation reflected in his own divorce proceding in subsequent client representations. Potential clients risk suboptimal outcomes as his approach may result in a negative reputation and/or poor credibility among some judges in Virginia.

Again, I would urge careful consideration of the case summary noted above before contacting this lawyer.

UPDATE 12/13/21

Kublan emailed the attached picture of text to my legal representative shortly after the above review appeared on Google. I have omitted the last name of my lawyer; otherwise, below I have posted Kublan's note with complete accuracy and in full.



💡 🙌 💗 😵
Helpful **4**   Thanks **0**   Love this **0**   Oh no **0**

**3:02** 
◀ Search

 📶 📶 🔋

**EXHIBIT D**

‹    **Respond now**    ⋮

. . . . . .

  **Justin Wilson**
Dec 11 · 1:12 PM

☆★★★★ .

"Ibrayeva v Kublan"                    ▲

I would encourage anyone considering
retainment of Kublan to first search via
Google "Ibrayeva v Kublan" and read the
resulting document carefully and in full. It is
the case summary of an appeal to a ruling for
divorce filed by Kublan's former wife (and
mother of their children). The document
states Kublan represented himself in the
matter.

Kublan has adopted the approach and
argumentation reflected in his own divorce
proceding in subsequent client
representations. Potential clients risk
suboptimal outcomes as his approach may
result in a negative reputation and/or poor
credibility among some judges in Virginia.

Again, I would urge careful consideration of
the case summary noted above before
contacting this lawyer.

  Respond as Kublan Khan PLC...

Exhibit E

## Kublan Khan PLC
6921 Arlington Blvd #201, Falls Church, VA

4.6 ★★★★ ⯪  124 reviews ⓘ

People often mention

All     team 23     law firm 17     results 13     case 11     +6

Sort by

Most relevant    Newest    Highest    Lowest

**Justin Wilson**
10 reviews · 1 photo

★  3 hours ago   NEW

"Ibrayeva v Kublan"

I would encourage anyone who might retain Kublan to first search via Google ... More

✎ Write a review



# Kublan Khan PLC

6521 Arlington Blvd #201, Falls Church, VA

**4.6** ★★★★★ 124 reviews ⓘ

✎ Write a review

**Justin Wilson**
10 reviews · 1 photo

☆ 3 hours ago NEW

⋯

**"Ibrayeva v Kublan"**

I would encourage anyone who might retain Kublan to first search via Google "Ibrayeva v Kublan" and read the resulting document carefully and in full. It is the case summary of an appeal to a ruling for divorce filed by Kublan's former wife (and mother of their children). The document states Kublan represented himself in the matter.

I believe Kublan has adopted the approach and argumentation reflected in his own divorce proceeding in subsequent client representations. I believe potential clients risk suboptimal outcomes as his approach may result in a negative reputation and/or poor credibility among some judges in Virginia.

A search for "Kublan v Humphreys" will detail Kublan's unsuccessful appeal of court-ordered sanctions. The appellant court upheld an order that Kublan pay attorney fees associated with his improper attempt to enforce a witness subpoena upon another lawyer bound by attorney-client privilege. I believe the opinion reflects poorly on Kublan's command of the law and upon his legal judgment.

Again, I would urge careful consideration of the case summaries noted above before contacting this lawyer.

UPDATE



# Kublan Khan PLC

6521 Arlington Blvd #201, Falls Church, VA

**4.6** ★ ★ ★ ★ ☆ · 124 reviews ⓘ

✎ Write a review

Again, I would urge careful consideration of the case summaries noted above before contacting this lawyer.

UPDATE

Kublan emailed the below text to my legal representative shortly after the above post appeared. Here, Kublan explicitly threatens to falsely claim I have engaged in "stalking" towards obtaining a court's protective order against me. The act Kublan threatens, in my view, represents egregiously poor legal ethics and a willingness to abuse the court system. I have omitted the last name of my lawyer; otherwise, below I have posted Kublan's email with complete accuracy and in full.

An electronic search of Fairfax circuit court records indicate Kublan has initiated unsuccessful defamation suits. This practice in my view lends further credibility to an assertion echoed among others on this page that Kublan's threats have coerced the removal of negative reviews.