FILED by Arlington County Circuit Court
09/09/2019

CL16001673-01
DIV
FO

V I R G I N I A :

## IN THE CIRCUIT COURT OF ARLINGTON COUNTY

|  |  |
|---|---|
| JUSTIN POTTER WILSON, JR., | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | * Case No. CL 16-1673-01 |
| ANNA VLADIMIROVNA WILSON, | * |
| (f/k/a Anna Nikolaeva Wilson) | * |
| | * |
| Defendant. | * |
| | * |

## <u>CUSTODY ORDER</u>

THIS CAUSE CAME before the Court on August 19-21, 2019 for a full evidentiary

hearing upon Defendant's Verified Emergency Motion to Modify Child Custody and Visitation

and Plaintiff's Motion to Modify Custody & Visitation of the minor child, Justin Potter Wilson

III (hereinafter the "Child"), age 10, born September 1, 2008; and

IT APPEARING TO THE COURT that after carefully considering each of the factors in

Virginia Code Section 20-124.3, affording each the appropriate weight, given the record in this

case, the testimony presented, including the demeanor and credibility of the respective witnesses

which the Court heard and observed over a period of three (3) days of testimony, and the exhibits

introduced into evidence; that, for the reasons set forth in the Court's ruling on August 23, 2019,

a copy of which is attached hereto and made a part of this Custody Order below,

IN CONSIDERATION WHEREOF, it is hereby ORDERED AND ADJUDGED:

(1)    <u>Transcript</u>.  The transcript of this court's ruling of August 23, 2019 is attached

hereto and incorporated by reference into this order.

*Custody Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 1 of 6*

(2)    Defendant's ("Mother's") Verified Emergency Motion to Modify Child Custody and Visitation is granted.  Plaintiff's ("Father's") Motion to Modify Custody & Visitation is denied.  The Court find that it is Father's conduct, not Mother's conduct, that brings this matter before the Court.  The Court further finds that the custody and visitation schedule set forth in the parties' May 19, ~~2019~~ 2016 Marital Settlement Agreement shall be modified as follows.

(3)    <u>Legal Custody</u>.  Defendant ("Mother") and Plaintiff ("Father") shall continue to share joint legal custody of the Child.  In the event that the parties cannot reach agreement, then Mother shall have final authority to make decisions on behalf of the Child.

(4)    <u>Physical Custody</u>.    Commencing August 26, 2019, Mother shall have primary physical custody of the Child.

(5)    <u>Visitation</u>.    Commencing August 26, 2019, Father shall have visitation with the Child every other weekend beginning after school on Friday (or 4:00 p.m. if there is no school) until Monday night at 7:00 p.m.  Father's alternating weekends shall begin on Friday, September 6, 2019.

(6)    <u>Summer Visitation</u>.  The parties shall have additional custodial time with Justin during his summer vacation from school as follows:

A.    Father shall have two (2) uninterrupted weeks with the Child during the month of June.  That fourteen (14) day period shall commence on a Sunday at 10:00 a.m. and end on a Sunday at 7:00 p.m.  Father shall also have one uninterrupted week in each of the months of July and August from 10:00 a.m. Sunday until 7:00 p.m. the following Sunday.  Mother shall not contact the Child during this time or schedule any activities for him.

B.    Mother shall have two (2) uninterrupted weeks with the Child during the Child's summer vacation from school, which can be either in July or August.  That fourteen (14) day period shall commence on a Sunday at 10:00 a.m. and end on a Sunday at 7:00 p.m.  Father shall not contact the Child during this time or schedule any activities for him.

C.    The parties shall provide a written notice to each other, electronic mail being *[handwritten: SAP / JW]* sufficient, of the dates of their respective weeks with the Child on or before ~~April 15~~ *[handwritten: May 1]* each year. To the ~~extend~~ *[handwritten: extent]* these dates conflict with each other, Mother's dates shall have priority in 2020 and all even-numbered years thereafter and Father's dates shall have priority in 2021 and all odd-numbered years thereafter. *[handwritten: Neither party shall schedule his/her summer custodial time during the other parents holiday/Birthday.]*

(7)    <u>Parents' Birthdays</u>.  The Child shall spend parents' birthdays with the respective parent. The parent celebrating the birthday can pick the Child up the night before at 7:00 p.m. and return the child to school the morning after the birthday.  If the morning after the birthday falls on a weekend, the Child shall be returned no later than 10:00 a.m., unless it is that parent's custodial weekend.    Neither parent shall call the Child while the Child celebrating the other parent's birthday.

(8)    <u>Child's Birthday</u>.  Commencing 2019 and every odd-year thereafter, the Child shall spend his birthday with Father.  Commencing 2020 and every even-year thereafter, the Child shall spend his birthday with Mother.  The parent celebrating the Child's birthday can pick the Child up the night before at 7:00 p.m. and return the child to school the morning after the Child's birthday. If the morning after the Child's birthday falls on a weekend, the Child shall be returned no later than 10:00 a.m., unless it is that parent's custodial weekend.  The parent who is not with the Child on his birthday may call the Child at a time to be agreed upon by the parties.

(9)    <u>Holidays, Spring Break, and Winter Break</u>.  Except as modified herein, the parties *[handwritten: SAP / JW]* shall continue to share custody of the Child on holidays, spring break and winter break as set forth in their May 19, ~~2019~~ *[handwritten: 2016]* Marital Settlement Agreement.

(10)    <u>Telephone Calls</u>.

A.    Father shall not call the Child during Mother's custodial time except Father may call the Child between the hours of 8:00 p.m. and 8:30 p.m. every Tuesday, Wednesday, and *[handwritten: SAP / JW]* Thursday evening when the child is in Mother's custody.  Father's calls to the Child shall be limited to half an hour.  Mother will ensure that the Child is available to speak with Father during this time. *[handwritten: Mother shall not call the child during Father's regular weekend custodial time except as provided in this Order. Neither parent shall hang up on the non-custodial parent during that parent's call with the Child, unless profanity is used in the call with the child.]*

B.    Each parent will be permitted one half-hour call with the Child on the following holidays: New Year's Day, Thanksgiving, and Christmas Day.

C.    The parents shall not call the Child on any other holiday when the Child is with the custodial parent and will be permitted one (1) call with the Child during spring and one (1) call with the Child during winter break during the other parent's custodial time.

D.    All telephone calls with the Child may be recorded at the option of the custodial parent without warning, and such recording will be deemed consensual on the part of the recorded party.

(11)    <u>Camps and Extracurricular Activities</u>.  Neither parent shall schedule any camps or other activities for the Child during other parent's custodial time.  Mother will advise Adam J. Sowa, Ph.D. or any other licensed therapist treating the Child at that time regarding any camp Mother intends to register the Child in during the summer prior to registration and that therapist will advise Mother if the Child expresses any concerns with any camps proposed.   Mother will forward via electronic mail to Father invitations to birthday parties or other events that occur during Father's custodial time and Father shall have sole authority to decide whether the Child will attend.

