RECEIVED by Arlington County Circuit Court
03/02/2022 03:48:37 PM

V I R G I N I A :

IN THE CIRCUIT COURT OF ARLINGTON COUNTY

_____

JUSTIN POTTER WILSON, JR.,

     Plaintiff,

v.                                                            Case No. CL 16-1673-01

ANNA VLADIMIROVNA WILSON,
(f/k/a Anna Nikolaeva Wilson)

     Defendant.

_____

### CHILD CUSTODY AND VISITATION ORDER

THIS CAUSE CAME before the Court on June 15-16, 2020, June 21-23, 2021, September 1-2, 2021, and September 15, 2021 for a full evidentiary hearing upon "Defendant's Verified Emergency Motion to Suspend Visitation and Modify Child Custody and Visitation" and "Plaintiff's Counter Motion Against Defendant for Emergency and Permanent Custody, Injunctive Relief and Sanctions" regarding the parties' minor child, Justin Potter Wilson III (hereinafter the "Child"), age 13, born September 1, 2008; and

IT APPEARING TO THE COURT that after carefully considering each of the factors in Virginia Code Section 20-124.3, affording each the appropriate weight, given the record in this case, the testimony presented, including the demeanor and credibility of the respective witnesses which the Court heard and observed over a period of eight (8) days of testimony, and the exhibits introduced into evidence; that, for the reasons set forth in the Court's ruling on September 29, 2021, a copy of which is attached hereto and made a part of this Child Custody and Visitation Order below,

IN CONSIDERATION WHEREOF, it is hereby ORDERED AND ADJUDGED:

(1)    <u>Transcript</u>.  The transcript of this Court's ruling of September 29, 2021 is attached hereto and incorporated by reference into this order.

(2)    <u>Material Change</u>.  Based on the reasons stated in the Court's ruling, the Court finds that there has been a material change in circumstances since entry of the Custody Order on September 9, 2019 and that this material change justifies a modification of said Order based upon the best interests of the Child as follows.  The Court further finds that the custody and visitation schedule set forth in the September 9, 2019 Custody Order shall be modified as follows.

(3)    <u>Legal Custody</u>.  Defendant ("Mother") shall have sole legal custody of the Child.   Mother shall provide Plaintiff ("Father") with information regarding any medical treatment received by the Child, as well as any school reports from any school the Child is attending.   Mother may, but is not required to, consult with Father regarding the Child's activities, school performances, and any behavioral or emotional issues involving the Child.

(4)    <u>Physical Custody</u>.   Mother shall have sole physical custody of the Child until further order of the Court.

(5)    <u>Visitation</u>.  Father shall have the following visitation with the Child:

(a)    Supervised visitations shall initially be with the reunification therapist, Michele Cole, Ph.D. ("Dr. Cole"), who is the therapist selected by the guardian *ad litem*.  Dr. Cole will work with Father and the Child in order to begin the reunification process.  The number and timing of sessions shall be decided by Dr. Cole.  When approved by Dr. Cole, Father will also be allowed supervised visitation with the Child one (1) Saturday a month for a period not to exceed four (4) hours, with supervision through either Safe Heavens or a certified visitation professional approved by the guardian *ad litem*.  Father shall pay for both the reunification therapy services and his supervised visitation.

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 2 of 5*

(b)      Mother shall not call or schedule any event for the Child during any of Father's supervised visitation times.  Father shall provide Mother with a visitation schedule approved by Dr. Cole at least two (2) weeks in advance, and Mother can reach out to Dr. Cole to adjust the schedule if an unavoidable conflict exists.

(c)      Telephone Calls.   Father shall not call the Child during Mother's custodial time, except Father may call the Child between 8:00 p.m. and 8:30 p.m. every Tuesday, Wednesday, and Thursday evening, and the calls shall be limited to a half hour.  Mother shall ensure that the Child is available to speak with Father during this time.  All Father's telephone calls with the Child may be recorded by Mother without warning, pursuant to this Order.   Notwithstanding the forgoing, Father shall be permitted to call the Child for up to one (1) hour during the following holidays: New Year's Day, Thanksgiving, and Christmas.

(6)      Disparaging Comments. Neither parent shall make derogatory or disparaging comments about the other parent or the activities that parent has arranged for the Child, and neither parent shall use profanity in conversations with the Child or with the other parent.

(7)      Corporal Punishment.  Neither parent shall use corporal punishment as a means of disciplining the Child or engage in any physical abuse of the Child.  This is to include intentionally hitting any part of the Child's body to get his attention, remonstrate him for inappropriate or thoughtless conduct, or for any other reason, except if the Child's safety or health is in danger and such action is necessary to protect the Child's immediate well-being.

(8)      Therapy.   Father shall continue his current therapy and shall also complete a specific anger management program to be approved by the guardian *ad litem*, and that can be done by William B. Zuckerman, Ph.D., as long as there is a clear focus on anger management as it applies to the relationship with Mother and the Child.   Mother shall engage in family counseling with Elizabeth Bennett, Ph.D. ("Dr. Bennett") and the Child at least every two (2) weeks until further order of the Court.

(9)      Mother shall make every effort to ensure that the Child is attending school in a consistent and timely manner, and shall work with the guardian *ad litem* if absences or tardies continue to be an ongoing issue while school is back in-person.

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 3 of 5*

(10)    The Court will set this matter for review, at which time the reunification therapist, guardian *ad litem*, and Dr. Bennett shall report to the Court as to whether increased visitation and unsupervised visitation with Father, including overnights, weekends, and holidays, are appropriate.

(11)    Father shall provide Mother with the Child's U.S. Passport, currently in his position, within ten (10) days from the entry of this Order.

(12)    Attorney's Fees.  The Court finds that the award of attorney's fees to Mother is supported by the record.  Father shall pay the sum of Fifty Thousand and no/100 Dollars ($50,000.00) to Mother as and for reimbursement of Mother's attorney's fees within thirty (30) days of the entry of this Order.

(13)    30 Day Notice. Pursuant to Section 20-124.5 of the Code of Virginia, 1950, as amended, thirty (30) days advance written notice must be given to the Court and the other party by any party intending to relocate and of any intended change of address.  Such notice shall provide the Court and the other party of the intended date of change of address, the specific street, route address, city or county, state and zip code of the intended new address.  Such written notice shall be mailed to the Court at the following address:  Clerk of the Court, Circuit Court of Arlington County, 1425 N. Courthouse Road, Arlington, Virginia 22201, and shall certify the date that such information was mailed or otherwise delivered to the other party.

IT IS FURTHER ORDERED that the Clerk of the Court may forthwith issue certified copies of this Order to Counsel of Record.

ENTERED this ___ day of _____

03/04/2022

JUDITH L. WHEAT
JUDGE

_____
Circuit Court Judge

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 4 of 5*

SEEN AND AGREED:

_____

ANDREI J. KUBLAN (VSB No. 73120)
KUBLAN KHAN PLC
6521 Arlington Blvd., Suite 201
Falls Church, Virginia 22042
Telephone: (703) 854-1081
Facsimile: (703) 854-1083
Email: andrei@kublankhan.com
*Counsel for Defendant (Mother)*


SEEN AND OBJECTED TO*:


_____

John L. Bauserman, Jr., VSB #33816
P.O. Box 1403
Fairfax, Virginia 22038
Telephone: (703) 939-4990
Facsimile: (703) 547-0257
Email: jblaw22@gmail.com
*Counsel for Plaintiff/Father*

*Objected for reasons stated in argument and on the record and for such other and further
reasons as may be submitted to the Court in the form of objections or motion for
reconsideration within twenty-one days from the date of entry of this Order.