(12)    <u>Tennis Lessons</u>.   The Child may attend one (1) tennis lesson with Michael Retta ("Mr. Retta") each week during Mother's custodial time.  Said lesson shall be scheduled directly between Mother and Mr. Retta.  Mother will bring the Child to and from the lesson.  <u>Father shall arrange for payment to Mr. Retta in accordance with any financial Father and Mr. Retta reach.</u>

(13)    <u>Travel</u>.  Each parent will give the other parent 24-hour notice, electronic mail being sufficient, of his/her intention to take the Child on a trip outside of the D.C. Metropolitan area, providing the time and dates of travel, destinations and persons traveling with the parent and the Child.   Unless the travel dates include New Year's Day, Thanksgiving, or Christmas Day, the non-custodial parent shall not call the Child during the travel dates. *with a therapist of his choice*

(14)    <u>Therapy</u>.  Father shall continue his current therapy *\/* and shall also complete anger management therapy within six (6) months of the date of this Order.  Father shall also engage in *SPF / JW* family counseling with the Child and coordinate the counseling with Adam J. Sowa, Ph.D. or any

other licensed therapist treating the Child at that time. Mother shall engage in family counseling with the Child and coordinate the counseling with Adam J. Sowa, Ph.D. or any other licensed therapist treating the Child at that time.

(15)    Neither parent shall make derogatory or disparaging comments about the other parent or the activities that parent has arranged for the Child. Neither parent shall use profanity in conversations with the Child or with the other parent.

(16)    <u>Attorney's Fees</u>. The Court finds that the award of attorney's fees to Mother is supported by the record. Father shall pay the sum of ~~Sixty Four~~ *Fifty Three* Thousand Four Hundred ~~Eleven~~ *Thirteen* and ~~52~~ *27*/100 Dollars (~~$64,411.52~~ *$53,413.27*) to Mother as and for reimbursement of her attorney's fees ~~within thirty (30) days of the date of this Order.~~ *This amount shall be paid based on the following schedule :a) #17,804.42 is due and payable on or before November 6, 2019;*

(17)    <u>30 Day Notice</u>. Pursuant to Section 20-124.5 of the Code of Virginia, 1950, as amended, thirty (30) days advance written notice must be given to the Court and the other party by any party intending to relocate and of any intended change of address. Such notice shall provide the Court and the other party of the intended date of change of address, the specific street, route address, city or county, state and zip code of the intended new address. Such written notice shall be mailed to the Court at the following address: Clerk of the Court, Circuit Court of Arlington County, 1425 N. Courthouse Road, Arlington, Virginia 22201, and shall certify the date that such information was mailed or otherwise delivered to the other party.

IT IS FURTHER ORDERED that the Clerk of the Court may forthwith issue certified copies of this Order to Counsel of Record.

ENTERED this *4u* day of September, 2019.

_____
Circuit Court Judge

*b) #17,804.42 is due and payable on or before January 6, 2020; and (c) #17,804.42 is due and payable on or before March 6, 2020.*

SEEN: AND OBJECTED TO the Court's finding that the current holiday schedule as set forth in May 19, 2016 Marital Settlement Agreement is appropriate, considering the court's ruling granting primary physical custody to Mother w/every other weekend to Father.

KUBLAN KHAN PLC

By: _____
ANDREI J. KUBLAN (VSB No. 73120)
Counsel for Defendant/Mother
6521 Arlington Blvd., Suite 201
Falls Church, Virginia 22042
Telephone: (703) 854-1081
Facsimile: (703) 854-1083
Email: andrei@kublankhan.com
*Counsel for Defendant (Mother)*

SEEN: AND OBJECTED TO FOR THE FOLLOWING REASONS: *

HICKS CRANDALL JUHL, PC

By: _____
SARAH ANN PIPER (VSB 47290)
Counsel for Plaintiff/Father
Three Flint Hill
3201 Jermantown Road, Suite 200
Fairfax, Virginia 22030
Telephone: (703) 691-4848
Facsimile: (703) 359-0197
sarah@hcj-law.com
*Counsel for Plaintiff (Father)*

*① The Court's finding that Defendant and her witnesses were credible was an abuse of discretion.

② The court failed to take into account Plaintiff's efforts and active and involved role in effectuating ADHD behavioral modifications for the child; which evidence was provided by plaintiff, expert Sawa, witness Sare and witness Retta. This was an abuse of discretion, as the court did not properly consider this evidence in respect to 20-124.3(1), 20-124.3(3) and 20-124.3(4).

③ The court's findings in respect to Defendant's psychological evaluation and the weight given thereto was error and an abuse of discretion in considering 20-124.3(1).

④ The court's failure to consider Defendant's interference in Plaintiff's calls with the child was an abuse of discretion/failure to consider 20-124.3(6)

V I R G I N I A:

        IN THE CIRCUIT COURT OF ARLINGTON COUNTY


JUSTIN POTTER WILSON, JR.,  )

       Plaintiff,     )

v.             )  CASE NO. 16-1673-01

ANNA VLADIMIROVNA WILSON,  )

       Defendant.    )


               Circuit Courtroom 10C
               Arlington County Courthouse
               Arlington, Virginia

               Friday, August 23, 2019

      The above-entitled matter came on to be heard
before the HONORABLE JUDITH L. WHEAT, Judge, in and for
the Circuit Court of Arlington County, in the Courthouse,
1425 North Courthouse Road, 10th Floor, Arlington,
Virginia, beginning at 4:15 o'clock p.m.
      APPEARANCES:
          On Behalf of the Plaintiff:

               Sarah A. Piper, Esquire
               HICKS CRANDALL JUHL, P.C.
               3201 Jermantown Road
               Suite 200
               Fairfax, Virginia  22030


          On Behalf of the Defendant:

               Andrei J. Kublan, Esquire
               KUBLAN KHAN, PLC
               6521 Arlington Boulevard
               Suite 201
               Falls Church, Virginia  22042

```
 1                       P R O C E E D I N G S

 2              THE COURT:  Good afternoon.

 3              THE COURT REPORTER:  Good afternoon.

 4              THE COURT:  Do I need to swear you again?  Ms.

 5    Court Reporter, should I swear you again?

 6              THE COURT REPORTER:  Oh, yes.

 7              (Whereupon, the court reporter was duly sworn by

 8    the Court.)

 9              THE COURT:  Good afternoon, Counsel, Mr. and

10    Mrs. Wilson.

11              This case comes before the Court on the

12    Defendant's emergency motion to modify custody and the

13    Plaintiff's cross motion to modify custody.

14              Upon consideration of the record in this case,

15    the testimony presented, including the demeanor and

16    credibility of the respective witnesses, review of the

17    exhibits introduced into evidence, and having afforded the

18    weight the Court deems appropriate to each, the Court

19    finds that there is sufficient evidence that there is a

20    material change in circumstances regarding the custody of

21    the parties' minor child, Justin Wilson.

22              Specifically, the Court finds that the father,
```

1    Justin Potter Wilson, Jr., has engaged in behavior over a

2    period of months in which he has disparaged the mother,

3    Anna Wilson, in front of Justin, who is 10 years old, used

4    profane and wholly inappropriate language in talking with

5    the child about his mother on numerous occasions, and

6    engaged in an ongoing and continuous course of conduct

7    designed to turn the child against his mother and

8    interfere with Ms. Wilson's custody and visitation rights

9    which the parties mutually agreed would govern the

10   relationship at the time of their divorce.