SEEN AND AGREED:

_____

Aaron S. Book, Esq.
300 N. Washington St.
Suite 404
Alexandria, VA 22314
888-987-9991 Phone & Fax
202-281-4890 Cell
abook@websterbook.com
*Guardian ad Litem*


*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 5 of 5*

SEEN AND AGREED:

_____
ANDREI J. KUBLAN (VSB No. 73120)
KUBLAN KHAN PLC
6521 Arlington Blvd., Suite 201
Falls Church, Virginia 22042
Telephone: (703) 854-1081
Facsimile: (703) 854-1083
Email: andrei@kublankhan.com
*Counsel for Defendant (Mother)*

SEEN AND OBJECTED TO*:

_____
John L. Bauserman, Jr., VSB #33816
P.O. Box 1403
Fairfax, Virginia 22038
Telephone: (703) 939-4990
Facsimile: (703) 547-0257
Email: jblaw22@gmail.com
*Counsel for Plaintiff/Father*

*Objected for reasons stated in argument and on the record and for such other and further reasons as may be submitted to the Court in the form of objections or motion for reconsideration within twenty-one days from the date of entry of this Order.

SEEN AND AGREED:

_____
Aaron S. Book, Esq.
300 N. Washington St.
Suite 404
Alexandria, VA 22314
888-987-9991 Phone & Fax
202-281-4890 Cell
abook@websterbook.com
*Guardian ad Litem*

*Child Custody and Visitation Order*
*Wilson v. Wilson*
*Case No. 16-1673-01*
*Page 5 of 5*

1

V I R G I N I A

      IN THE CIRCUIT COURT OF ARLINGTON COUNTY

- - - - - - - - - - - x
                               :
JUSTIN POTTER WILSON, JR.,    :
                               :
        Plaintiff,     :
                               :
     -vs-          :  CASE NO.: CL16001673-00
                               :
ANNA VLADIMIROVNA WILSON,    :
                               :
        Defendant.     :
                               :
- - - - - - - - - - - x

                        Circuit Courtroom 10C
                        Arlington County Courthouse
                        Arlington, Virginia

                        Wednesday, September 29, 2021

        The above-entitled matter came on to be heard

*Via Microsoft Teams module* before the HONORABLE JUDITH L.

WHEAT, Judge, in and for the Circuit Court of Arlington

County, beginning at 2:46 o'clock p.m.

        APPEARANCES:

               On Behalf of the Plaintiff:

                       JOHN L. BAUSERMAN, JR., ESQUIRE

               On Behalf of the Defendant:

                       ANDREI J. KUBLAN, ESQUIRE

2

Also Present:

AARON S. BOOK, ESQUIRE

3

```
1                    P R O C E E D I N G S
2              THE BAILIFF:  All rise.  This Circuit Case is
3    now in session. The Honorable Judith Kelly Wheat is now
4    presiding.
5              THE CLERK:  This is CL16001673-03, Wilson
6    versus Wilson.
7              (Whereupon, the Court Reporter was sworn by
8    the Clerk of the Court.)
9              THE COURT:  Good afternoon, everyone.  Mr.
10   Book, do you have any objection if I take my mask off?
11             MR. BOOK:  No objection.
12             THE COURT:  All right.  As I indicated to all
13   of you, I would render my decision today.  I have spent a
14   considerable amount of time working on it, and I will go
15   through the facts that I have considered and the
16   conclusions that I have drawn after multiple days of
17   testimony in this case.
18             This matter came before the Court on the
19   motion of Anna Wilson to modify custody based on
20   allegations of physical abuse of a child by Justin Wilson.
21   Justin Wilson filed a cross-motion to modify custody,
22   alleging that Mrs. Wilson committed fraud on the Court in
23   filing her petition and in her testimony in June 2020
```

4

1      during the emergency custody proceeding.

2              The first issue before the Court is whether

3      there has been a material change in circumstances such

4      that modification of the custody is properly before the

5      Court.  In deciding this issue, the Court makes the

6      following preliminary observations.

7              The Court heard several days of testimony on

8      August 20, 2019, on the party's cross motions to modify

9      custody.  At the conclusion of that hearing, the Court

10     maintained joint legal custody on the part of Mr. and Mrs.

11     Wilson, with Mrs. Wilson having final decision-making

12     authority.  I awarded primary physical custody to Mrs.

13     Wilson, with extended weekend and holiday visitation to

14     Mr. Wilson.

15             This decision was intended to achieve certain

16     objectives which the Court deemed to be in the best

17     interest of the parties' minor child, Justin, who at that

18     time was turning 11 years old.

19             The Court's objectives include, first,

20     providing each parent the opportunity to engage fully in

21     the child's educational, emotional, and physical

22     development, while also providing a final decision-maker,

23     given the high level of conflict between the father and

5

1    mother.

2           Second, allowing the child to maintain

3    relationships with other important individuals in his

4    life, including Mr. Wilson's family, Mrs. Wilson's and the

5    minor child's childhood friends, Mr. Rhett (ph.), a hired

6    tennis coach who appeared to be a positive adult influence

7    in the child's life; and Dr. Sowa, a clinical psychologist

8    and therapist who had been working with the child for over

9    a year prior to the hearing and appeared to have a good

10   relationship with the child.

11          Third, creating clear lines of separation

12   between the child's time with each parent, with the goal

13   of minimizing intrusion or interference by the other

14   parent during their non-custodial time.  And, four,

15   diffusing the parties' efforts to embroil the child in

16   their high-conflict relationship.

17          The Court was also concerned, given the

18   testimony presented during the 2019 hearing, about Mr.

19   Wilson's ability to control his emotions and his anger

20   towards Mrs. Wilson, when he believed Mrs. Wilson and the

21   child were engaging in activities that Mr. Wilson did not

22   agree were a priority for the child, such as taking a

23   four-day trip to Disney World with Mrs. Wilson and family

6

1    friends rather than staying in Arlington with Mr. Wilson

2    practicing tennis, which was the subject of extended

3    testimony in the 2019 hearing.

4              In addition, the Court was concerned, based on

5    the testimony provided, that Mr. Wilson would be upset

6    with the Court's decision to modify custody.

7              For these reasons, the Court made anger-

8    management counseling and continued therapy a condition of

9    the September 2019 custody order for Mr. Wilson to

10   minimize the possibility of intended or unintended

11   emotional and physical harm to the minor child when

12   conflicts arose between the parents or between the parents

13   and the child.

14             Based on the evidence presented in eight days

15   of hearing the instant cross petitions to modify custody,

16   it appears that none of these objectives were met in the

17   ten months between the 2019 custody trial and the 2020

18   emergency cessation of Mr. Wilson's visitation in this

19   case.

20             Before the Court signed the final order in

21   September 2019, Mr. Rhett was no longer providing tennis

22   lessons to Justin and had otherwise discontinued his

23   relationship with him.

7

1          In December 2019, Dr. Sowa advised that he was

2    unable to continue to assist the family and recommended a

3    new therapeutic model involving two therapists working

4    separately with Justin and an individual parent, which

5    ultimately was the genesis of the emergency petition filed

6    in May 2020.

7          Throughout the period January 20 through April

8    20, 2020, the parents disagreed over how best to implement

9    the two therapists mom recommended by Dr. Sowa to the

10   family.