11          This conduct violates the Marital Separation

12   Agreement between the parties and has caused severe stress

13   and anxiety to the minor child, as attested by the child's

14   therapist, Dr. Sowa.

15          In determining custody and or visitation for a

16   minor child, Virginia Code 20-124.3 requires the Court to

17   consider the following factors.

18          1.  The age and physical and mental condition of

19   the child, giving due consideration to the child's

20   changing developmental needs.

21          Justin is 10 years old.  He will turn 11 next

22   month and entering the fifth grade.  He has been diagnosed

1    with attention deficit hyperactivity disorder -- ADHD --

2    and has documented difficulty with impulsive behavior,

3    executive functioning and decision making, including

4    processing information, following instructions, and

5    understanding the consequences of his words, actions and

6    choices.

7              Evidence regarding Justin's diagnosis and

8    functioning was provided by Dr. Sowa, a clinical

9    psychologist and Justin's treating therapist, and Mr.

10   Sere, Director of Lower Education at Commonwealth Academy,

11   Justin's elementary school.

12             It is undisputed that at various times over the

13   past twelve months Justin has presented as depressed,

14   anxious and or stressed, specifically, one, when

15   transitioning between his parents' custodial time; two,

16   prior to and during phone conversations with Mr. Wilson

17   during mother's custodial time; and, three, in the

18   presence of Mother, after returning from Father's

19   custodial time, as evidenced by the testimony of

20   Defendant's witnesses Galina Spivak, Olga Bogatova and

21   Maxim Usubyan, and Plaintiff's witnesses, Michael Retta

22   and Dr. Sowa.

1        Justin has been described as otherwise healthy,

2    although small for his age.  He enjoys playing tennis and

3    other sports, is an avid reader, and reads and speaks in

4    both Russian and English.

5        When in the company of one parent or the other,

6    he presents as happy, warm and loving toward that parent.

7    He has been described by numerous witnesses as sociable

8    and having a varied group of friends, including both

9    childhood friends and classmates.

10        Dr. Sowa testified that Justin is making

11    progress in therapy addressing his ADHD.  And Mr. Sere

12    testified that his grades at Commonwealth Academy have

13    been good.

14        The second factor.  The age and physical and

15    mental condition of each parent.

16        Addressing first Ms. Wilson, Ms. Wilson is a 46-

17    year-old female who has been diagnosed with insomnia.  A

18    considerable amount of testimony was presented to the

19    Court regarding Ms. Wilson's prescribed use of Xanax for

20    insomnia during the period 2015 to the present, and its

21    effect on her ability to be an appropriate custodian for

22    Justin.

1           Ms. Wilson's primary physician, Dr. Maria

2    Natividad, who was accepted by the Court as an expert in

3    internal medicine, testified that she has been Ms.

4    Wilson's doctor since June, 2009, and has been treating

5    Ms. Wilson for stress related insomnia since approximately

6    2015 when Ms. Wilson and Mr. Wilson separated.

7           Dr. Natividad originally prescribed .5

8    milligrams of alprazolam, otherwise known as Xanax, for

9    Ms. Wilson which she described as the lowest dose.  Since

10    that time Dr. Natividad has increased Ms. Wilson's

11    prescription to one and a half to two milligrams daily to

12    be taken before bed.

13           Dr. Natividad explained that it is normal over

14    the course of time to increase the dosage of Xanax when

15    used for insomnia, as the patient becomes more accustomed

16    to the drug.  She testified that Ms. Wilson is still on a

17    low dosage of Xanax, given the number of years she has

18    been on the medication.

19           Recognizing the potential for alprazolam to be

20    abused, Dr. Natividad testified that she meets with Ms.

21    Wilson every 3 to 6 months and reviews her use of

22    alprazolam to ensure it is still medically appropriate.

1        She also reviewed Ms. Wilson's prescription

2   report and confirmed that Ms. Wilson's usage was

3   consistent with the medication that had been prescribed.

4        Because of the amount of time that Ms. Wilson

5   has taken the drug, she has twice tried to change Ms.

6   Wilson to a different medication, but neither was found to

7   be effective in addressing Ms. Wilson's medical condition.

8        Dr. Natividad opined to a reasonable degree of

9   medical certainty that Ms. Wilson is not addicted to

10  alprazolam and that her usage of the drug is medically

11  appropriate.

12       Dr. Natividad's testimony was largely

13  corroborated by the testimony of Plaintiff's witness,

14  George Young, a clinical social worker who was accepted by

15  the Court as an expert in the field of substance abuse

16  counseling and testing.

17       Mr. Young is not a medical doctor and has never

18  prescribed alprazolam for any medical condition.  He has

19  never met with Ms. Wilson or conducted any substance abuse

20  evaluation of her.

21       He has reviewed the medical records admitted

22  into evidence and Ms. Wilson's deposition testimony, and

1  agreed that Ms. Wilson's use of Xanax appeared consistent

2  with what had been prescribed by Dr. Natividad.  He also

3  agreed that use of one and a half to two miligrams of

4  alprazolam per day would not in itself indicate a

5  dependency on the drug.

6          He opined that as a substance abuse

7  professional, not a medical professional, he had a concern

8  about whether Ms. Wilson had a dependency on the

9  medication, given the length of time Ms. Wilson had used

10  the medication and the amount prescribed, but again

11  acknowledged he had not conducted a personal evaluation of

12  Ms. Wilson and had no medical training -- no formal

13  medical training.

14          He also opined that, given these factors, any

15  decision for her to stop using alprazolam needed to be

16  done gently to avoid potential medical complications.

17  Since he had not personally evaluated Ms. Wilson, he could

18  not render any further opinions regarding the

19  appropriateness of Ms. Wilson's alprazolam use.