11         Consequently, instead of counseling providing

12   both continuity and a safe space for the child to engage

13   with adults, who could help him navigate the high level of

14   ongoing conflict between his parents and its effect on

15   him, it became the catalyst for the events now before the

16   Court.

17         In April of 2020, Mr. Wilson verbally

18   assaulted family friends of the minor child in front of

19   the minor child when he happened upon them while out

20   jogging, calling them terrible, horrible, ugly people,

21   because of the testimony they provided in the 2019 custody

22   trial.

23         Mr. Wilson urged the child to tell the family

8

1    that he wanted to live with his father, not his mother,

2    notwithstanding the Court's order the previous fall.  Mr.

3    Wilson also admitted in June 2020 that he was angry about

4    the outcome of the 2019 custody trial.

5            Significantly, and in keeping with the Court's

6    2019 concerns, Mr. Wilson admitted during an emergency

7    custody hearing in June of 2020 that in May of 2020, after

8    being advised by the child's therapist that the child was

9    provided conflicting information to both therapists

10   regarding his relationship with each parent, Mr. Wilson,

11   in a rage he described as 9.5 out of 10, physically

12   grabbed the child by the shoulders and vigorously shook

13   him about six times and smacked him on the bottom.

14           He admitted to telling the child that he was

15   so angry he would not look at him, that he feels like he

16   could break the child's nose, and that the child needed to

17   stay in his room.

18           In the week after this incident, the child

19   made clear to his therapist and Court-appointed GAL that

20   he did not want to have contact with his father.

21           The Court finds this combination of factors

22   sufficient to create a material change in circumstances.

23           Mrs. Wilson's emergency petition to modify

9

1   custody alleges the child reported that on May 18th, 2020,

2   Mr. Wilson hit the child in the face, head and arms.  The

3   petition also alleges the child reported that on prior

4   visits with Mr. Wilson he repeatedly hit the child in the

5   head, causing pain which lasted up to 20 minutes.

6           Mr. Wilson's cross petition to modify custody

7   alleges that Mrs. Wilson committed fraud on the Court, and

8   that the pictures submitted to support the emergency

9   petition were fabricated and Mrs. Wilson provided false or

10   misleading testimony to the Juvenile Court and this Court,

11   respectively, in the June 2nd protective order hearing and

12   the June 15th emergency motion to modify custody in this

13   court.

14           After 15 months of extended discovery in the

15   case, the Court heard three days of testimony in June 2021

16   and two additional days of testimony and one-half day of

17   argument in September 2021.

18           Having considered the credibility of the

19   evidence and the witnesses presented by both parties and

20   according the weight the Court deems appropriate to each,

21   the Court makes the following findings with respect to the

22   factors set forth in Virginia Code 20-124.3.

23           On the age and physical and mental condition

10

1   of the child, given due consideration to the child's

2   changing developmental needs, Justin is now 13 years old

3   and entering the 7th grade.  For the 2019-2020 and 2020-

4   2021 school years he was enrolled in Commonwealth Academy

5   in Alexandria, Virginia, however he was not invited back

6   for the 2021 and 2022 school year.  The guardian ad litem

7   reports this was due to litigation in this case.

8           Mr. Wilson acknowledged that in or around

9   December of 2020 he received an e-mail from the school

10  asking the parents not to embroil the school in the

11  litigation.  He also acknowledged that one of the factors

12  cited by the school for Justin not being allowed to return

13  was the subpoenas issued by Mr. Wilson's attorney in this

14  case.  Justin, the son, currently attends Swanson Middle

15  School in Arlington, Virginia.

16          He has been diagnosed in the past with

17  attention-deficit hyperactivity disorder, but the Court

18  has not been made aware that he is taking any medication

19  for ADHD.

20          Mr. Wilson testified that Justin's grades at

21  Commonwealth Academy were Bs and B-minuses and that his

22  grades had been slightly lower this past year, but neither

23  party introduced Justin's academic records or report

11

1    cards.

2              Jacqueline Riley, Justin's 5th-grade math

3    teacher, testified that he attended class regularly

4    throughout 2019-2020.  Mr. Wilson introduced attendance

5    records which show that during the 2020-2021 school year

6    Justin was marked absent or tardy from various classes in

7    excess of 100 times.

8              Mrs. Wilson testified that Commonwealth

9    Academy's policy was to mark a student tardy or absent

10   even if they were a few minutes late.

11             Dr. Bennett testified that sometime in March

12   of 2021 she recalled that Justin was sent home from school

13   for refusing to wear a mask.

14             Justin has been described by both parents and

15   the guardian ad litem as active, athletic, and in good

16   physical health.  He has been involved in football,

17   tennis, skateboarding, hiking, chess and guitar.

18             Marianna Lanzo and Iryna Balusheuskaya, who

19   see Justin frequently and saw him in June of 2021 prior to

20   the trial, described him as very happy, inquisitive,

21   talkative, and open to trying new things.

22             Regarding Justin's mental and emotional state,

23   the Court heard testimony from Dr. Elizabeth Bennett, Dr.

12

1  Guy Van Sickle, and Dr. Adam Soa in June 2020, and

2  additional testimony from Dr. Bennett in June 2021.  Dr.

3  Bennett, accepted by the Court as an expert in clinical

4  psychology, began seeing Justin every other week,

5  beginning in March of 2020, upon a referral from Dr. Sowa.

6  She had met with Justin approximately nine times and Mrs.

7  Wilson twice as of June 2020.

8          She described Justin initially as somewhat

9  aloof, oppositional, disruptive, and mildly hostile to

10  Mrs. Wilson during their initial sessions.

11          Dr. Van Sickle, accepted by the Court as an

12  expert in clinical psychology, first began seeing Justin

13  in April 2020, also at the suggestion of Dr. Sowa, and saw

14  him every other week through May 15th, 2020.  He observed

15  that Justin seemed fond of his father and appeared calm

16  and happy when he spoke about his father.  He testified

17  that Justin was extremely unhappy when discussing his

18  mother, claiming he never did anything when he was with

19  her, and generally having nothing positive to say.

20          Dr. Bennett and Dr. Van Sickle first conferred

21  in May 2020 regarding Justin.  Based on their

22  conversations and observations of Justin, it was obvious

23  that Justin was in conflict and was telling very

13

1     different, polarized stories to both parents.

2          Dr. Bennett described Justin as a child who

3     felt trapped by a loyalty conflict between his parents and

4     was struggling to figure out how to untangle himself from

5     it.

6          Both therapists were concerned about Justin's

7     psychological well-being, and their goal for therapy in

8     early May 2020 was to ensure that Justin was safe and to

9     bring his emotions more to center, help him develop a

10    positive relationship with both parents, and lessen the

11    loyalty conflict.

12         Dr. Bennett testified that after the May 2020

13    incident, Justin seemed relieved that there was going to

14    be a break in contact with his father and more open to

15    discussing the pressure he had been under and his worries

16    about being hit by his father.

17         Dr. Bennett found the child's demeanor and

18    specific emotional response during their conversations

19    consistent with the comments he was making.  She observed

20    that his overall demeanor changed significantly after June

21    2020, and he was more age-appropriate and spontaneous in

22    therapy than he had been before.

23         Although Justin remained fearful of his father

14

1    even into June 2021, he was much warmer towards his mother

2    and exhibited fewer power struggles with her during this

3    time.

4           Over the course of 2020, he did exhibit

5    perspective about his father's feelings, concerned that he

6    may be sad, and appeared to be softening a bit in his

7    unwillingness to have contact with his father.