20          Mr. Young described a number of possible side

21  effects of alprazolam that he has observed in his clinical

22  practice on the part of individuals who have developed a

1   chemical dependency to the drug, including irritability,

2   mood swings and difficulty operating motor vehicles.  He

3   could not opine whether Ms. Wilson experienced any of

4   these side effects from her alprazolam use.

5           Mr. Young also agreed that these side effects

6   would be less of an issue for a person taking the

7   medication before going to sleep, as does Ms. Wilson,

8   since the drug would likely have flushed out of a person's

9   system by morning.

10          Dr. Natividad testified that she had not

11  observed any adverse indications from Ms. Wilson's use of

12  the drug.  And Ms. Wilson's fact witnesses confirmed that

13  they had never observed any behavior suggesting she was

14  abusing drugs or alcohol.

15          I found the testimony of Ms. Wilson's fact

16  witnesses to be credible.

17          Dr. Samenow, the independant mental health

18  expert appointed by the Court, testified that he was aware

19  that Ms. Wilson had an issue with sleeping and had been

20  prescribed Xanax.  He testified that he was not a medical

21  doctor and, therefore, was not qualified to comment on

22  whether the Xanax dosage medically prescribed for Ms.

1    Wilson was appropriate.

2            He agreed that the use of Xanax, even pursuant

3    to a doctor's prescription, could be a cause of concern if

4    there was evidence that Ms. Wilson was taking the drug in

5    an amount that exceeded what had been prescribed on an

6    ongoing basis.  No such evidence has been tendered to the

7    Court.

8            The Plaintiff introduced photographs from

9    Defendant's Facebook page showing her drinking a glass of

10   wine on her birthday and at a friend's birthday

11   celebration, which was consistent with Ms. Wilson's

12   testimony that she occasionally drinks one or two glasses

13   of wine on social occasions.

14            Dr. Natividad testified that if Ms. Wilson had a

15   glass of wine and took a Xanax at the same time, she would

16   feel extremely drowsy.  There was no evidence presented

17   that Ms. Wilson ever did this.

18            The Court had ample opportunity to observe Dr.

19   Natividad's demeanor while on the witness stand and

20   reviewed a copy of her curriculum vitae, which was entered

21   into evidence.  The Court finds Dr. Natividad's testimony

22   to be credible.

1       The Court further finds, based on the totality

2   of the evidence, there is no evidence that Ms. Wilson has

3   a substance abuse problem or that her use of Xanax

4   interferes with any of her ongoing daily activities.

5       Dr. Samenow conducted psychological testing

6   which also contained no indication of any psychopathology

7   on the part of Ms. Wilson.  Dr. Samenow interviewed Ms.

8   Wilson and a number of Ms. Wilson's colleagues, including

9   Galina Spivak and Frederico Delasobera, who both testified

10  at trial and were subject to cross examination by counsel

11  for Mr. Wilson.

12      Dr. Samenow found that Ms. Wilson is reflective

13  and appeared willing to identify and discuss shortcomings.

14  She is generally a cheerful person but not ambitious or

15  competitive.

16      She self-reported difficulty making decisions

17  because she is "full of doubts".  Based on his evaluation,

18  Dr. Samenow found that Ms. Wilson had some general anxiety

19  as well as difficulty sleeping, both situational and

20  stemming from the divorce.

21      His professional opinion, therefore, is that Ms.

22  Wilson has no diagnosable mental disorder.

1    Ms. Wilson appears otherwise healthy and engages

2    in a variety of activities, including hiking, camping,

3    travel, cooking and reading.

4    Mr. Wilson.  Mr. Wilson is a 46-year-old male

5    who self-reports that he has undiagnosed ADHD.  Dr.

6    William Zuckerman, the independent mental health expert

7    appointed by the Court, found the following with respect

8    to Mr. Wilson.

9    "He can be assertive" -- and this is a quote --

10    "He can be assertive, even aggressive at times, not

11    necessarily physical, in his interpersonal relationships,

12    but his social skills are good.  He is able to work

13    collaboratively with others and he is likely in most

14    situations to act in a conventional way.

15    "He can be oppositional at times but he is also

16    likely to be quite perseverant in pursuit of his goals

17    with that pursuit having yielded positive results in the

18    past.

19    "Mr. Wilson is stressed by the current

20    circumstances so that he is likely to be experiencing

21    tension and some helplessness along with a temporary

22    increase in irritability.  However, his coping skills, in

1    general, are within the normal range.  He may have some

2    deficits in understanding others, but they are balanced by

3    a level of interest in others and an ability to develop

4    warm and intimate relationships.  Moreover, his thinking

5    is likely to be logical and coherent and his day to day

6    judgments are likely to be within the normal range.

7              "Family issues can create some stress for Mr.

8    Wilson, perhaps due to current and past events, but he is

9    quite child focused with a strong and positive view toward

10   his son and a normal positive embrace of the parental

11   position.

12             "Despite the current stress, there are no long-

13   term predictions of difficulty with anxiety or depression.

14   Diagnostically he would fit the category of having a

15   situational adjustment disorder with anxiety.

16             "He has, according to testing, some compulsive

17   personality features, but he has no diagnosable axis two

18   disorders and no other axis one disorder.  There are no

19   findings that would preclude him from being able to parent

20   effectively," unquote.

21             Dr. Zuckerman's report further notes that when

22   Justin was about -- Justin, the child -- was about 3 or 4,

1    Mr. Wilson described that his drinking had become "a

2    problem" and that he was having as many as 5 beers a night

3    for a period of about 4 years.

4           During that time he "remembers having driven a

5    car in situations -- sometimes taking Zhenya" -- another

6    name for Justin -- "to activities wherein he might have

7    been legally considered inebriated.  He feels he was

8    somewhat less available to Zhenya during this time."

9           Mr. Wilson testified that he has not had a drop

10   of alcohol in over a thousand days.  Mr. Wilson appears to

11   be in good physical health.  He is a vegetarian and works

12   out daily.

13          3.  The relationship existing between each

14   parent and Justin, including positive involvement and

15   ability to accurately assess and meet the emotional,

16   intellectual and physical needs of the child.

17          Ms. Wilson.  The weight of the credible evidence

18   shows that Ms. Wilson's relationship with Justin when he

19   is in her presence without interference from Mr. Wilson is

20   warm, loving and caring.

21          Ms. Wilson engages Justin in numerous age

22   appropriate activies, including soccer, swimming, music

1    lessons, reading in both Russian and English, cooking,

2    amusements, cultural activities, outings with friends,

3    hiking, camping, birthday parties, and travel.

4         Family friends who have known Ms. Wilson and

5    Justin since before the divorce testified as to the

6    positive nature of their relationship and the types of

7    activities that they do together.  Justin spends time in

8    the company of his mother and his childhood friends when

9    he is with his mother, as well as at a wide variety of

10   activities.