8           Dr. Bennett acknowledged that although Mrs.

9    Wilson articulated significant worry in early May about

10    physical abuse by Mr. Wilson, Dr. Bennett did not recall

11    having any information consistent with physical abuse by

12    Mr. Wilson prior to the May 2020 CPS report.

13           In subsequent sessions with Justin, Justin

14    talked about being hit by Mr. Wilson on other occasions,

15    but his reports were inconsistent from session to session,

16    and Dr. Bennett had no specific information about the

17    nature of the contact or the frequency.

18           Dr. Van Sickle testified that during his

19    sessions with Justin, he never manifested discomfort with

20    his father or disclosed that Mr. Wilson had treated him

21    poorly.

22           Factor two, the age and physical and mental

23    condition of each parent.

15

1          Prior to the 2019 custody trial, the Court

2    ordered both Mr. and Mrs. Wilson to undergo independent

3    medical examinations, which were performed by Dr.

4    Zuckerman and Dr. Saminow, respectively.  The Court did

5    not require new evaluations prior to the 2021 hearing, and

6    neither parent was deemed to have any mental or emotional

7    disorder.  Mr. Wilson self-reported that he believes he

8    has ADHD, but it has never been diagnosed.

9          Both parents are in their late 40s, and both

10   appear to be in good physical health.  Mr. Wilson

11   described his level of fitness as above average.  Prior to

12   June 2020, both parents engaged in various physical

13   activities with the child, including hiking, jogging,

14   pick-up basketball, and skating.

15          Number three, the relationship existing

16   between each parent and Justin, including cognitive

17   involvement and ability to accurately assess and meet the

18   emotional, intellectual, and physical needs of the child.

19          Mrs. Wilson.  Mrs. Wilson testified that

20   during the period of September of 2019 through June 2021,

21   she would take Justin to the skate park, hiking, to

22   swimming lessons, guitar lessons, basketball, and to play

23   chess.

16

 1              He was enrolled in skateboard lessons and

 2     winter soccer in 2019, guitar lessons, swimming lessons,

 3     flag football, football camp and nature camp in 2020,

 4     tennis in 2020 and 2021, and Carnegie, an online

 5     scholastic math game in 2019 and 2020.

 6              Mrs. Wilson and Justin also like to read and

 7     cook together and spend time with family friends.

 8              During the time period in issue, they went on

 9     two winter ski vacations to Canaan Valley, West Virginia,

10     two beach vacations in Marco Island, Florida, played laser

11     tag, went rock-climbing, attending skating groups,

12     birthday parties, and movie nights.

13              Defendant's Exhibit 7 contains numerous photos

14     of Justin engaging in many of these activities with Mrs.

15     Wilson and others.

16              Mother's witnesses, Marianna Lanzo, Iryna

17     Balusheuskaya, and Galina Spivak, who see Justin with his

18     mother frequently, described him in June 2021 as very

19     happy, inquisitive, talkative, and open to trying new

20     things.

21              During the period of 2019 through May 2020,

22     they also described Justin as more relaxed, open, and less

23     stressed after prolonged stays with his mother.  They were

17

1  aware of his involvement in football, tennis, chess,

2  skateboarding and guitar.

3          In apparent conflict with this evidence, Dr.

4  Sowa testified that through December 2019 Justin described

5  having a very negative relationship with his mother,

6  claiming that they never did anything together and that he

7  would just sit in his room and play videogames when he was

8  with her.  Dr. Sowa never discussed this with Mrs. Wilson,

9  even though Mrs. Wilson brought Justin to most of their

10 sessions in 2019.

11         Dr. Van Sickle provided similar testimony in

12 June 2020, but admitted he never observed any interactions

13 between Justin and his mother, and that Mrs. Wilson was

14 very agreeable with the idea of him working with Justin.

15         Neither therapist was able to offer an opinion

16 as to whether Justin's statements regarding time spent

17 with his mother was coached, but Justin's descriptions are

18 wholly inconsistent with the overwhelming, credible

19 evidence presented to the Court in 2019 and again in 2021.

20         Dr. Bennett, too, described Justin initially

21 as defiant and oppositional towards his mother in the

22 spring of 2020, but noticed a marked positive difference

23 in his attitude immediately after the events of May 2020.

18

1    By 2021, she described the child's relationship with his

2    mother as generally stable and his therapy as being on a

3    maintenance level.

4            The Court finds all of this evidence

5    consistent with the therapists' opinions that, due to the

6    conflict between the parents, Justin did not feel it was

7    permissible to admit having a positive relationship with

8    his mother.

9            Mr. Wilson.  The only friends of Mr. Wilson,

10   Solomon Wanamu (ph.) and Rajish Lashish (ph.) testified

11   that they had engaged in numerous activities with Mr.

12   Wilson and Justin, mostly revolving around tennis and

13   other sports, prior to the change in custody in 2019.

14           They did not interact with Mr. Wilson or

15   Justin frequently after that.  They described Mr. Wilson's

16   relationship with Justin as a good father who tended to

17   his needs.  They had seen Mr. Wilson pat Justin on the

18   back or the butt, but never saw him physically abuse

19   Justin.

20           The Court notes that although tennis was a

21   predominant part of Mr. Wilson's and Justin's routine

22   prior to the custody hearing in 2019, and Mr. Wilson

23   testified in this hearing how important he believes tennis

19

1  is for Justin's ADHD, Mr. Wilson discontinued tennis

2  lessons with Mr. Rhett immediately after the 2019 hearing

3  and stopped playing tennis with Justin during his

4  custodial time.

5          The Court notes that this was done even

6  though, due to the holiday schedule incorporated into the

7  Court's 2019 order, Mr. Wilson had custody of Justin close

8  to 50 percent of the time in the fall and the winter of

9  2019 and 2020.

10          Mr. Wilson did testify that during this time,

11  he planned fun weekend outings with Justin, including

12  traveling to New York and the Dominican Republic, and

13  trips to a football game in Florida, and to visit family

14  in Nashville.

15          Mr. Wilson worked in an exercise component

16  during his visitation time with Justin.  And when he and

17  Justin stayed in the D.C. area, they would go to the

18  movies, play paintball, go to the park, jog, play at the

19  rec center, or engage in other physical type activities.

20          Because his visitation with Justin was

21  primarily on weekends, Mr. Wilson did not engage in much

22  school work with Justin.  However, he testified that

23  Justin usually had less than 15 minutes of homework while

20

1     he was enrolled in Commonwealth Academy.

2          He testified that throughout the period 2019

3     through 2021, he checked in with the school approximately

4     once per week regarding Justin's progress and assisted him

5     with one large project in the fall of 2019.

6          Mr. Wilson was aware that Justin was taking

7     skateboarding lessons in October of 2019 and attended some

8     swimming lessons in the fall of 2020 and drove him to flag

9     football in early 2020.

10          While Mr. Wilson appears to have come to some

11     realization, with the help of Dr. Zuckerman, of the impact

12     that continuous custody disputes had had on Justin, Mr.

13     Wilson appears unable or unwilling to see that it is his

14     actions which have played the most significant role in the

15     outcome of these proceedings, and instead continues to

16     blame Mrs. Wilson for the rupture in the father/child

17     relationship.

18          Mr. Wilson also does not seem to understand

19     why his 11-year-old son might understand a statement made

20     in raging amber that he could break his nose as a threat

21     of physical harm rather than a rhetorical statement, as

22     Mr. Wilson continues to describe it.

23          In addition, Mr. Wilson has embarked on a

21

1    scorcher of litigation strategies to discredit Mrs. Wilson

2    and indirectly Justin, notwithstanding his own admissions

3    at the very first emergency hearing in June 2020 that he

4    precipitated an inappropriate and physical abusive

5    encounter with his son on May 18, 2020, that Mrs. Wilson

6    played no role in whatsoever.