11        He also plays tennis with one of his coaches,

12   Fred Delasobera, on Sunday mornings, who testified that

13   Justin's relationship with his mother was normal.  Mr.

14   Delasorbera was Justin's primary tennis coach until

15   December 2018, when Mr. Wilson hired a different coach,

16   Michael Retta, for Justin.  Mr. Retta only coaches Justin

17   when he is with his father.

18        Ms. Wilson's mother, Olga Bogatova, spends

19   summers in the United States and provided testimony

20   regarding the nature of Ms. Wilson's relationship with

21   Justin.  She observed that Justin appeared happy when he

22   was in his mother's house, except when he expected his

1    father to call.  She testified that sometimes during these

2    calls, Justin suddenly starts screaming at Ms. Bogatova

3    and Ms. Wilson, saying derogatory things to them.

4         The Court finds significant the fact that after

5    these calls finish Justin apologizes to his mother and

6    grandmother for his behavior, recognizing that the

7    behavior is not appropriate.

8         The credible evidence shows that in the last

9    several years, transitions between Mother and Father's

10   custodial time have been very difficult for Justin.

11        Mr. Retta, Justin's tennis coach, who plays

12   tennis with Justin immediately upon his return to Mr.

13   Wilson on Sunday evenings, and several of Ms. Wilson's

14   friends who routinely spend time with the family on Sunday

15   afternoons, testified that Justin is noticeably anxious in

16   the time before the transition between the two households

17   or lethargic and sad afterwards.

18        Ms. Wilson testified that she generally needs to

19   end activities about an hour before Justin is returned to

20   his father on Sunday.  And she spends this time alone with

21   him sitting with him, talking with him, and hugging him as

22   he prepares to go to his father's home.

1    Likewise, Justin has, on at least three

2  occasions before returning to his mother's home,

3  physically resisted leaving his father's company until his

4  father was no longer present.

5    At some point between the summer of 2017 and

6  2018, Justin's attitude towards his mother changed.

7    In an email exchange between Ms. Wilson and Mr.

8  Wilson, which was admitted as Plaintiff's Exhibit 12, Ms.

9  Wilson noted that "Zhenya seems more resentful of me and

10  blames me for everything whenever he gets upset.  It is

11  especially noticeable when he first comes to be with me."

12    In that same email Ms. Wilson stated that she

13  was concerned about Justin's well-being, stating, "He

14  needs reassurance from you" -- Mr. Wilson -- "that it's

15  okay to feel good with both parents.  Since you have a

16  great deal of influence on him and he takes your opinions

17  very personally, he would clearly benefit from you cutting

18  back on criticizing him and his activities with me.  We

19  need to prepare him and ourselves for his pre-teen and

20  teen years and need to help him work on the coping

21  mechanisms and build his confidence."

22    Mr. Wilson acknowledged that he likely did not

1    respond to Ms. Wilson's email.

2          On numerous occasions in the fall and winter of

3    2018 and 2019, Ms. Wilson overheard Mr. Wilson using

4    profane and derogatory language when discussing her in

5    front of Justin.

6          She also heard him belittling the child's

7    activities with her, including swimming, guitar lessons

8    and going to the trampoline park, and telling the child to

9    disobey his mother.

10          During the mother's custodial time in winter

11    2018, she overheard Mr. Wilson instructing Justin to

12    refuse to go on a trip to Disney World with her and

13    instead to leave the house and go to his father's home.

14          Mr. Wilson admitted to Dr. Zuckerman that there

15    were times when "he has expressed his dissatisfaction

16    about Ms. Wilson to Justin," including that she does not,

17    "support his strong interest in tennis."

18          He also told Dr. Zuckerman that Justin knows

19    "that his father disapproves of his mother's behavior and

20    demonstrates dissatisfaction with Ms. Wilson at

21    transition."

22          Mr. Wilson stated unequivocally on direct

1    examination that he has said "reprehensible things about

2    the mother in front of the child."

3            Although he was noticeably less candid on

4    cross-examination, he did not deny the statements

5    attributed to him by Ms. Wilson that he used profanity

6    when describing her to the child, that he told the child

7    to disobey the mother, and that he disparaged the child's

8    activities with the mother, including going to the

9    trampoline park and to Disney World.

10            As to the content of these conversations, after

11   hearing the testimony of both Ms. Wilson and Mr. Wilson,

12   and watching the demeanor of the two in the courtroom, the

13   Court finds Ms. Wilson's testimony to be credible and Mr.

14   Wilson's testimony on cross-examination not credible.

15            The weight of the evidence establishes that

16   since the time of separation, Ms. Wilson has been aware of

17   Justin's need to maintain a relationship with his father

18   and has tried to navigate a coparenting relationship with

19   Mr. Wilson without success.

20            Ms. Wilson is responsive and appropriate in

21   matters involving Justin's school, takes him to medical

22   appointments and counseling, encourages him to play

1    tennis, even during her custodial time, and does not

2    interfere with Mr. Wilson's custodial time, going so far

3    as to find ways for Justin to talk with his father even

4    when the family is on a camping trip, on vacation, at the

5    park and on travel.

6            Plaintiff presented evidence of two occasions

7    when there did appear to have been a misunderstanding

8    regarding transfer dates and times on the part of Ms.

9    Wilson.

10           The Court finds that while Justin is with Ms.

11   Wilson, she provides both structured and unstructured time

12   as well as ongoing and varied physical activity.  She also

13   engages Justin in social and creative activities and

14   intellectual pursuits, including birthday parties, trips

15   to the library, math, chess, reading in Russian and

16   English, cooking, music and theater arts.

17           Ms. Wilson and her mother both testified that

18   there is a clear routine followed in the home when Justin

19   is present.  While the routine is different than what Mr.

20   Wilson follows, Dr. Sowa testified that Justin can adapt

21   to different routines in different households as long as

22   the routines within each household are consistently

1    followed in that household.

2              The Court found this testimony to be credible.

3              Mr. Wilson.  The evidence also shows that when

4    Justin is with Mr. Wilson they appear to have a positive,

5    loving relationship.

6              This evidence was presented by Dr. Sowa, who has

7    seen Mr. Wilson interact with Justin, and Michael Retta,

8    the tennis coach who has spent approximately 8 to 10 hours

9    per week with Justin and Mr. Wilson since December of

10    2018.  Mr. Sere also testified that Mr. Wilson's

11    interactions with Justin at school were all appropriate.

12              Mr. Wilson's interactions with Justin appear to

13    center around tennis and basketball.  Justin plays every

14    day for two to two and a half hours during Mr. Wilson's

15    custodial time.  Mr. Retta testified that he is paid

16    $2,500 per week by Mr. Wilson to provide tennis lessons to

17    Justin and Mr. Wilson who is his largest single client.

18              Justin also plays basketball at the rec center

19    while Mr. Wilson works out nearby.