7            This conduct occurred just nine months after

8    the Court found that Mr. Wilson engaged in a pattern of

9    emotional abuse towards both Mrs. Wilson and Justin that

10   necessitated a change in custody and anger-management

11   counseling.

12           Moreover, while the Court has attempted

13   repeatedly over the past 18 months to focus this case back

14   on Justin, Mr. Wilson has done the opposite.  To this day,

15   he has expressed no concern about the decision by

16   Commonwealth Academy to disenroll Justin for the 2021-22

17   school year, nor has he taken any responsibility for the

18   impact his litigation tactics has had on his son's ability

19   to return to the specialty school he has attended for the

20   past several years.

21           Finally, while Mr. Wilson appears genuinely

22   upset about not having had contact with Justin for the

23   past 18 months, he has been unwilling to participate in

22

1    the program of supervised visitation as recommended by the

2    guardian ad litem in order to begin the reconciliation

3    process with Justin.

4            As a result, Justin, too, has lost 18 months

5    of interaction with his father, during COVID, one of the

6    most challenging and isolating times he has likely faced

7    in 13 years of life.

8            The Court finds these facts significant in

9    weighing what is in the best interest of the child in this

10    case.

11            Factor four, the needs of the child, given due

12    consideration to other important relationships of the

13    child, including, but not limited to siblings, peers, and

14    extended family members.

15            The evidence is undisputed that after the

16    incident on May 18th, 2020, Justin wanted no contact with

17    Mr. Wilson and has had no contact with Mr. Wilson or his

18    family, all of whom have strong relationships with Justin.

19            The evidence also establishes that Justin's

20    hardline position appears to be softening as the months

21    have gone by, and Justin seems more willing to re-engage

22    with his father, although he is still fearful of what that

23    process might look like.

23

1          Prior to May 2020, witnesses called by both

2    Mr. and Mrs. Wilson testified that Justin appeared content

3    when dealing with either parent without the interference

4    of the other, although transitions were difficult,

5    particularly given the custody tug-of-war Justin's

6    therapist described him as being in.

7          Justin has been described as a polite,

8    articulate, athletic, bright, high-needs child, and

9    routine and structure as well as physical activity are

10   important to him.

11         Although the Court attempted to create a

12   framework in its 2019 order that would allow the parties

13   to institute both routine and structure, the ongoing

14   conflict between the parties and Mr. Wilson's volatile

15   responses to that conflict have completely undermined any

16   routine or structure the Court's 2019 order was designed

17   to provide.

18         Five, the role each parent has played and will

19   play in the future in the upbringing of the child.  Mrs.

20   Wilson was awarded primary physical custody in 2019.

21   Although it was noted previously, given the holiday

22   schedule incorporated into that order, Mr. Wilson's

23   custody in the fall of 2019 continued to be closer to

24

1    50/50.  Since May 21, 2020, Mr. Wilson has had no contact

2    at all with Justin.

3            Although the Court maintained joint legal

4    custody in its 2019 order, in the hope that Mr. and Mrs.

5    Wilson would work with one another to achieve Justin's

6    best interest, given the toxic relationship between the

7    parents, this Court cannot envision how both parents can

8    continue to play an equal, ongoing, and supportive role in

9    Justin's life in the future.

10           Six, the propensity of each parent to actively

11   support the child's contact and relationship with the

12   other parent, including whether the parent has

13   unreasonably denied the other parent access to or

14   visitation with the child.

15           The Court adopts the facts previously

16   articulated in that in evaluating this factor, and finds

17   the ongoing high level of conflict between the parties,

18   and their continued willingness to embroil the child in

19   that conflict, and the propensity of each as evidenced by

20   the testimony to think the worst of the other, is a

21   significant factor in the Court's consideration.

22           The relative willingness and demonstrated

23   ability of each parent to maintain the close and

25

1   continuing relationship with the child and the ability of

2   each parent to cooperate and resolve differences regarding

3   the matters affecting the child.  The Court adopts the

4   facts previously articulated in evaluating this factor.

5           Eight, the reasonable preference of the child.

6   The Court deems the child to be of reasonable

7   intelligence, understanding, age, and experience to

8   express such a preference.  At 13, the Court finds that

9   Justin possesses the requisite age, understanding, and

10  experience to express a preference, taking into

11  consideration that he struggles with impulse control and

12  has expressed fear about reinitiating contact with his

13  father, given the facts and circumstances currently before

14  the Court.

15          The Court previously found that Justin has

16  difficulty with executive decision-making, particularly

17  understanding the consequences of his words, actions and

18  choices.  He continues to exhibit ongoing stress when

19  faced with conflict between his parents.

20          Justin has expressed and acted upon his desire

21  not to have contact with his father.  However, this

22  position has softened, and presented with a safe scenario

23  to begin reunification, he may be amenable to that

26

1    process.

2              In addition, Justin appears to have developed

3    an open relationship with his guardian ad litem, who can

4    assist Justin with decision-making and any reunification

5    process.

6              Nine, prior history of the family abuse.  The

7    parties presented evidence of an incident in 2017, when

8    Mr. Wilson struck Justin with a belt and a report was made

9    to CPS.  The facts regarding this incident are now fully a

10   part of the record in this case.

11             The incident was addressed by CPS, but the

12   only assessment that appears from the deposition from the

13   testimony of Mr. Rails (ph.), is that Mr. Wilson was

14   advised to refrain from further corporal punishment of the

15   child.

16             The Court finds the incident relevant as an

17   additional example of a stern physical interaction between

18   Justin and Mr. Wilson that may play into his fear of

19   physical violence on the part of his father and weighs it

20   accordingly.

21             The Court does not find it particularly

22   informative on the issue of whether Mrs. Wilson's

23   testimony that she did not know what to do the week of May

27

1    18, when she learned that Justin was hit by his father was

2    credible.

3              There is no evidence that Mrs. Wilson made the

4    CPS report regarding the 2017 incident, moreover knowing

5    what to do and knowing whether to do it are two completely

6    different issues.

7              Ten, other factors the Court deems

8    significant.  The Court does find that during the week of

9    May 18, 2020, Mrs. Wilson embroiled Justin in the instant

10   dispute by having the child make multiple tape recordings

11   regarding the events of May 18, which she was slow to

12   produce in discovery, and taking various pictures of the

13   child's face, which were relied upon by Mr. Wilson for his

14   fraud on the Court allegations.

15             In addition, Mrs. Wilson provided conflicting

16   explanations regarding the events of May 18 to 22 and

17   admitted that she provided false information to the

18   police, Dr. Bennett, and Child Protective Services

19   regarding the date she learned the cause of the bruise on

20   the child's face.

21             She explained that she did not tell the

22   authorities she had learned about the source of the bruise

23   several days earlier because she was afraid she would get

28

1    in trouble for not reporting the injury at that time.

2            The Court believes that Mrs. Wilson was not

3    sure what she should do in May 2020 after learning about

4    the abuse, given the way this litigation has proceeded so

5    close in timing to the 2019 proceedings and its effect on

6    Justin.

7            However, her decision to alter the narrative

8    to make herself look better provided Mr. Wilson the

9    factual basis to allege fraud, and Mrs. Wilson to some

10   extent brought that on herself.  That said, the Court does

11   not find either clear and convincing or a preponderance of

12   evidence that Mrs. Wilson committed a fraud on the Court.

13           Notwithstanding Mr. Wilson's arguments to the

14   contrary, Mrs. Wilson did not make up an allegation of

15   physical abuse by Mr. Wilson on May 18th, 2020.  Mrs.