20              Mr. Wilson admitted that for one season he

21    allowed Justin to watch a Netflix series about a serial

22    killer.

1        Mr. Wilson testified that when school is not in

2   session, he and Justin also read and spend free time

3   together doing various activities.

4        Although Mr. Wilson emphasized that he had a

5   strict routine that he followed with Justin, Mr. Retta and

6   Mr. Wilson provided somewhat conflicting testimony

7   regarding that schedule.

8        While it appears that Mr. Wilson does love his

9   son, he admitted that he loathes Ms. Wilson.

10       The Court finds that the weight of the credible

11  evidence established that since at least the summer of

12  2018, Mr. Wilson has engaged in a course of behavior that

13  is negatively interfering with Ms. Wilson's relationship

14  with Justin.

15       The Court finds that this behavior is not

16  consistent with Justin's emotional needs, but instead

17  creates substantial stress for the child by forcing the

18  child to choose between his parents.

19       Mr. Wilson testified that he calls Justin every

20  day and talks for upward of a half an hour during Ms.

21  Wilson's custodial time.

22       During the school year Ms. Wilson has custodial

1    time only three nights per week.    Ms. Wilson's testimony

2    is that the calls at times last an hour or longer and

3    often upset the child so much that he has a hard time

4    falling asleep.

5            Mr. Wilson expects to talk with Justin,

6    regardless of what he is doing.  By his own admission he

7    becomes frustrated and upset if his call is not returned

8    almost immediately after it is made.

9            Various witnesses testified that Ms. Wilson

10   often has to go to great lengths to ensure that Justin is

11   able to communicate with Mr. Wilson when he calls and that

12   the calls are not only stress inducing for Justin, but

13   generate conflict between Justin and Ms. Wilson.  As a

14   result of one such call while Justin was in Florida with

15   his mother, Justin jumped out of a car onto the side of a

16   busy road at night in the dark and ran from his mother,

17   putting himself and others in the car in real danger.

18   Justin can be heard on the video telling his father he has

19   to call him back and subsequently yelling at his mother

20   that she and the others in the car have to wait so he can

21   talk with his father.

22           During the 4-day trip to Florida, Mr. Wilson

1  constantly and repeatedly called and emailed Ms. Wilson

2  about talking with Justin, even though there was no

3  obvious need for Mr. Wilson to talk with the child while

4  he was on vacation in Florida.

5        Email communications introduced by Plaintiff's

6  Counsel, as well as testimony by Ms. Wilson, indicate that

7  Mr. Wilson has repeatedly threatened to stop providing

8  things to Justin that are important to him, such as tennis

9  lessons, in order to induce the child to do what Mr.

10  Wilson wants, including refusing to go on planned outings

11  and vacations with Ms. Wilson.

12        On the night prior to the Disney World trip, Mr.

13  Wilson not only attempted to convince the child to refuse

14  to go on the trip, but then physically drove over to the

15  mother's apartment and asked the concierge to go to the

16  apartment to perform a welfare check on the child in what

17  can only be viewed as an attempt to manufacture some

18  reason to keep the child from going on the trip.

19        After observing Mr. Wilson's demeanor on the

20  witness stand for almost 5 hours, the Court finds Mr.

21  Wilson's testimony to be, for the most part, not credible,

22  particularly regarding the events of December 29 through

1    January 2nd.

2          The Court finds that Mr. Wilson is willing to

3    support only those activities that he deems appropriate

4    for Justin -- primarily sporting activities and one on one

5    time with Mr. Wilson -- and actively attempts to undermine

6    those activities that Ms. Wilson deems important.  He also

7    consistently seeks to impose his will on Justin, even when

8    he is with Ms. Wilson, and to create conflict with Ms.

9    Wilson when Mr. Wilson cannot get what he wants.

10          The Court finds these facts significant in

11    determining the best interest of the child.

12          4.  The needs of the child, giving due

13    consideration to other important relationships of the

14    child, including, but not limited to siblings, peers and

15    extended family members.

16          Justin needs and wants the love and affection of

17    both parents, and as a general matter seems content when

18    dealing with either parent without the interference of the

19    other.

20          Justin is a high needs child.  And routine and

21    structure are important to him.  The credible evidence

22    supports that both parents provide structure in their

1    household.   The structure is simply different in the two

2    households.   However, as Dr. Sowa explained, Justin need

3    not have the same routine and structure with both parents.

4    He needs clear rules and routines for each individual

5    household which are consistently applied within that

6    household.

7           Justin appears to have a close relationship with

8    his maternal grandmother who he sees for several months

9    every year, friends he knows through his mother, friends

10   from school, and his tennis coach, Mr. Retta.

11          He apparently also has some friends he plays

12   basketball with at the community center, but there was no

13   evidence that Justin socializes with them outside of that

14   environment.

15          5.  The role each parent has played and will

16   play in the future in the upbringing of the child.

17          Ms. Wilson testified that she has been Justin's

18   primary caretaker his entire life up to this point.  Mr.

19   Wilson testified that he became Justin's primary caretaker

20   when Justin was 4 or 5 when Ms. Wilson returned to work.

21          While it is probable that Mr. Wilson took on

22   additional responsibilities for Justin's care when Ms.

1    Wilson returned to work, by Mr. Wilson's own admission, he

2    was drinking heavily during this time and likely not very

3    available to Justin.

4          Given the toxic relationship between the

5    parents, this Court cannot envision how both parents can

6    continue to play an equal ongoing supportive role in

7    Justin's life in the future.

8          6.  The propensity of each parent to actively

9    support the child's contact and relationship with the

10   other parent, including whether a parent has unreasonably

11   denied the other parent access to or visitation with the

12   child.

13         The Court adopts the facts previously

14   articulated in evaluating this factor.

15         The Court finds that Ms. Wilson has demonstrated

16   an ongoing willingness to support Justin's contact and

17   relationship with his father and has not unreasonably

18   denied Mr. Wilson access or visitation with Justin.

19         The Court finds that Mr. Wilson has actively and

20   somewhat successfully undermined Ms. Wilson's relationship

21   with Justin and has actively interfered with Ms. Wilson's

22   access to and visitation with the child.

1    In addition to the testimony regarding Mr.

2    Wilson actively denigrating the mother's choices for the

3    child, as well as trying to impose Mr. Wilson's needs and

4    wants on Ms. Wilson's custodial time with the child, the

5    Court finds significant Mr. Wilson's statement to Dr.

6    Zuckerman that when Justin complains about issues with his

7    mother, Mr. Wilson agrees with the child, rather than

8    supporting Ms. Wilson.