16   Wilson stated in her emergency motion to modify custody

17   and in her motion for protective order that Justin told

18   her that Mr. Wilson struck him in the face, the arms, and

19   the head on May 18th.

20           Mr. Wilson admitted that a physical

21   altercation occurred between Justin and him on May 18th.

22   No one else was present.  Mr. Wilson did not tell Mrs.

23   Wilson about the altercation.  Thus, the only way Mrs.

29

1    Wilson could have learned about the altercation was from

2    Justin.

3            Mr. Wilson testified in June 2020 that around

4    4:30 p.m. on the afternoon of May 18 he had a telephone

5    conversation with Dr. Van Sickle about the conflicting

6    information Justin was providing the two therapists.

7    Justin had denied this to Dr. Van Sickle in a session the

8    previous Friday, May 15th.

9            Mr. Wilson had confronted Justin about what he

10   had been saying to Dr. Van Sickle and Dr. Bennett.  Mr.

11   Wilson admitted that he was angry, disappointed, and

12   stunned.  In what Mr. Wilson characterized as a rage of

13   9.5 out of 10, he smacked the child on the bottom with an

14   open hand to get his attention and usher him into his

15   room.

16           He testified that he also took Justin by both

17   arms, placed his hands on his shoulder, and shook him

18   fairly vigorously about six times.  He admitted telling

19   the child that he was so angry he couldn't look at him and

20   felt like he could break his nose, the same statement that

21   Mrs. Wilson included in her motion for a preliminary

22   protective order filed prior to Mr. Wilson's June 2020

23   testimony.

30

1        Afterwards, the child stayed in his room while

2    Mr. Wilson calmed down by running for a lengthy time on

3    the treadmill.  Mrs. Wilson picked the child up around

4    7:00 p.m.

5        Even accepting Mr. Wilson's version of events

6    as true, given these facts, it's certainly reasonable that

7    a ten-year-old who was being securely held by his arms and

8    shoulders and shaken vigorously by a much stronger,

9    larger, outraged parent, would describe the physical

10   sensation he was feeling as being hit in the arms, head

11   and face, particularly if he had his eyes closed or if his

12   face or head came into contact with Mr. Wilson's hand

13   while they were clamped onto his shoulders.

14       No one but Mr. Wilson and Justin know exactly

15   what happened that day.  But given Mr. Wilson's

16   contemporaneous admissions in June of 2020, Mr. Wilson's

17   own evidence is not inconsistent with the child's report

18   that the father struck him on the head, face and arms on

19   May 18th, 2020.

20       When Mrs. Wilson picked the child up around

21   7:00, she noticed that he was quiet and had a bruise on

22   his cheek that was blue in color.  Justin did not tell her

23   about the source of the bruise on Monday, and she did not

31

1    take a photograph of it.

2            Dr. Warburton, who the Court accepted as an

3    expert in pediatric medicine, testified that a bruise is

4    normally red in color for the first one to two hours,

5    after which it is predominantly blue.

6            Mrs. Wilson's description of the bruise on

7    Justin's cheek is wholly consistent with both Dr.

8    Warburton's and Mr. Wilson's testimony, as he stated the

9    incident occurred sometime after 5:00, but sufficiently

10   before 7:00, to allow Mr. Wilson to perform a lengthy

11   workout on the treadmill and then sit with Justin for an

12   additional period of time before Mrs. Wilson arrived.

13           Dr. Warburton testified that between 24 and 72

14   hours after an injury is inflicted, a bruise will begin to

15   turn yellow and green with blue hues, and most bruises

16   will be completely resolved within a week.

17           Three witnesses testified that they observed a

18   bruise on Justin's cheek the way of May 18th.  Ms.

19   Balusheuskaya, who saw the bruise Friday evening,

20   testified that it was yellowish-blue in color.  She

21   testified that she gently touched the bruise and it did

22   not feel swollen.  No makeup came off on her hand when she

23   touched the bruise.

1           The DCPS worker, Jackie Martinez, saw the

2   bruise on Saturday afternoon and described the bruise as

3   purple-blue.  Ms. Martinez testified that she had not

4   notified Mrs. Wilson that she was coming to the house on

5   Saturday, and that Mrs. Wilson was out of her sight less

6   than a minute before taking Ms. Martinez to meet with

7   Justin.

8           She took photos of Justin's face from about

9   two feet away within the first ten minutes of the visit,

10  which she forwarded to the hotline staff and then deleted

11  from her phone.

12          She also spoke with Justin about what

13  happened.  She did not testify that Justin seemed to be

14  fabricating or dissembling how he got the bruise and

15  offered no testimony that the bruise appeared to have been

16  applied or was fake.  She recalled the coloring of the

17  bruise being more intense than what she saw depicted in

18  the photo.

19          Ms. Lanza saw Justin on Sunday and noticed a

20  discoloration on his cheek, which was yellowish and

21  fading.

22          Dr. Warburton opined that the purple-blue

23  coloration described by Ms. Martinez on Saturday was not

33

1  consistent with the color progression of a healing bruise.

2  Dr. Warburton also testified that when someone is slapped

3  or punched, it is more likely than not one will see hand

4  or finger marks, which he did not see any sign of in the

5  digital images.

6          However, he did not quantify how long these

7  would be visible.  Dr. Warburton admitted that most of his

8  medical experience dealing with bruises was not in his

9  medical practice, as he was rarely called upon in the

10  office to treat a bruise, and he has not conducted any

11  medical research regarding bruises or aging of bruises.

12          Prior to this case, he has never been asked to

13  opine whether a photograph depicts a real or fake bruise.

14  Nevertheless, he opined the bruise in the May 2020 photos

15  was either fake or occurred sometime after May 18.

16          None of Justin's teachers reported noticing a

17  bruise on his face in any of the remote learning sessions

18  the week of May 18th.  The teachers had somewhere between

19  5 and 16 students on their screens during each class.

20          While the Court finds Dr. Warburton's

21  testimony regarding the general aging and coloration

22  progression of bruises to be largely credible, the Court

23  finds that his opinion is otherwise contrary to the

34

credible evidence in the case, including the testimony of the three witnesses who actually saw the bruise, none of whom testified it appeared to be fake or applied.

Moreover, there is no evidence that Dr. Warburton was apprised of these facts or that he was aware that Mr. Wilson admitted vigorously shaking the child while his hands were clutching the child's shoulders close to his face.

Moreover, other than being told the child was generally in good health, there is no evidence that Dr. Warburton was provided any information regarding the child's medical condition, including that he suffers from eczema, a skin condition.

Rather, Dr. Warburton appears to have relied on the narrowly-tailored set of factors provided by Mr. Wilson's counsel to render an opinion on whether the bruise depicted in the mother's photos was real, an opinion he acknowledged he has not previously been called upon to render in more than 40 years of practicing and teaching medicine.

With respect to the computer forensic experts, Mr. Latham and Mr. Caruso, the Court finds Mr. Caruso's testimony more persuasive.

35

1          First, Mr. Latham received the images he

2     analyzed from another expert who performed an unknown

3     authentication analysis on the images.  The Court was

4     provided no information as to whether that analysis

5     changed the images in any way.

6          Second, Mr. Latham, testified that he applied

7     different filters to the different images to attain the

8     desired results, leaving the Court to essentially compare

9     apples to oranges.  Mr. Latham testified that some

10    unspecified mathematical algorithms were applied to

11    determine which filters to use.  But Mr. Caruso testified

12    that it was impossible to determine or recreate the

13    methodology used by Mr. Latham or to determine its

14    accuracy.