9    The Court does not find evidence to support Mr.

10    Wilson's contention that Ms. Wilson has repeatedly

11    interfered with his ability to have reasonable contact

12    with his child.

13    7.  The relative willingness and demonstrated

14    ability of each parent to maintain a close and continuing

15    relationship with the child and the ability of each parent

16    to cooperate and resolve disputes regarding the matters

17    affecting the child.

18    The Court adopts the facts previously

19    articulated in evaluating this factor.  As already

20    described in substantial detail, the Court finds that Mr.

21    Wilson is neither capable nor willing to cooperate with

22    Ms. Wilson to resolve issues regarding the child.

1          The Court notes that although Dr. Sowa has

2     suggested on at least two occasions that the parents

3     consider medication for Justin for his ADHD, and Ms.

4     Wilson has indicated a willingness to discuss this

5     possibility, Mr. Wilson has consistently refused to

6     discuss with Ms. Wilson the possibility of medication for

7     Justin.

8          The Court also notes that when deciding which

9     school to transfer Justin to after the decision was made

10    to remove him from Congressional, although Ms. Wilson was

11    leaning towards a different school, Mr. Wilson

12    unilaterally made the decision to place Justin at

13    Commonwealth Academy then criticized Ms. Wilson for

14    waiting until the final day to sign the paperwork.

15          Finally, the evidence supports a finding that

16    had this Court not entered an order in March 2019 allowing

17    either party to record telephone calls with the child, Mr.

18    Wilson would have continued his abusive and derogatory

19    comments towards the mother in his phone calls with the

20    child.

21          The reasonable preference of the child if the

22    Court deems the child to be of reasonable intelligence,

1    understanding, age, and experience to express such a

2    preference.

3             The Court finds that Justin does not possess the

4    requisite age, understanding or experience to express a

5    preference.  Justin is 10 years old, about to turn 11, and

6    will be entering the fifth grade.  As such, he has not yet

7    completed elementary school.

8             He has ADHD and struggles with impulse control

9    which appears to be triggered to extreme degrees after

10   spending time with or during phone conversations with his

11   father.

12            He has difficulty with executive decision

13   making, particularly understanding the consequences of his

14   words, actions and choices.

15            He exhibits continued and ongoing stress when

16   faced with conflict between his parents, and acts out

17   aggressively, particularly towards his mother, when faced

18   with making any choice that is contrary to the expressed

19   wishes of his father.

20            The Court has carefully considered each of the

21   above factors and all of the -- I do not believe there's

22   -- I think the final factor is evidence of prior abuse.

1   And I do not find that any evidence was presented of prior

2   abuse, so the Court has also considered that factor.

3        The Court has carefully considered each of the

4   factors in Code Section 20-124.3 affording each the

5   appropriate weight, given the record in this case, the

6   testimony presented, including the demeanor and

7   credibility of the respective witnesses which the Court

8   heard and observed over a period of 3 days of testimony,

9   and has reviewed the exhibits introduced into evidence.

10        The Court finds that the best interests of the

11   child require that the custody and visitation schedule set

12   forth in the Marital Settlement Agreement be modified as

13   follows.

14        One.  The parties will continue to share joint

15   legal custody.  However, in the event the parties cannot

16   reach agreement, Ms. Wilson will have final authority to

17   make decisions on behalf of the child.

18        Two.  Ms. Wilson is granted primary physical

19   custody of Justin.

20        Three.  Mr. Wilson will have visitation with

21   Justin every other weekend beginning after school on

22   Friday until Monday night at 7:00 p.m.

1          Four.  Justin may attend one tennis lesson with

2     Mr. Retta each week during mother's custodial time.  Said

3     lesson will be scheduled directly between Ms. Wilson and

4     Mr. Retta.  And Ms. Wilson will bring the child to and

5     from the lesson.

6          Mr. Wilson will arrange for payment to Mr. Retta

7     in accordance with any financial arrangement they reach.

8          Five.  Neither parent shall make derogatory or

9     disparaging comments about the other parent or the

10    activities that parent has arranged for the child.

11         And neither parent shall use profanity in

12    conversations with the child or with the other parent.

13         Six.  Ms. Wilson will not call or schedule any

14    events for Justin during Father's custodial time.

15         Ms. Wilson will forward via email to Mr. Wilson

16    invitations to birthday parties or other events that occur

17    during Mr. Wilson's custodial time.  And Mr. Wilson will

18    have sole authority to decide whether Justin attends.

19         Seven.  Mr. Wilson will not call Justin during

20    Mother's custodial time except Mr. Wilson may call Justin

21    between 8:00 and 8:30 p.m. every Tuesday, Wednesday and

22    Thursday evening.  And the calls will be limited to half

1    an hour.

2         Ms. Wilson will ensure that Justin is available

3    to speak with his father during this time.  All telephone

4    calls may be recorded at the option of the custodial

5    parent without warning, and such recording will be deemed

6    consensual on the part of the recorded party.

7         Eight.  Justin will spend parents' birthdays

8    with the respective parent.  The parent celebrating the

9    birthday can pick Justin up the night before at 7:00 p.m.

10   and return the child to school the morning after the

11   birthday.

12        If the morning after falls on a weekend, the

13   child shall be returned no later than 10:00 a.m., unless

14   it is that parent's custodial weekend.

15        Neither parent shall call the child while he is

16   celebrating the other parent's birthday.

17        Justin will spend every other one of his

18   birthdays with his father beginning in 2019.  The

19   visitation schedule will be the same as for either

20   parent's birthday.

21        The parent who is not with Justin on his

22   birthday may call him at a time to be agreed upon by the

1    parties.

2        Holidays, spring break and winter break will

3    remain as set forth in the parties' Marital Separation

4    Agreement.

5        Each parent will be permitted one half-hour call

6    with the child on the following holidays: New Year's Day,

7    Thanksgiving, and Christmas.

8        The parents will not call the child on any other

9    holiday when the child is with the non-custodial parent

10   and will be permitted one call with the child during

11   spring and winter break during the other parent's

12   custodial time.

13       During the summer Mr. Wilson will have two

14   uninterrupted weeks with Justin during the month of June

15   which will begin at 10:00 a.m. Sunday and last until 7:00

16   p.m. the following Sunday.  So two successive Sundays

17   because it's two uninterrupted weeks.

18       Mr. Wilson will have one uninterrupted week in

19   each of the months of July and August which will last from

20   10:00 a.m. Sunday until 7:00 p.m. the following Sunday.

21       Ms. Wilson will not contact Justin during this

22   time or schedule any activities for him.

1          Mr. Wilson will not schedule any camps or other

2     activities for Justin except during his custodial time.