15         While Mr. Caruso admitted that the filtering

16    process can be very valuable, there is sufficient

17    reference points for comparison.  Without things such as

18    the child's actual skin tone or no lighting set up, he

19    opined there were not sufficient reference points for the

20    filters to be useful.

21         In addition, Mr. Caruso noted that the images

22    were taken with different cameras with different pixel

23    capacities and different normalization features.  In

36

1    addition, the lighting conditions, shadows, distance, and

2    facial orientation were different in each picture.  To

3    equalize the size of the images, Mr. Latham zoomed in on

4    one of the pictures, which stretched the image.

5              According to Mr. Caruso, all of these factors

6    undercut the reliability of Mr. Latham's opinion.

7              Finally, Mr. Latham testified that there

8    appeared to be an area of dark contrast on both sides of

9    the child's face, including the side that all witnesses

10   testified had no evidence of bruising.

11             Based on this evidence, the Court found it

12   impossible to determine what coloration on the child's

13   face Mr. Latham's filtering process actually highlighted

14   for analysis.

15             For these reasons, the Court gave greater

16   weight to Mr. Caruso's opinion that there was simply not

17   enough information available from the photos of the

18   child's face to draw any conclusion regarding the relative

19   placement of the bruise.

20             The second allegation in Mrs. Wilson's

21   emergency motion is that Mr. Wilson repeatedly struck

22   Justin in the face and head when the child was visiting.

23   Again, Mr.  Wilson admitted in June 2020 that prior to the

37

1  2019 custody hearing it was possible that he struck Justin

2  on the head approximately two times per visit.

3          He explained that he did not do this to hurt

4  the child, but to make him think or remember to do

5  something.  He meant it to be a strong reminder for the

6  child so that he would comply with an instruction.

7          Subsequently, in 2021, Mr. Wilson testified

8  that he would hit the child in the head with an open hand

9  only one or two times in a several week period.  Either

10  way, Mr. Wilson admitted engaging in the conduct alleged

11  in Mrs. Wilson's complaints.

12          The Court has carefully considered all the

13  evidence presented in this case regarding each of the

14  above factors, and not just the facts relied upon and set

15  forth this afternoon to explain the Court's decision.

16          The Court has carefully assessed the demeanor

17  and credibility of the respective witnesses as they

18  appeared over five days of the in-person and remote

19  testimony, five days in 2021 and three days in 2020, and

20  has reviewed the exhibits introduced into evidence and

21  accorded each the weight the Court deems appropriate.

22          The Court finds that the best interest of the

23  child require that the custody and visitation schedule set

38

1  forth in the September 2019 modification of custody order

2  requires further modification.

3        The Court awards sole legal custody of the

4  minor child to Mrs. Wilson.  Mrs. Wilson will provide Mr.

5  Wilson with information regarding any medical treatment

6  received by the child, as well as any school reports from

7  any school Justin is attending.

8        Mrs. Wilson may, but is not required to,

9  consult with Mr. Wilson regarding the child's activities,

10  school performance, and any behavior or emotional issues

11  involving the child.

12        Mrs. Wilson is granted sole physical custody

13  of Justin until further order of the Court.

14        The guardian ad litem shall identify a

15  reunification therapist no later than October 31st, 2021,

16  who will work with the father and child to begin the

17  reunification process.

18        Supervised visitation will initially be with

19  the reunification therapist, and the number and timing of

20  sessions will be decided by the therapist.  When approved

21  by the reunification therapist, Mr. Wilson will also be

22  allowed supervised visitation with the child one Saturday

23  a month for a period not to exceed four hours, with

39

1    supervision through either Safe Havens or a certified

2    visitation professional approved by the guardian ad litem.

3    Mr. Wilson will pay for both the reunification therapy

4    services and his supervised visitation.

5            If the reunification therapist deems it

6    appropriate, Justin may also have two full days of

7    supervised visitation with his paternal grandfather and

8    uncles in Arlington prior to the end of the year, and Mr.

9    Wilson can participate in that visitation.

10            Neither parent is to make derogatory or

11   disparaging comments about the other parent or the

12   activities that parent has arranged for the child, and

13   neither parent shall use profanity in conversations with

14   the child or with the other parent.

15            Neither parent will use corporal punishment as

16   a means of disciplining the child or engage in any

17   physical abuse of the child.  This is to include

18   intentionally hitting any part of the child's body to get

19   his attention, remonstrate him for inappropriate or

20   thoughtless conduct, or for any other reason, except if

21   the child's safety or health is in danger and such action

22   is necessary to protect his immediate well-being.

23            Mrs. Wilson will not call or schedule any

40

1    events for Justin during any of Mr. Wilson's supervised

2    visitation times.  Mr. Wilson will provide Mrs. Wilson

3    with a visitation schedule approved by the reunification

4    counselor at least two weeks in advance, and Mrs. Wilson

5    can reach out to the counselor to adjust the schedule if

6    an unavoidable conflict exists.

7            Mr. Wilson will not call Justin during

8    mother's custodial time, except Mr. Wilson may call Justin

9    between 8:00 and 8:30 p.m. every Tuesday, Wednesday and

10   Thursday evening, and the calls will be limited to a half

11   hour.

12           Mrs. Wilson will ensure that Justin is

13   available to speak with his father during this time.  All

14   telephone calls may be recorded without warning, pursuant

15   to this order.  Mr. Wilson will be permitted to call up to

16   one hour with the child on the following holidays in 2020

17   (sic):  New Year's Day, Thanksgiving, and Christmas.

18           Mr. Wilson will continue his current therapy

19   and will complete a specific anger-management program to

20   be approved by the guardian ad litem, and that can be done

21   with Dr. Zuckerman, Mr. Book, as long as there is a clear

22   focus on anger management as it applies to the

23   relationship with Mrs. Wilson and the child.

41

1          Mrs. Wilson is to engage in family counseling

2     with Dr. Bennett and the child at least every two weeks

3     until further order of the Court.  Mrs. Wilson will make

4     every effort to ensure that Justin is attending school in

5     a consistent and timely manner, and she will work with the

6     guardian ad litem if absences or tardies continue to be an

7     ongoing issue now that school is back in-person.

8          The Court will set this matter for review in

9     January 2020 (sic), at which time the reunification

10    therapist, guardian ad litem, and Dr. Bennett shall report

11    to the Court as to whether increased visitation and

12    unsupervised visitation with Mr. Wilson, including

13    overnights, weekends, and holidays, are appropriate.

14          MR. KUBLAN:  Your Honor, what was the deadline

15    for the report?  I seem to have missed it.

16          THE COURT:  I'm sorry?

17          MR. KUBLAN:  You said there was a reporting

18    deadline for them to report to the --

19          THE COURT:  I'll set a review date in January

20    of 2020 (sic), and that will be the date for everyone to

21    provide information to the Court, with the goal that Mr.

22    Wilson obviously would get increased and unsupervised

23    visitation.  That is the Court's hope.

42

1          MR. KUBLAN:  You mean January of 2022, right?

2          THE COURT:  January of 2022, yes.

3          MR. BOOK:  Judge, could I ask a question?   I

4    was typing quickly, but is your ruling going to be

5    produced in an order, or shall we order a transcript?  I

6    just want to make sure I got down all the conditions.

7          THE COURT:  I think probably for everyone's

8    purposes, it makes sense to get a transcript and attach

9    that to the order, and that can be so that it is all

10   clearly set forth.  I think the order can just reference

11   the enclosed transcript.

12          It's unfortunate that it's come to this point,

13   and I really hope, for Justin's sake, that he can start

14   having a normal relationship with both his parents.