3          Eleven.  Ms. Wilson will advise Dr. Sowa or

4     whoever Justin's current therapist is regarding any camp

5     she intends to register Justin in during the summer prior

6     to registration.  And that therapist will advise her if

7     Justin expresses any concerns with any camp proposed.

8          Twelve.  Each parent will give the other parent

9     24 hours notice of their intention to take the child on a

10    trip outside of the D.C. Metropolitan area, providing the

11    times and dates of travel, destination and persons

12    traveling with parent and child.

13         Unless the travel dates include New Year's Day,

14    Thanksgiving or Christmas, the non-custodial parent will

15    not call the child during the travel dates except on the

16    specified holiday.

17         Thirteen.  Mr. Wilson will continue his current

18    therapy and will also complete anger management therapy.

19    Mr. Wilson will also engage in family counseling with

20    Justin and coordinate the counseling with Dr. Sowa.

21         Fourteen.  Ms. Wilson will engage in family

22    counseling with Justin and will coordinate the counseling

1   with Dr. Sowa.

2         Defendant's emergency motion to modify custody

3   is granted.  Father's motion to modify custody is denied.

4   The Court finds it it Mr. Wilson's conduct, not Ms.

5   Wilson's conduct, that brings this matter before the

6   Court.

7         The Court further finds that the award of

8   attorney's fees to Ms. Wilson is supported by the record.

9         Do the parties have any questions?

10        MR. KUBLAN:  Your Honor, just one clarification

11   about summertime?  I think the Court said two weeks in

12   June, one week in July and one week in August for the

13   father.

14        What about Ms. Wilson --

15        THE COURT:  The rest of the time is Ms.

16   Wilson's.

17        MR. KUBLAN:  But -- you know, but if she wants

18   to take him, let's say two weeks uninterrupted and, you

19   know, we have --

20        THE COURT:  She should be able to do that

21   because he has every other weekend.

22        MR. KUBLAN:  I guess so, yes.  Never mind.

```
 1          THE COURT:  I don't think that should be a

 2    problem, but if it is, I do intend for her also to be able

 3    to have a period of two uninterrupted weeks.  That can be

 4    in July or August.

 5          MR. KUBLAN:  Can Your Honor put that in the

 6    order then?

 7          THE COURT:  Certainly.

 8          MR. KUBLAN:  Okay.

 9          THE COURT:  Any additional questions?

10          MS. PIPER:  As to Mr. Wilson's therapist -- may

11    he choose a therapist?

12          THE COURT:  Certainly.

13          MS. PIPER:  I have questions as to times but I

14    can get that from the court reporter.

15          THE COURT:  Okay.  What I would suggest is if

16    the parties would prepare an order.  And that way you can

17    kind of confer and you can look at the transcript and make

18    sure it's -- it's consistent.

19          We can schedule a date in a couple of weeks to

20    enter the order.  And if there are any questions at that

21    point the Court will take them up.

22          Mr. Wilson, I will simply tell you I don't
```

1    really think you appreciated how generous Ms. Wilson was

2    in the marital separation and custody and visitation

3    arrangement that she agreed with you at the time of the

4    divorce.

5              And I genuinely believe that we would not be

6    here today but for the conduct that you have engaged in.

7    And I hope that you will use this as an opportunity to

8    reflect on that and modify that conduct because I do

9    believe it is very important for you -- and that you

10   consider it very important -- to have an ongoing

11   relationship with your son.

12             And I'd like to see that happen.  But it can not

13   -- things can not continue in the way they have been over

14   the last 18 months.

15             If there are no further questions, thank you,

16   Counsel for your time.  Have a nice weekend.

17             MR. KUBLAN:  Your Honor, should we select a date

18   to --

19             THE COURT:  Oh, yes.  Why don't we do that?

20             MS. PIPER:  Actually, Your Honor, I -- I do have

21   a question.  When is the custodial schedule to begin?

22             MR. KUBLAN:  Can it be (indiscernible)?

```
 1              THE COURT:  Where is -- where is Justin this --
 2   where was he supposed to be this weekend?
 3              MS. PIPER:  Justin is supposed to be with Mr.
 4   Wilson this weekend.
 5              THE COURT:  Okay.  So I would like to keep that.
 6   I don't at five o'clock on Friday want to suddenly pull
 7   the rug out from under him.  So I would like to keep that
 8   and have that custody continue until 7:00 p.m. on Monday.
 9              And then we'll pick up with the custodial
10   schedule beginning 7:00 p.m. on Monday.
11              MS. PIPER:  And I -- and I didn't raise this
12   before, but, Your Honor, I believe it would be best for
13   Justin to have Dr. Sowa talk to him about the custodial
14   change or be available.
15              Can we have a ruling or can the parties agree
16   that they are not going to discuss the changes with Justin
17   until his therapy appointment which is Thursday?
18              MR. KUBLAN:  I don't understand why there needs
19   to be even a discussion, Your Honor.  The child is ten
20   years.  I mean, it just -- it's -- I -- I just think, you
21   know, they are just going to continue with the new
22   schedule.
```

1          And if the child has any questions, you know,

2     then I think they just say to the child that this is what

3     they decided.

4          MS. PIPER:  I mean, I think that he would

5     benefit from having Dr. Sowa available to talk to him.

6          THE COURT:  I don't have any problem with having

7     Dr. Sowa available.  I -- I do think at this point that it

8     makes the most sense to just explain to him that this is

9     what the -- the arrangement is going to be going forward.

10          And then Dr. Sowa can certainly be available to

11     him whenever Justin would like to talk with him about it.

12     I'm sure there will be a number of issues that he'll like

13     to talk about.

14          MR. KUBLAN:  So just to be clear, Your Honor,

15     starting this Monday at 7:00 o'clock that's when the new

16     schedule is going to begin?

17          THE COURT:  Correct.

18          MR. KUBLAN:  Okay.  And what's the Court's

19     availability for the --

20          THE COURT:  Any day but the 13th of September --

21     any Friday but the 13th of September.

22          MS. PIPER:  I'm available on the 30th and the

1    6th.

2              MR. KUBLAN:  I'm available on the 6th, Your

3    Honor, too.

4              THE COURT:  We will set this down for 10:00 a.m.

5    on the 6th of September.

6              THE CLERK:  (Inaudible.)

7              THE COURT:  Yes.  Thank you, Counsel, Mr.

8    Wilson, Mrs. Wilson.

9                          *  *  *  *  *

10             (Whereupon, at approximately 5:00 o'clock p.m.,

11   the hearing in the above-entitled matter concluded.)

12

13

14

15

16

17

18

19

20

21

22

CERTIFICATE OF REPORTER

I, COURTNEY A. SEBASTIAN, a Certified Court Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

*Courtney Sebastian*
COURTNEY A. SEBASTIAN, CCR