15          Is there anything else that we need to do

16   today?

17          MR. KUBLAN:  Yes, Your Honor, there are

18   several issues.  One of the issues, as I mentioned before,

19   is the request for attorney's fees.  And you said you want

20   us to schedule a different hearing for that.  I do

21   believe, you know, the bulk of these attorney's fees could

22   have been avoided if the father did not raise, you know,

23   the issue of fraud and a fake bruise and all that other

43

1    stuff, all the conspiracy theories that we had to deal

2    with for, like, seven days of trial.

3             And I wouldn't be surprised, Your Honor,

4    considering that Mr. Bauserman kept mentioning, you know,

5    that he's creating a record, that, you know, the father

6    will be appealing this decision.

7             THE COURT:  They have a right to do that.

8             MR. KUBLAN:  Absolutely, Your Honor.

9             THE COURT:  They have the right to do that.

10            MR. KUBLAN:  Absolutely, I mean, he has the

11   right to do that, but the issue is that my client is

12   completely out of money at this point.  So, I mean, she's

13   spent a significant amount of money to defend herself, and

14   not just from the legal piece.

15            I'm talking about the expertise and many other

16   things, you know, they had to go into this litigation to

17   basically to prove her innocence and to stand up for the

18   child.

19            So I don't know if Your Honor wants to have a

20   separate hearing on that, or if we can just submit some

21   kind of brief or something.  I mean, I'd obviously be

22   amenable to that.

23            THE COURT:  Mr. Bauserman, your position?

44

1          MR. BAUSERMAN:  So, Your Honor, Mr. Wilson's

2    position on that is that I would like to see Mr. Kublan's

3    attorney's fees affidavit and review it ahead of time and

4    to see if I have any argument on it.

5          So I think we probably do need to reconvene

6    and, you know, reserve at least half an hour, depending

7    on, you know, to an hour to review that.  I mean, I'm not

8    going to try to guess what his attorney's fees might be.

9          THE COURT:  Well, I think, given the

10   complexity of all of the issues here, that having an

11   opportunity to review it ahead of time is eminently fair,

12   and so I have no problem.

13         Mr. Kublan, when do you believe you can get

14   Mr. Bauserman your attorney's fees affidavit?

15         MR. KUBLAN:  Either today or tomorrow, Your

16   Honor.

17         THE COURT:  I'm sorry?

18         MR. KUBLAN:  Either today or tomorrow.  I

19   actually have the affidavit right here with me, you know,

20   here in the (unintelligible).

21         THE COURT:  All right.  So he gets it to you -

22   - assuming it's the end of the day today, Mr. Bauserman,

23   so it's really tomorrow -- what kind of time would you

45

1   like, and would you just prefer to do a hearing, or would

2   you prefer to submit something in writing?  I'm happy to

3   handle it either way.

4            MR. BAUSERMAN:  I think I'd prefer to have --

5   appear in person, Your Honor, and respond.

6            THE COURT:  Okay.  Two weeks, is that enough

7   time, three weeks?  When would you like to try to do it?

8   I'm available -- well, I'm not terribly available, but we

9   can find an afternoon time other than the last week in

10   October.  I know I cannot do the 4th, the 5th, and I

11   cannot do the week of the 18th.

12            But I can do possibly the 6th, possibly --

13   well, the 6th is just next week.  Possibly the 13th,

14   possibly the end of the week of the 18th.

15            MR. BAUSERMAN:  So I have a full three days of

16   trial the week of the 18th, Monday, Tuesday and Wednesday.

17            THE COURT:  Okay.  Do you want to do it in

18   November?

19            MR. KUBLAN:  I mean, obviously, our

20   preference, Your Honor, is to do it as soon as possible,

21   because --

22            THE COURT:  I know, Mr. Kublan, but I'm out

23   the entire last week in October.  It sounds like Mr.

46

1   Bauserman is out a bunch the third week in October.  So, I

2   mean, we can try to find a date sometime, the 13th, 14th,

3   15th of October, that week of the 11th, but otherwise I

4   think we're into November.

5           MR. KUBLAN:  I have, Your Honor, availability

6   on the 14th, Your Honor.  I also can do the 15th.  So, I

7   mean, are any of those dates available for Mr. Bauserman?

8           MR. BAUSERMAN:  The afternoon of the 14th is

9   not available to me, but the morning is, and the afternoon

10  of the 15th is available.

11          MR. KUBLAN:  It's available for me, too, Your

12  Honor, if you have availability on the Court's schedule.

13          MR. BOOK:  Your Honor --

14          THE COURT:  This doesn't really affect you;

15  right?

16          MR. BOOK:  I was going to suggest that if I do

17  not need to participate, I don't want to hold up anybody's

18  schedule.

19          THE COURT:  Okay.  Do you think an hour is

20  enough time?

21          MR. BAUSERMAN:  Yes.

22          MR. KUBLAN:  I would think so, Your Honor,

23  yes.

47

1          THE COURT:  All right.  How about if we set it

2     on the afternoon of the 15th at, say, 2:00?

3          MR. KUBLAN:  And that's October 15th, Your

4     Honor, right?

5          THE COURT:  Yes, October the 15th.

6          MR. KUBLAN:  Yes.

7          MR. BAUSERMAN:  So that would be --

8          THE COURT:  You have a trial starting on

9     Monday, or would that really create an issue for you?

10          MR. BAUSERMAN:  It's not ideal, but --

11          THE COURT:  Yeah, I don't think it's ideal

12     either.  Would you prefer the morning of the 14th?

13          MR. BAUSERMAN:  I would.

14          THE COURT:  Does that work for you, Mr.

15     Kublan?

16          MR. KUBLAN:  Yes, Your Honor, certainly.

17          THE COURT:  Do I have a trial set that day?  I

18     know I had something on the 14th.  It's a carry-over,

19     yeah, it's a carry-over of a case.

20          But could we do this at 9:00 via Teams?  Would

21     that work for all of you, and then we could be done by

22     10:00?

23          MR. KUBLAN:  Yes, Your Honor, absolutely.

48

1          MR. BAUSERMAN:  Yes, Your Honor.

2          THE COURT:  All right.  So we'll go ahead and

3    set it at 9:00 a.m. on October the 14th.

4          MR. KUBLAN:  And, Your Honor, before you

5    leave, we do have one small issue here.  The father still

6    continues to hold the passport, the child's passport.

7          Can we ask him to surrender it to the mother

8    at this point?

9          THE COURT:  Is there any idea that she's going

10   to be traveling internationally with him right now?  I

11   just don't want to inject another issue into the case that

12   doesn't need to be in there.

13         MR. KUBLAN:  Well, she doesn't have any plans

14   to travel anywhere, but I believe, in light of the Court's

15   decision that my client has sole legal custody, I think

16   it's appropriate for her to keep that passport at this

17   point.

18         THE COURT:  Mr. Bauserman, why don't we just

19   address that on the 14th as well, so that you have an

20   opportunity to talk with your client.  I think she should

21   be entitled to it, but why don't we just take that up on

22   the morning of the 14th as well.

23         MR. BAUSERMAN:  All right.

49

1          THE COURT:  All right, thank you all.

2          MR. KUBLAN:  Thank you, Your Honor.

3          (Whereupon, at approximately 3:39 o'clock

4    p.m., the proceedings in the above-entitled matter were

5    concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

50

* * * * *

CERTIFICATE OF REPORTER

I, MICHELLE L. DONATH, a Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_____
MICHELLE L. DONATH
Verbatim Reporter